## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA



**FILED**

**NOV 0 9 1999**

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

**KENNETH CAMPBELL**
**365 Lowther Street**
**Lemoyne, Pennsylvania 17043**

**and**

**DONALD BATTS**
**545 Lincoln Drive**
**Rocky Mount, North Carolina 27801**

**and**

**PATRICIA YOUNG-BOSEMAN**
**336 11th Street, S.E.**
**Washington, D.C. 20003**

**and**

**KENNETH MCDANIEL**
**19755 Framingham Drive**
**Gaithersburg, Maryland 20879**

**and**

**VICKI JONES-WHITTIES**
**4008 Livingstone Place**
**Durham, North Carolina 27707**

**and**

**TREADWELL SMITH**
**12401 South Yale Avenue**
**Chicago, Illinois 60628-7211**

**and**

**SABRENNA MUMPHREY**
**7437 Heronwood Lane**
**Charlotte, North Carolina 28227**

**and**

**RICKY MURDOCK**
**773 Harris Street**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CIVIL ACTION NO.:**
**[Jury Trial Demanded]**

**CLASS ACTION**
CASE NUMBER   1:99CV02979

JUDGE: Emmet G. Sullivan

DECK TYPE: EEOC

DATE STAMP: 11/09/1999

**JURY ACTION**

Concord, North Carolina 28025                          )
                                                       )
and                                                    )
                                                       )
CHARMIN BARROW                                         )
3800 Texas Drive                                       )
Apt. 130                                               )
New Orleans, Louisiana 72114                           )
                                                       )
and                                                    )
                                                       )
TIMOTHY MCKISSIC                                       )
3819 Lovett Circle                                     )
Charlotte, North Carolina 28210                        )
                                                       )
and                                                    )
                                                       )
CARLOS BELGRAVE                                        )
5214 Bethany Lane                                      )
West Palm Beach, Florida 33415                         )
                                                       )
and                                                    )
                                                       )
AUDLEY BOLAND                                          )
2367 Northwest 82nd Way                           )
Sunrise, Florida 33322                                 )
                                                       )
and                                                    )
                                                       )
DONALD RODGERS                                         )
102 Gettys Drive                                       )
Gaffney, South Carolina 29341                          )
                                                       )
and                                                    )
                                                       )
HAROLD REDFERN                                         )
9225 Otter Creek Drive                                 )
Charlotte, North Carolina 28277                        )
                                                       )
and                                                    )
REACHELLE FRANCIS                                      )
9327 Stroelitz Street                                  )
New Orleans, Louisiana 70118                           )
                                                       )
and                                                    )
                                                       )

2

**BERTHA KELLY**
1480 West 73rd Place
Chicago, Illinois 60636

and

**MICHAEL HELTON**
4838 West Washington Boulevard
Chicago, Illinois 60644

and

**WILLIAM MILLER**
2015 South 10th Avenue
Maywood, Illinois 60153

and

**DARYL LATHAM**
14351 South Lincoln Avenue
Dalton, Illinois 60419

and

**LYSA RIDLEY-JONES**
1048 Flat Shoals Road #404
College Park, Georgia 30309

and

**DARRELL JOHNSON**
4149 Blenheim Road
Charlotte, North Carolina 28208

and

**KIRK MARSHALL**
131 North Mason
Unit 203
Chicago, Illinois 60644

and

**CARL BETTERSON,**
5634 Hunters Valley

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

3

Lithonia, Georgia 30038,                              )

Individually and on Behalf of Others                  )
Similarly Situated, and                               )
                                                      )
THE PENNSYLVANIA FEDERATION OF                        )
THE      BROTHERHOOD      OF                           )
MAINTENANCE OF WAY EMPLOYES                            )
1930 Chestnut Street                                  )
Suite 607-609                                         )
Philadelphia, PA 19103                                )
                                                      )
          PLAINTIFFS,                                 )
                                                      )
v.                                                    )
                                                      )
NATIONAL RAILROAD PASSENGER                           )
CORPORATION                                           )
400 North Capitol Street, N.W.                        )
Washington, D.C. 20001                                )
                                                      )
          DEFENDANT, and                              )
                                                      )
INTERNATIONAL BROTHERHOOD OF                          )
ELECTRICAL WORKERS,                                   )
                                                      )
INTERNATIONAL BROTHERHOOD OF                          )
FIREMEN & OILERS,                                     )
                                                      )
BROTHERHOOD OF LOCOMOTIVE                             )
ENGINEERS,                                            )
                                                      )
T R A N S P O R T A T I O N                           )
COMMUNICATIONS UNION,                                 )
                                                      )
UNITED TRANSPORTATION UNION,                          )
                                                      )
AMERICAN RAILWAY SUPERVISORS                          )
ASSOCIATION (A DIVISION OF THE                        )
T R A N S P O R T A T I O N                           )
COMMUNICATIONS UNION),                                )
                                                      )
SHEETMETAL WORKERS' UNION,                            )
                                                      )
BROTHERHOOD OF RAILWAY                                )
SIGNALMEN,                                            )
                                                      )

4

TRANSPORT WORKERS' UNION,                    )
                                             )
BROTHERHOOD    OF    RAILWAY                  )
CARMEN-TCU,                                   )
                                             )
INTERNATIONAL  ASSOCIATION  OF               )
MACHINISTS, and                              )
                                             )
AMTRAK    SERVICE    WORKERS'                 )
COUNCIL,                                      )
                                             )
        AS ADDITIONAL DEFENDANTS             )
        UNDER RULE 19, FED. R. CIV. P.       )
                                             )

## COMPLAINT — CLASS ACTION

## I.    NATURE OF THIS ACTION

1.    The Plaintiffs bring this action against the National Railway Passenger Corporation (hereinafter "Amtrak") to redress race discrimination in employment. Specifically, the named Plaintiffs, all of whom are present or former employees or applicants for employment within Amtrak's Intercity Strategic Business Unit ("Intercity SBU"), bring this class action against Amtrak on behalf of themselves and all other African-American employees and applicants for employment within Amtrak's Intercity SBU who are similarly situated pursuant to 42 U.S.C. § 1981 and Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000(e), et seq. (hereinafter "Title VII").

2.    The named Plaintiffs are seeking, on behalf of themselves and the classes they seek to represent, declaratory and injunctive relief, back pay, front pay, compensatory and punitive damages, and attorneys' fees, costs, and expenses to redress Amtrak's pervasive and racially discriminatory employment policies, practices and procedures.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201, and 2202, 42 U.S.C. § 1981, and Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000(e), *et seq.*

4.    Venue is proper in the District of Columbia because Amtrak resides here, maintains its corporate headquarters here, maintains its personnel records here, determines and implements here its company-wide policies, practices and procedures which have affected the named Plaintiffs, engages in and/or ratifies here illegal conduct which has adversely affected the named Plaintiffs, and engages in corporate activities, such as the implementation of discriminatory employment policies, practices and procedures, which are conceived and carried out here.

## III.    CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII

5.    The named Plaintiffs have fulfilled or are in the process of fulfilling all conditions precedent to the institution of this action under Title VII.  Specifically, Daryl Latham, Carlos Belgrave, Audley Boland, and Kenneth Campbell have filed  charges with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the last discriminatory action and have filed suit within ninety (90) days of receipt of their right-to-sue letters from the EEOC.  Other named Plaintiffs are in the process of filing and perfecting their Title VII administrative charges of discrimination with the EEOC and this pleading will be supplemented as additional right-to-sue letters are received.

6.    The named Plaintiffs are relying on their own EEOC charges and/or those of other named Plaintiffs.  The Plaintiffs' claims arising under 42 U.S.C. § 1981 do not require administrative exhaustion.

## IV.    PARTIES

### A.    Plaintiffs

7.    Plaintiff Kenneth Campbell is an African-American citizen of the United States and a resident of the State of Pennsylvania. He has been continuously employed by Amtrak in its Intercity SBU from May 19, 1986 to the present and is presently working as an Assistant Conductor in the Transportation Department of the Intercity SBU. Campbell is represented for purposes of collective bargaining by the United Transportation Union (hereinafter "UTU").

8.    Plaintiff Donald Batts is an African-American citizen of the United States and a resident of the State of North Carolina. He has been continuously employed with Amtrak since October 1987, and is presently working as a Station Agent in the Intercity SBU. Batts is represented for purposes of collective bargaining by the United Transportation Union ("UTU").

9.    Plaintiff Patricia Young-Boseman is an African-American citizen of the United States and a resident of the District of Columbia. She was hired by Amtrak as a Coach Attendant in the Intercity SBU on June 14, 1994. She became a Food Specialist in November of 1994 and was made a Lead Service Attendant in October of 1995. During her employment with Amtrak, Young-Boseman has been represented for purposes of collective bargaining by the Transport Workers' Union ("TWU").

10.    Plaintiff Kenneth McDaniel is an African-American citizen of the United States and a resident of the State of Maryland. He has been employed by Amtrak as a Service Attendant/Train Attendant in the Onboard Services Department of its Intercity SBU from

7

November 12, 1973 to the present. During his employment with Amtrak, McDaniel has been represented for purposes of collective bargaining by the TWU.

11.    Plaintiff Vicki Jones-Whitties is an African-American citizen of the United States and a resident of the State of North Carolina. She has been continuously employed by Amtrak since 1989, and is presently working as a Station Agent in the Intercity SBU. Jones-Whitties is represented for purposes of collective bargaining by the Transportation Communications Union ("TCU").

12.    Plaintiff Treadwell Smith is an African-American citizen of the United States and a resident of the State of Illinois. He is presently employed by Amtrak as a Foreman III in the Engineering Department, Maintenance of Way Division, of the Intercity SBU. Smith has been continuously employed by Amtrak in its Intercity SBU since November 16, 1987 and is currently represented for purposes of collective bargaining by the TCU and the American Railway Supervisors Association ("ARSA"), a division of the TCU.

13.    Plaintiff Sabrenna Mumphrey is an African-American citizen of the United States and a resident of the State of North Carolina. She has been continuously employed by Amtrak since July 14, 1994 and is presently working as a Relief Lead Ticket Agent in the Customer Services Department of the Intercity SBU. Mumphrey is represented for purposes of collective bargaining by the TCU.

14.    Plaintiff Ricky Murdock is an African-American citizen of the United States and a resident of the State of North Carolina. He has been continuously employed by Amtrak in its Intercity SBU since October 30, 1992, and is presently working as a Ticket Clerk in the Customer Services Department of its Intercity SBU. Murdock is represented for purposes of collective bargaining by the TCU.

8

15.    Plaintiff Charmin Barrow is an African-American citizen of the United States and a resident of the State of Louisiana. She has been continuously employed by Amtrak in its Intercity SBU since October 9, 1996, and is presently working as a Lead Service Attendant in the On Board Services Department of its Intercity SBU. Barrow is represented for purposes of collective bargaining by the TCU.

16.    Plaintiff Timothy McKissic is an African-American citizen of the United States and a resident of the State of North Carolina. He has been continuously employed by Amtrak since May 23, 1986, and is presently working as a Locomotive Engineer in the Transportation Department of its Intercity SBU. McKissic is represented for purposes of collective bargaining by the Brotherhood of Locomotive Engineers ("BLE").

17.    Plaintiff Carlos Belgrave is an African-American citizen of the United States and a resident of the State of Florida. He has been continuously employed by Amtrak since 1973 and is presently working as Carman/Car Inspector in the Mechanical Department of its Intercity SBU. Belgrave is represented for purposes of collective bargaining by the TCU.

18.    Plaintiff Audley Boland is an African-American citizen of the United States and a resident of the State of Florida. He has been employed by Amtrak since July 30, 1993 and is presently working as an Electrician in the Mechanical Department of its Intercity SBU. Boland is represented for purposes of collective bargaining by the International Brotherhood of Electrical Workers ("IBEW").

19.    Plaintiff Donald Rodgers is an African-American citizen of the United States and a resident of the State of Florida. He has been employed by Amtrak in its Intercity SBU since August 25, 1986, and is presently working as a Conductor in the Transportation

Department of Amtrak's Intercity SBU. Rodgers is represented for purposes of collective bargaining by the UTU.

20.    Plaintiff Harold Redfern is an African-American citizen of the United States and a resident of the State of North Carolina. He has been, since 1991, and is presently employed by Amtrak in its Intercity SBU as an engineer. During his employment by Amtrak, Redfern has been represented for purposes of collective bargaining by the BLE.

21.    Plaintiff Reachelle Francis is an African-American citizen of the United States and a resident of the State of Louisiana. She was employed by Amtrak as a Train Attendant/Service Attendant in the Customer Services Department of its Intercity SBU from June 16, 1997 until her discharge on December 1, 1997. During her employment with Amtrak, Francis was represented for purposes of collective bargaining by the ASWC.

22.    Plaintiff Bertha Kelly is an African-American citizen of the United States and a resident of the State of Illinois. Kelly applied for the position of Cook in Amtrak's Intercity SBU in June of 1998, but was denied the position.

23.    Plaintiff Michael Helton is an African-American citizen of the United States and a resident of the State of Illinois. He has been continuously employed by Amtrak since October 23, 1989, and is presently working as a Baggage Clerk in the Mail Baggage and Express Department of its Intercity SBU. Helton is represented for purposes of collective bargaining by the TCU.

24.    Plaintiff William Miller is an African-American citizen of the United States and a resident of the State of Illinois. He has been continuously employed by Amtrak in its Intercity SBU since February 29, 1988, and is presently working as a Release Lead in the

10

Mail Baggage & Express Department of its Intercity SBU.  Miller is represented for purposes of collective bargaining by the TCU.

25.    Plaintiff Darryl Latham is an African-American citizen of the United States and a resident of the State of Illinois.  He has been continuously employed by Amtrak in its Intercity SBU since August 6, 1983, and is presently working as an Administrative Chief in the On Board Services Department of its Intercity SBU.  Latham is represented for purposes of collective bargaining by the ARSA.

26.    Plaintiff Lysa Ridley-Jones is an African-American citizen of the United States and a resident of the State of Georgia.  Jones has been continuously employed by Amtrak since 1986, and is presently working as a Ticket Agent in Atlanta, Georgia.  Ridley-Jones is represented for purposes of collective bargaining by the TCU.

27.    Plaintiff Darrell Johnson is an African-American citizen of the United States and a resident of the State of Georgia.  He has been employed at Amtrak since September 25, 1989, and is presently working in Charlotte Facility as a ticket agent/baggageman.  Johnson is represented for purposes of collective bargaining by the TCU.

28.    Plaintiff Kirk Marshall is an African-American citizen of the United States and a resident of the State of Illinois.  He was initially employed by Amtrak in its Intercity SBU in Chicago on November 26, 1986 as a Commissary Clerk.  In approximately 1992, Marshall transferred to the position of ticket clerk in the Ticket Office.  In approximately 1997, Marshall transferred back to the position of Commissary Clerk.  Marshall remained in that position until his resignation in 1997.  During his employment with Amtrak, Marshall was represented for purposes of collective bargaining by the TCU.

29.    Plaintiff Carl Betterson is an African-American citizen of the United States and a resident of the State of Georgia.  He has been continuously employed by Amtrak since July 16, 1975, and is currently working as a Ticket Agent in Atlanta, Georgia. Betterson is represented for purposes of collective bargaining by the TCU.

30.    Plaintiff The Pennsylvania Federation of the Brotherhood of Maintenance of Way Employes ("PFBMWE") is a labor organization headquartered in the State of Pennsylvania and doing business in the District of Columbia.  The Pennsylvania Federation of the BMWE represents, for purposes of collective bargaining with Amtrak, the maintenance of way workers, such as trackmen, in the Chicago portion of Amtrak's Intercity SBU.

31.    Defendant Amtrak is a corporation incorporated under the laws of, and with its principal place of business in, the District of Columbia.  It provides passenger rail service to more than five hundred (500) stations in forty-four (44) states.  From its corporate office in the District of Columbia, located at 400 North Capitol Street, N.W., Amtrak maintains actual and/or constructive control, oversight, and/or direction over all of its operations at all of its various locations, including the employment policies, practices and procedures to be utilized and adhered to at all of its locations. The acts set forth in this Complaint were authorized, ordered and/or done by Amtrak's officers, agents, employees, and/ or representatives while actively engaged in the management of Amtrak's business.

32.    Defendants IBEW, International Brotherhood of Firemen & Oilers ("IBF&O"), BLE, TCU, UTU, ARSA, ASWC, Sheetmetal Workers' Union ("SWU"), Brotherhood of Railway Signalmen ("BRS"), Transportation Workers' Union ("TWU"), Brotherhood of Railway Carmen-TCU ("BRC"), and International Association of Machinists ("IAM")

12

(collectively the "Unions") are labor organizations, each representing some of the named Plaintiffs and/or some of the putative class members for purposes of collective bargaining with Amtrak.  The Unions are entities subject to suit under 42 U.S.C. § 1981 and Title VII of the Act of Congress known as the "Civil Rights Act of 1964", 42 U.S.C. § 2000e et seq. as amended by the Civil Rights Act of 1991.

## V.    CLASS ACTION ALLEGATIONS

### A.    General Facts and Class Definition

33.    Amtrak is divided into three strategic business units, or "SBUs": the Northeast Corridor, Amtrak Intercity, and Amtrak West.   Amtrak's Northeast Corridor refers to the territory between Newport News, Virginia and Boston, Massachusetts, including connections to Springfield, Massachusetts, St. Albans, Vermont, Harrisburg, Pennsylvania, Buffalo, New York, and Toronto and Montreal in Canada.  Amtrak West refers to the geographic region of California, Oregon, and Washington.  The Amtrak Intercity SBU refers to the geographic region within the continental United States bordered by Amtrak West and the Northeast Corridor.  The Intercity SBU consists of a coordinated network of intercity rail services, including both short distance and long distance services.  All of the named Plaintiffs and all of the proposed class members have been employed, or have applied for employment, in Amtrak's Intercity SBU.

34.    All hourly, non-exempt employees who work in the Mechanical Department of Amtrak's Intercity SBU are represented for purposes of collective bargaining by the

13

IBEW or the IBF&O. There have been collective bargaining agreements in existence between Amtrak, the IBEW and the IBF&O concerning some of the named Plaintiffs and some members of the proposed classes throughout the applicable liability period.

35. All hourly, non-exempt employees who work in the Transportation Department of Amtrak's Intercity SBU are represented for purposes of collective bargaining by the UTU or the BLE. There have been collective bargaining agreements in existence between Amtrak, the UTU, and the BLE concerning some of the named Plaintiffs and some members of the proposed classes throughout the applicable liability period.

36. All hourly, non-exempt employees who work in the Customer Services Department of Amtrak's Intercity SBU are represented for purposes of collective bargaining by the TCU, the ASWC, or the ARSA. There have been collective bargaining agreements between Amtrak, the TCU, the ASWC and the ARSA concerning some of the named Plaintiffs and some members of the proposed classes throughout the applicable liability period.

37. All hourly, non-exempt employees who work in the Engineering Department within the Chicago portion of Amtrak's Intercity SBU are represented for purposes of collective bargaining by the PFBMWE. There has been collective bargaining agreements between Amtrak and the PFBMWE concerning some members of the proposed classes throughout the applicable liability period in this case.

38. The named Plaintiffs seek to maintain claims on their own behalf and on behalf of two classes of Amtrak employees and applicants. One or both of these classes may be divided into two or more subclasses at such time as the plaintiffs move for class certification. Each of the named Plaintiffs is a member of one of these two classes.

39.    The first class consists of all African-Americans who are, or have been, employed by Amtrak in hourly, non-exempt positions in its Intercity SBU and have experienced race discrimination at any time during the liability period (the "employee class").  All of the named Plaintiffs, except Bertha Kelly and Reachelle Francis, are proposed representatives of this class.

40.    The second class consists of all African-Americans who have applied and been rejected for employment by Amtrak for hourly, non-exempt positions in the Intercity SBU at any time during the liability period (the "rejected applicant class").  This class includes applicants who have applied and been rejected and those who have been terminated by Amtrak during their probationary period.  Plaintiffs Bertha Kelly and Reachelle Francis are the class representatives of this class.  At present, it is impossible to determine even an approximate number of the members of the proposed rejected applicant class; however, the Plaintiffs believe that the members of this class will number in the thousands.

41.    The named Plaintiffs seek to represent all of the African-American employees and rejected applicants described above who have been subjected to one or more aspects of the systemic racial discrimination and racial harassment described in this Complaint, including, but not limited to: discriminatory hiring and advancement policies, practices and procedures; disparate and hostile working conditions; discriminatory training policies, practices and procedures; disparate disciplinary policies, practices and procedures, discriminatory work and equipment assignments; the failure to promulgate, maintain and enforce effective racial harassment and/or non-discrimination policies, practices and

15

procedures;  and unequal terms and conditions of employment.  The systemic racial discrimination and racial harassment described in this Complaint reaches many years back in time, and has been and is continuing in nature.

### B.    Efficiency of Class Prosecution of Common Claims

42.    Certification of classes of African-American applicants and employees similarly situated to the named Plaintiffs is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the named Plaintiffs and the proposed classes.  The individual claims of the named Plaintiffs require resolution of the common question of whether Amtrak has engaged in a systemic pattern and/or practice of racial discrimination and racial harassment against African-American applicants and employees in its Intercity SBU.  The named Plaintiffs seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers and working conditions and in the lives, careers and working conditions of the proposed class members, and to prevent continued racial discrimination and/or racial harassment in the future.  The named Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination and/or harassment has had on them individually, and on African-Americans generally.  In order to gain such relief for themselves, as well as for the putative class members, the named Plaintiffs will first establish the existence of systemic racial discrimination as the premise for the relief they seek.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the proposed classes of African-Americans who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the

16

evidence and arguments necessary to resolve such questions for the named Plaintiffs, the proposed classes, and Amtrak. The named Plaintiffs' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

### C.    Numerosity and Impracticability of Joinder

43.    The classes which the named Plaintiffs seek to represent are too numerous to make joinder practicable. The proposed classes consist of several thousand former, current and future African-American applicants and employees who have been, are, or will be employed by Amtrak throughout the Intercity SBU during the liability period. By way of illustration, Amtrak currently employs approximately 6,000 employees in its Intercity SBU, approximately 2,000 of whom are African-American. Amtrak's pattern and/or practice of race discrimination also makes joinder impracticable by discouraging African-Americans from applying for or pursuing promotional, training or transfer opportunities, thereby making it impractical and inefficient to identify many members of the classes prior to determination of the merits of Amtrak's class-wide liability.

### D.    Common Questions of Law and Fact

44.    The prosecution of the claims of the named Plaintiffs will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the putative classes they seek to represent. The common questions of law would include, *inter alia*, whether Amtrak has engaged in unlawful, systemic race discrimination in its hiring, advancement, transfer, training, and discipline policies, practices and procedures, and in the general terms and conditions of work and employment; whether

17

Amtrak is liable for a continuing systemic violation of Title VII and/or Section 1981; and what are the proper standards for proving a pattern or practice of discrimination by Amtrak against its African-American applicants and employees. The common questions of fact would include, *inter alia*: whether Amtrak has, through its policies, practices and procedures, (a) precluded or delayed the hiring of African-Americans and/or the promotion of African-Americans into jobs traditionally held by white employees; (b) discouraged African-Americans from applying for employment and/or from seeking promotions and/or transfers into jobs traditionally held by white employees; (c) prevented African-Americans from learning about or competing for opportunities in jobs traditionally held by white employees; (d) subjected African-Americans to a racially hostile work environment; (e) segregated African-Americans into jobs and departments traditionally held and occupied by African-Americans; (f) failed to train or offer training to African-Americans so they could compete for positions traditionally held by white employees; and (g) subjected African-Americans to disparate disciplinary policies, practices, and procedures.

45.    The employment policies, practices and procedures within Amtrak's Intercity SBU are set at Amtrak's corporate level and do not vary from one geographical location to another within the Intercity SBU. These employment policies, practices and procedures are not unique or limited to any particular station or geographical area; rather, they apply to all stations and geographical areas and thus, affect the named Plaintiffs and proposed class members in the same ways no matter where they work in Amtrak's Intercity SBU.

46.    The collective bargaining agreements ("CBAs") between each of the Unions and Amtrak cover various topics relevant to the claims of the named Plaintiffs and the putative class members in this case, including: (1) the filling of vacant positions; (2) the

18

right of employees to demonstrate qualifications for positions; (3) the right of employees to train on equipment or for a particular job; (4) the right of employees to transfer; (5) discipline and/or termination for cause; (6) layoffs; and (7) the impact of seniority on each of these topics. The rules established by the CBAs concerning these issues are uniform throughout the Intercity SBU. This uniformity among the CBAs gives Amtrak's predominately white managers/supervisors freedom to make subjective decisions affecting the employees throughout the Intercity SBU despite the various Unions representing the employees.

47.    Throughout the liability period, about 33% of the approximately 6000 non-exempt employees in the Intercity SBU have been African-American. Throughout this same period, a disproportionately large percentage of the managers/supervisors in the Intercity SBU have been white.

48.    Discrimination in advancement occurs as a pattern and/or practice throughout all levels and all geographical areas of Amtrak's Intercity SBU. The white managers manipulate the CBA rules so that white employees receive better job assignments, better training opportunities, and better opportunities to demonstrate their qualifications for advancement. White managers also utilize their discretion under the CBAs to decide; whether to permit on-the-job training, and if so, which employees will receive opportunities to train; whether an employee is ready to be tested on a particular job or piece of equipment; the type of test to be used; and the ultimate determination of whether the employee is qualified for advancement to a better work assignment or position. As a result, white employees have advanced and continue to advance more rapidly to better and

19

higher paying non-exempt jobs, including Foreman positions, than do African-American employees.

49.    Amtrak's policies, practices and procedures have had an adverse impact on African-American employees seeking advancement to better and higher paying positions within the Intercity SBU.  In general, the higher the level of the job classification, the lower the percentage of African-American employees holding it.

## E.    Typicality of Claims and Relief Sought

50.    The claims of the named Plaintiffs are typical  of the claims of the proposed classes.  The named Plaintiffs assert claims in each of the categories of claims asserted on behalf of the proposed classes.  The relief sought by the named Plaintiffs is also typical of the relief which is sought on behalf of the proposed classes.

51.    The named Plaintiffs are all hourly, non-exempt employees who have worked, or applicants who have sought employment, in the same departments and classifications of the Intercity SBU as those where the members of the proposed classes in this case have worked or sought employment.

52.    Discrimination in training, qualifications, evaluations and advancement affects the compensation of the named plaintiffs and all the employee class members in the Intercity SBU in the same ways: wages are tied to job level, and opportunities for overtime work are greater for employees with better qualifications.  In situations involving layoffs, qualifications and evaluations affect bumping rights of the named Plaintiffs and the employee class members in the same ways.

53.    Discrimination in discipline occurs as a pattern and/or practice throughout all levels and geographic areas of Amtrak's Intercity SBU.  The white managers in the Intercity

20

SBU have manipulated the rules in the CBAs so that African-American, non-exempt employees, including both the named Plaintiffs and the employee class members, have been disciplined more frequently and more severely than their white counterparts.

54. Discrimination in the form of a hostile work environment occurs as a pattern and/or practice throughout all levels and all geographical areas of Amtrak's Intercity SBU and affects the named Plaintiffs and the members of the employee class in the same ways. The white managers and supervisors in the Intercity SBU have used derogatory language when speaking to and about African-American employees, have described African-Americans generally in negative and stereotypical terms, have retaliated against African-American, non-exempt employees who have sought to enforce their rights, have made it clear in various ways that they favor white, non-exempt employees, and otherwise have created a working environment hostile to African-American employees. They have also condoned hostile words and actions by white, non-exempt employees which has added to the already hostile working environment.

55. African-American, non-exempt employees have complained repeatedly to Amtrak management about race discrimination and the racially hostile work environment. Amtrak's investigations into these complaints have been inadequate and unresponsive. Amtrak has failed to implement adequate procedures to detect and correct this pattern and/or practice of discrimination.

56. Amtrak has failed to create adequate incentives for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices and procedures described in this Complaint and/or has failed to adequately discipline its managers and other employees when they violate the law.

21

57.    The relief necessary to remedy the claims of the named Plaintiffs is exactly the same as that necessary to remedy the claims of the proposed class members in this case. The named Plaintiffs seek the following relief for their individual claims and those of the members of the proposed classes: (a) a declaratory judgment that Amtrak has engaged in systemic racial discrimination against African-American applicants and employees by subjecting them to a racially hostile work environment, by limiting their ability to be promoted to better and higher paying positions, by limiting their employment opportunities to lower and less desirable classifications, by limiting their training and transfer opportunities, by exposing them to less desirable terms and conditions of employment, and by limiting the number of them hired into Amtrak and hired into preferable higher paying contract positions; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effects a restructuring of Amtrak's hiring, promotion, transfer, training, work environment, and discipline policies, practices and procedures so that African-Americans will be able to fairly compete in the future for hire and for promotion, transfer and/or assignment to better and higher paying classifications with terms and conditions of employment traditionally enjoyed by white employees; (d) injunctive relief which effects a restructuring of Amtrak's workforce so that African-Americans are hired into and promoted into higher and better paying classifications which they would have held in the absence of Amtrak's past racial discrimination; (e) back pay, front pay, compensatory and punitive damages and other equitable remedies necessary to make the African-American applicants and employees whole from Amtrak's past discrimination; and (f) attorneys' fees, costs and expenses.

**F.    Adequacy of Representation**

22

58.    The named Plaintiffs/Class Representatives' interests are coextensive with those of the members of the proposed classes in this case.  Each seeks to remedy Amtrak's discriminatory employment policies, practices and procedures so that African-Americans will no longer be subjected to a racially hostile work environment, will not be segregated into lower paying positions, will not be prevented from being hired, and once hired, will not be prevented from obtaining higher paying and more desirable positions. The named plaintiffs are willing and able to represent the two (2) proposed classes fairly and vigorously as they pursue their similar individual claims in this action.  The named Plaintiffs have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience and resources of the named Plaintiffs and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Fed.R.Civ.P. 23(a)(4).

G.    Requirements of Rule 23(b)(2)

59.    Amtrak has acted on grounds generally applicable to the named Plaintiffs and proposed classes by adopting and following systemic policies, practices and procedures which are racially discriminatory.  Racial discrimination is Amtrak's standard operating procedure rather than a sporadic occurrence.  Amtrak has refused to act on grounds generally applicable to the classes by, inter alia:  (a) refusing to adopt and apply selection, transfer, discipline and training policies, practices and procedures which do not have a disparate impact on or otherwise systemically discriminate against African-Americans; (b) refusing to provide equal terms and conditions of employment for African-Americans; and

23

(c) refusing to provide a working environment free of racial harassment. Amtrak's systemic discrimination and refusal to act on grounds that are not racially discriminatory has made appropriate final injunctive and declaratory relief with respect to both classes as a whole.

60.    Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of Amtrak's individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the named Plaintiffs' and class members' entitlement to monetary and non-monetary remedies at Stage II of such trial. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic racial discrimination against African-American applicants and employees in Amtrak's Intercity SBU.

**H.    Requirements of Rule 23(b)(3)**

61.    The common issues of fact and law affecting the claims of the named Plaintiffs and proposed class members, including, but not limited to, the common issues identified in paragraphs 44 - 49 above, predominate over any issues affecting only individual claims.

62.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the named Plaintiffs and members of the proposed classes.

63.    The cost of proving Amtrak's pattern or practice of discrimination makes it impracticable for the named Plaintiffs and members of the proposed classes to control the prosecution of their claims individually.

64.    The Plaintiffs are not aware of any pending race discrimination lawsuit brought against Amtrak by a member of the proposed classes in this case.

24

65.    The District of Columbia is the most logical forum in which to litigate the claims of the named Plaintiffs and the proposed classes in this case. Amtrak's headquarters are in Washington, D.C.; Washington, D.C. is within the Intercity SBU; and the related cases of *Thornton et al. v. Amtrak*, Civil Action Number 1:98CV00890 (EGS) and *McLaurin et al. v. Amtrak*, Civil Action Number 1:98CV02019 (EGS) are pending in this Court.

## VI.    CLASS CLAIMS

66.    The named Plaintiffs and the putative classes they seek to represent, have been subjected to systemic pattern and/or practice of racial discrimination involving a battery of practices, including the use of written tests, which have had an unlawful disparate impact on them and their employment opportunities. Such racial discrimination includes adhering to a policy and practice of restricting the hiring of African-Americans and, if hired, restricting the advancement opportunities of African-American employees so that they remain in the lower classification and compensation levels. Amtrak in effect bars African-Americans from better and higher paying contract positions which have traditionally been held by white employees. The systemic means of accomplishing such racial stratification include, but are not limited to, Amtrak's selection, training and transfer policies, practices and procedures.

67.    Amtrak's hiring, advancement, training, and transfer policies, practices and procedures incorporate the following racially discriminatory practices: (a) relying upon subjective judgments, procedures and criteria which permit and encourage the incorporation of racial stereotypes and bias by Defendant's predominately white managerial staff in making hiring, promotion, transfer and training decisions; (b) refusing

25

or failing to provide equal training opportunities to African-Americans; (c) refusing or failing to provide African-Americans with opportunities to demonstrate their qualifications for advancement; (d) refusing or failing to establish and/or follow policies, practices, procedures or criteria that reduce or eliminate disparate impact and/or intentional racial bias or stereotypes; (e) refusing or failing to post or announce all vacancies or employment opportunities in a manner that would allow African-American employees and applicants to learn about such opportunities and compete for them before they are filled by white employees or applicants; (f) using informal subjective selection methods which do not rely upon formal applications or other safeguards to open the procedure to competition by African-Americans; (g) pre-selecting whites, through the use of selective training opportunities, before full-time job vacancies become generally known; (h) disqualifying African-American employees for vacancies by discriminatorily disciplining them; (i) discouraging applications and expressions of interest by African-Americans; (j) requiring employees and applicants seeking employed or to be promoted to higher and better paying positions to pass unnecessary written examinations; and (k) subjecting African-Americans to a racially hostile work environment.

68.    Amtrak's selection policies, practices and procedures have had a disparate impact on the African-American classes represented by the named Plaintiffs. Such procedures are not valid, job related or justified by business necessity. There are alternative objective, structured and more valid selection procedures available to Amtrak, which are more closely related to the actual responsibilities of the position, which would have less of a disparate impact on African-Americans. However, Amtrak has refused to consider or use such alternative procedures.

69.    Amtrak's selection, training and transfer policies, practices and procedures are intended to have a disparate impact on the named Plaintiffs and the classes they seek to represent.  Such practices form a part of Amtrak's overall pattern and/or practice of keeping African-Americans in the lower classifications which have less desirable terms and conditions of employment.

70.    Because of Amtrak's systemic pattern and/or practice of racial discrimination, the named Plaintiffs and classes they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, wages, back and front pay, other employment benefits, embarrassment, emotional distress, humiliation, indignity and resulting injury and loss.  This pattern and/or practice of racial discrimination includes: not being considered for traditionally white job classifications at the time of application, not being able to learn about or compete for employment opportunities in traditionally white job classifications after hire, not being appointed to traditionally white job classifications, not being given an opportunity to work in historically white positions, being denied training opportunities provided to white applicants and employees, being held in classifications and compensation levels traditionally occupied by African-Americans, being subjected to a racially hostile work environment, and being required to work in positions in which they and the other members of their race are demeaned.

71.    The named Plaintiffs and the classes they seek to represent have been subjected to a racially hostile work environment, both severe and pervasive, which affects the terms and conditions of their employment.  For example, white managers have used derogatory terms with respect to African-American employees, have described African-American employees, and African-Americans in general, in negative stereotypical terms,

27

have made it clear that they favor white employees over African-American employees, and otherwise have created a working environment hostile to African-American employees. Amtrak has condoned similar words and actions by white, non-exempt employees. Discrimination in this form occurs throughout Amtrak's Intercity SBU.

72.    African-American employees working in the Intercity SBU have repeatedly complained to their supervisors, including upper-level management at Amtrak, about the racially hostile work environment.  Amtrak managers have conducted inadequate and/or superficial investigations of these complaints and have failed to implement adequate procedures to alter the hostile working environment.

73.    Amtrak has failed, throughout its Intercity SBU, to impose adequate discipline on any manager or employee violating the equal employment opportunity laws and has failed to create adequate incentives for its managerial personnel to comply with these laws regarding each of the employment policies, practices and procedures described above.

74.    The Plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief. The  Plaintiffs are now suffering and will continue to suffer irreparable injury from Amtrak's unlawful policies, practices and procedures as set forth herein unless those policies, practices and procedures are enjoined by this Court.

## VII.    ALLEGATIONS OF THE NAMED PLAINTIFFS.

75.    **Plaintiff Kenneth Campbell** is presently employed in Amtrak's Intercity SBU as an Assistant Conductor. He has been employed at Amtrak since May 19, 1986. During his employment at Amtrak, Campbell has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's hostile

work environment and its subjective selection policies, practices and procedures which have deprived Campbell of the opportunity of working in an integrated environment in which African-American employees hold higher level positions.

76.    Campbell began working for Amtrak on May 19, 1986 as a full-time Attendant.  In July of 1988, he became an Assistant Conductor.  In January of 1991, Campbell became a "Promoted Conductor."  In order to work as a Full-Time Conductor, Amtrak requires employees to complete "physical characteristics training."  This training is conducted by other Conductors and Engineers, the vast majority of whom are white. During Campbell's physical characteristics training, the white Conductors, Engineers, Supervisors, and Managers withheld vital information from Campbell which he needed to pass.  Because of these actions by the white Conductors, Engineers and Supervisors/Managers, it took Campbell much longer to complete his physical characteristics training than it should have taken. Campbell finally completed his written and oral examinations and became a Full-Time Conductor in January, 1995.  Once in this position, the white Conductors, Engineers, and Supervisors/Managers began to severely harass, criticize and ridicule Campbell in an attempt to discourage him from continuing to hold the Full-Time Conductor position. These employees made it clear that they had no intention of taking orders from an African-American Conductor.

77.    In May of 1998, the racially hostile treatment encountered by Campbell became so severe and difficult to endure that he felt he had no other choice but to step down from his Conductor position to the Assistant Conductor position which he presently holds.  Because of the severely hostile working conditions faced by him, Campbell has

29

become discouraged from seeking further promotions to higher and better paying positions, like Full-Time Conductor.

78.    In June of 1996, Campbell complained to Amtrak's EEO representative, Sheila Davidson, about the continuing harassment to which he was being subjected at Amtrak. Davidson told Campbell that there was not much she could do for him, other than investigate his allegations, that she could not protect him from retaliation if she investigated his charges, and that she could not discipline the harassers even if it were proven that they were harassing him.

79.    In October of 1998, Campbell contacted Amtrak's Employee Advisory Program Representative, Mike Cipressi, and again complained about the retaliation and harassment he continued to face after his move back to Assistant Conductor. Cipressi's only advice was for Campbell to file a complaint.

80.    The racially motivated harassment which Campbell has had to endure includes: being falsely accused of rule violations, having his car vandalized, placing a sign on the wall stating "the all new and improved Campbell coupler coming soon", and placing a sign on Campbell's radio battery stating "Dumb, Dumb Campbell."

81.    As a result of Amtrak's discriminatory actions, Campbell has suffered extreme harm.

82.    **Plaintiff Donald Batts** is presently employed in Amtrak's Intercity SBU as a Station Agent. He was initially employed on October 18, 1987 as a Ticket Clerk/Baggage Handler in Alexandria, Virginia. Batts remained in this position until 1989 when he became a Ticket Clerk. In May of 1998, Batts was promoted to the position of Station Agent at Wilson, North Carolina.

30

83.    During his employment with Amtrak, Batts has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's pattern of subjective selection policies, practices and procedures which have deprived Batts of the opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.

84.    Amtrak has discriminated against Batts during his employment by denying him promotions to those better and higher paying positions which are traditionally held by white employees and from which he could have had a better opportunity to be promoted to still better and higher paying positions. For example, on November 27, 1996, Batts applied for Temporary Customer Service Supervisor, a contract position. At the time of his application, Batts was qualified for this position: he held a four (4) year college degree, had three (3) years of managerial experience, and had approximately nine (9) years of total experience with Amtrak. In January of 1997, Batts was interviewed for the Temporary Customer Service Supervisor position by Jerry Bridgeforth, a white supervisor, Sharon Gray, a white Human Resources Representative, and Daniel Aboud, a white District Supervisor. On January 29, 1997, Batts received a letter from Amtrak stating that he had not been selected for the position. Elizabeth Hill, a white female, was awarded the Temporary Customer Service Supervisor position.

85.    Batts was denied the position of Temporary Customer Service Supervisor because of his race. Batts was better qualified for this position than was Hill. He had more education, experience and seniority than did Hill. Batts learned after Hill's selection that Tom Fortune, a white train manager, had stated two (2) months before the position was

31

formally advertised, that Hill would be selected as the successful candidate for the position. As a result of Amtrak's discriminatory actions, Batts has suffered extreme harm.

86.    **Plaintiff Patricia Young-Boseman** was hired on June 14, 1994 as a Coach Attendant in Amtrak's Intercity SBU.   She was promoted to Food Specialist in November of 1994 and to Lead Service Attendant in October of 1995.  She has remained a Lead Service Attendant since October of 1995.

87.    During her employment by Amtrak, Young-Boseman has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's pattern of disparate discipline and its subjective selection policies, practices and procedures which have deprived Young-Boseman of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

88.    During her employment at Amtrak, Young-Boseman has been discriminated against in the discipline she has received.  Young-Boseman and African-American employees generally are treated more harshly in discipline than are their white co-workers. This pattern of harsher discipline culminated in Young-Boseman's discharge on January 19, 1998. Young-Boseman was terminated for alleged misappropriation of funds; however, Young-Boseman was not guilty of this conduct.  In fact, she was told that she could avoid discipline if she falsely accused another black employee of theft, which she refused to do. White employees, who are actually guilty of the same or similar misconduct alleged about Young-Boseman, have not been terminated by Amtrak.  Young-Boseman was terminated solely because of her race. After her discharge, Young-Boseman filed a union grievance. After a hearing on the merits in June of 1999, the Public Law Board found that Amtrak's

32

articulated reason for discharging Young-Boseman was unworthy of credence and that Amtrak's termination of Young-Boseman was not justified. Therefore, Amtrak was ordered to reinstate Young-Boseman into her position of Lead Service Attendant.

89.    The inconsistent and discriminatory decisions by Amtrak described in the immediately proceeding paragraph were accomplished through the use of subjective decision-making by the predominantly white Amtrak managerial staff. Indeed, Amtrak has a pattern and/or practice of issuing Notices of Intent to Impose Discipline on white employees, but never imposing such discipline. African-American employees, on the other hand, are not treated this way; rather, Amtrak issues either a Notice of Intent to Impose Discipline or a Notice To Withhold From Service, or both, against them and then proceeds to impose the discipline or dismissal.

90.    Amtrak discriminated against Young-Boseman during her employment by denying her training for, and promotions into, those better and higher paying positions which are traditionally held by white employees and from which she could have had a better opportunity to promote to still higher positions. For example, in May of 1997, Young-Boseman submitted a letter application to Dan Butler, her white Train Manager, requesting assignment to the position of Chief Of On Board Services and requesting training for this position. However, Butler denied Young-Boseman the training, and refused to interview her for the position. Through a subjective decision-making process, the Chief of On Board Services position was awarded to a number of people, several of whom were white, less qualified, and junior to Young-Boseman. Young-Boseman was denied the position of Chief On Board Services because of her race.

33

91.    As a result of Amtrak's discriminatory actions, Young-Boseman has suffered extreme harm.

92.    **Plaintiff Kenneth McDaniel** was hired on November 12, 1973 as a Service Attendant/Train Attendant in the On Board Services Department.  He has remained in this position to the present, and has worked in the Intercity SBU since August 1996.

93.    During his employment by Amtrak, McDaniel has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's pattern of disparate discipline and its subjective selection policies, practices and procedures which have deprived McDaniel of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

94.    During his employment at Amtrak, McDaniel has been discriminated against in the discipline he has received.   McDaniel and African-American employees generally are disciplined more harshly than are their white co-workers.  This pattern of harsher discipline culminated in McDaniel's discharge on January 19, 1998.  McDaniel was terminated for alleged misappropriation of funds; however, McDaniel was not guilty of this conduct.  Rather, he was terminated solely because of his race.  In fact, he was told that he could avoid discipline if he falsely accused another black employee of theft, which he refused to do.  After his discharge, McDaniel filed a union grievance.  A hearing on the merits of this grievance was held in June of 1999 and the Public Law Board found that Amtrak's articulated reason for discharging McDaniel was unworthy of credence and that Amtrak's termination of McDaniel was not justified.  Amtrak was ordered to reinstate McDaniel into his position of Service Attendant/Train Attendant.  White employees, who are guilty or suspected of the same or similar misconduct alleged about McDaniel,

34

including, but not limited to Michael Cammarata, have not been investigated, disciplined or terminated by Amtrak.

95.    These inconsistent and discriminatory decisions by Amtrak were accomplished through the use of subjective decision-making by the predominantly white Amtrak managerial staff. Indeed, Amtrak has a pattern and/or practice of issuing Notices of Intent to Impose Discipline on white employees, but never imposing such discipline. African-American employees, on the other hand, are not treated this way; rather, Amtrak issues either a Notice of Intent to Impose Discipline or a Notice To Withhold From Service, or both, against them and then proceeds to impose the discipline or dismissal.

96.    Amtrak has discriminated against McDaniel during his employment by denying him promotions to those better and higher paying positions which are traditionally held by white employees and from which he could have had a better opportunity for promotion to still higher positions. For example, McDaniel submitted an application for the Supervisor of Terminal Services position in Washington, D.C., on or about March 11, 1998. McDaniel was qualified for this position. However, McDaniel received a letter dated June 3, 1998, stating that, although he was in fact qualified for the position, he would not be considered for it. Amtrak continued to seek other persons to fill this position. McDaniel was denied the position of Supervisor of Terminal Services because of his race and in retaliation for his prior complaints of race discrimination.

97.    As a result of Amtrak's discriminatory actions, McDaniel has suffered extreme harm.

35

98.    **Plaintiff Vicki Jones-Whitties** was initially hired by Amtrak on November 2, 1989 as a Baggage Agent in the Intercity SBU.  On July 7, 1996, Jones-Whitties was promoted to Lead Station Agent.  She has remained in this position to the present.

99.    During her employment at Amtrak, Vicki Jones-Whitties has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Jones-Whitties from advancing into higher and better paying positions such as Safety Training Coordinator, and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Jones-Whitties has been subjected to a racially hostile work environment and to disparate discipline.

100.    In 1995, Jones-Whitties was referred to as a "lazy nigger" by a white fellow employee, Allen Scalsboro.  She reported this incident to her supervisor.  At the conclusion of the resulting investigation, Scalsboro was told, "Don't do this anymore", but no disciplinary action was taken against him by Amtrak.

101.    Subsequent to this incident, another black ticket agent, who had been dating a white woman, was told by Scalsboro that if he (Scalsboro) ever again saw the black agent leaving the white woman's house, he would "...have to go get his rope".  Jones-Whitties told her white supervisor, Danny Best, how outraged she was by this incident. Best told Jones-Whitties that he could not talk to her about the incident because "there will probably be an investigation." However, no investigation ever took place and Scalsboro is still employed by Amtrak today.  Because of these incidents and the stress of working in such a racially hostile environment, Jones-Whitties obtained a transfer out of this district.

36

102.    On July 7, 1996,  Jones-Whitties transferred from Virginia to Durham, North Carolina to take the job of Lead Station Agent, a job which was supposed to have a significant amount of overtime built into it.   The North Carolina Amtrak supervisory personnel did not want Jones-Whitties to receive this position; rather, they wanted Tim Carol, a white male, to receive it.  In approximately April or May of 1997, the Lead Station Agent was re-bulletined and the overtime aspect removed, thereby depriving Jones-Whitties of her overtime pay.

103.    In July of 1997, J. McArthur, Jones-Whitties' white General District Manager, told Jones-Whitties that he was watching her, and that her job was in jeopardy if she deviated in any way from the established procedures.   Jones-Whitties was so traumatized by McArthur's threat that she had to "mark off" from work.

104.    After General District Manager McArthur's threat in 1997, Jones-Whitties was subjected to five (5) audits during the next year by her white supervisor, Bea Hill, including three (3) audits during the latter part of 1997 and early 1998. The first audit accused Jones-Whitties of several deviations from standard office procedures.   When Jones-Whitties, in her response to this audit, stated that the deviations were not attributable to her but rather, to her predecessor, Michael Parnell (white), Jones-Whitties was asked by Hill not to submit her reply "because it makes Michael look so bad."

105.    In October of 1997, Jones-Whitties inadvertently violated Amtrak's rule about giving at least two (2) hours notice if you are too sick to come to work.  Due to her illness, Jones-Whitties called in sick only 45 minutes before her starting time.   As a result of this violation, she was brought up on charges which, if sustained, could have led to her termination.  White employees who violate this rule are not brought up on such charges.

37

The charges against Jones-Whitties were not dropped until the day of the hearing. By contrast, a white ticket agent during the same week failed to show up for work, and never called in at all. The white ticket agent (who had been arrested, was in jail, and was subsequently convicted), was never brought up on any charges or disciplined by Amtrak in any way.

106.     As a result of the third audit in early 1998, Jones-Whitties was again brought up on unsubstantiated charges of non-performance which could have led to her termination by Amtrak. As with the previous audit, these charges were only dropped the day before the hearing.

107.     In the Spring of 1998, Brett McDaniel, a white ticket agent, was working under the supervision of Jones-Whitties. B. McDaniel had previously been given two (2) years probation for making racial slurs about a black employee in Charlotte, North Carolina. After being transferred to Durham, North Carolina, B. McDaniel was again written up and suspended for thirty (30) days for making rude remarks to a black passenger. After B. McDaniel's return to work, Jones-Whitties admonished B. McDaniel for inadequate performance. B. McDaniel responded with a contemptuous gesture, which was witnessed by a passenger. When Jones-Whitties called her white supervisor to report this act of insubordination, the supervisor responded that if she had to come over to the office, she would put both Jones-Whitties and B. McDaniel out of service. White supervisors who complain of insubordination are not treated in this manner.

108.     In the ensuing investigation regarding B. McDaniel, Amtrak failed to call the eye-witness, whose name and number had been furnished to Amtrak by Jones-Whitties. Thus, when B. McDaniel denied the charge, Amtrak told Jones-Whitties that nothing could

38

be done about it because it was a case of "his word against your word." Any black employee who committed such an act of insubordination similar to that committed by B. McDaniel would have been terminated on the spot by Amtrak.

109. In 1998, Jones-Whitties applied for the position of Safety Training Coordinator. The job was given to white employee Jim Turner, who had less experience and seniority than Jones-Whitties. When Jones-Whitties inquired why she was not even interviewed for the position, she was told that it was because there was a negative letter in her file. (This letter related to her having been tardy in calling in sick one time in the previous year.) Jones-Whitties was given no explanation as to why this same rule did not also disqualify Turner, who had been written up for acts of actual dishonesty, such as putting an employee's time card through the time clock long after the employee had left the premises. Indeed, white employees similarly situated to Jones-Whitties are not disciplined for such conduct. White supervisor Bea Hill placed the negative letter in Jones-Whitties' file because of Jones-Whitties' race and in retaliation for her being awarded the Lead Station Agent position in Durham, North Carolina.

110. As a result of Amtrak's discriminatory actions, as set forth above, Jones-Whitties has suffered extreme harm.

111. **Plaintiff Treadwell Smith** is presently employed as a Foreman III in the Intercity SBU. He has been employed by Amtrak since November 16, 1987. During his employment by Amtrak, Smith has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which have prevented Smith from advancing into higher and better paying positions at better locations and have deprived Smith of the

39

opportunity to work in an integrated environment in which African-American employees hold higher level positions. The promotions sought by Smith were given to less qualified white employees.

112.    In 1998, the Foreman II position at Union Station became open. There were no qualified white applicants for this position; only Ron Sutton, an African-American employee, was qualified for this position. However, Sutton was told he was not what Amtrak was looking for and was rejected for the job. This position was subsequently upgraded to a Foreman III position. Because the Foreman III position at Union Station was a more desirable job than the Foreman III position he held, Smith applied for the Union Station position. Smith was well qualified for the Union Station Foreman III position, as he had previously held the Foreman II position at Union Station. On August 10, 1998, Smith was awarded this position. However, Amtrak's personnel department rescinded the decision to re-assign Smith on August 14, 1998. The job was re-posted for bid on August 24, 1998 and Smith was the only black applicant. A less qualified, white employee, Patrick Sleigher, who had worked under Smith's supervision, was selected over Smith for the Foreman III position at Union Station on September 22, 1998. When Smith asked Steve Reynolds, the white decision-maker, why he had not been selected for the Foreman III position at Union Station, Reynolds said that Sleigher's interview responses regarding safety were more impressive than Smith's. However, the interviewers never questioned Smith about safety during his interview.

113.    Smith is currently working as a Foreman III in the Yard. The Foreman III position at Union Station, which was denied to Smith because of his race, would have paid Smith more money than his present job because of the available overtime and would have

40

offered Smith more desirable hours, which would have allowed him to attend school. The Foreman III position at Union Station is also preferable because its proximity to higher level positions offers more opportunity to advance.

114.    In addition to being denied promotions and/or transfers to better and higher paying positions, the white managers for whom Smith has worked have repeatedly tried to bully him into disciplining African-American employees for actions for which white employees are not disciplined. Smith has resisted imposing any such discipline on African-American employees, and the white managers have retaliated against him by accusing him of failing to perform his duties.

115.    Smith's current supervisor, Facility Maintenance Manager Ken Bibley, who is white, has referred to Hispanics as "wet backs" and has called an African-American an "uppity nigger."

116.    As a result of Amtrak's discriminatory actions, Smith has suffered extreme harm.

117.    **Plaintiff Sabrenna Mumphrey** was last employed as a Relief Lead Ticket Clerk in the Customer Services Department of Amtrak's Intercity SBU. She was initially hired on July 14, 1994 as a Ticket Agent. Mumphery's employment was terminated on March 12, 1998 by Deborah Wetter, a white Regional Manager, because Mumphrey had allegedly been sleeping on the job.

118.    During her employment by Amtrak, Mumphrey was adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including being subjected to a racially hostile work environment and being retaliated against when she objected to such hostile work environment. In approximately November of 1997,

41

Mumphrey observed a white Ticket Agent named Brett McDaniel ask Pamela Micheaux, an African-American employee who was sweeping the floor and had who recently had her hair colored, if black blondes were as "ditsy" as white blondes. McDaniel then taunted Micheaux by kicking her broom and tearing up pieces of paper and throwing them on the floor in front of her. The actions of McDaniel caused Micheaux to start crying. Mumphrey was offended by the conduct and comments of McDaniel and reported him to Station Manager John Quigley, a white male. Quigley took no formal disciplinary action against McDaniel; Mumphrey, on the other hand, was continually harassed by white Amtrak managers and co-employees after taking this action.

119. Mumphrey was denied certain privileges of employment which were enjoyed by her white co-workers. For example, it is the common practice at Amtrak to allow relatives of employees to ride the train free of charge. Indeed, Mumphrey had been directed by Quigley to allow his relatives to ride free on numerous occasions. However, when Mumphrey put her aunt on the train to ride free, Quigley took her out of service for thirty (30) days.

120. Quigley discriminated against Mumphrey in the terms and conditions of her employment by forcing her to work excessive overtime. On one occasion, when Mumphrey had already worked twenty-one (21) consecutive hours, Quigley refused to allow her to leave and forced her to work an additional six (6) hours.

121. Quigley constantly disciplined and/or threatened to discipline Mumphrey for acts for which similarly situated white employees were not disciplined or threatened with discipline. On or around February 8, 1998, Quigley falsely accused Mumphrey of sleeping on the job. As a result of these false accusations by Quigley, Mumphrey was fired.

42

Similarly situated white employees have in fact slept on the job and not been fired. Mumphrey, who was not sleeping on the job, was discharged because of her race.

122.    As a result of Amtrak's discriminatory practices, Mumphrey has suffered extreme harm.

123.    **Plaintiff Ricky Murdock** is presently employed as a Ticket Clerk in the Intercity SBU. He has been employed in this position since October 30, 1992. During his employment by Amtrak, Murdock has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which have deprived Murdock of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

124.    Murdock has been discriminated against in being denied promotions to better and higher paying positions. Throughout his employment at Amtrak, Murdock sought promotions to better and higher paying positions. However, he has never been awarded any of these jobs; rather, they have been awarded to white employees less qualified than him. For instance, in October of 1995, Murdock applied, and was tested, for the position of Conductor in Jacksonville, Florida. After completing and passing the written examination for Conductor, Murdock was denied an interview. Four white employees, three of whom had less seniority than Murdock, were appointed as Conductors instead of him. Murdock contacted Sharon Gray in the Personnel Department and received confirmation that he had passed the test. Murdock should have been awarded a Conductor's position; however, he was denied this position because of his race. Similarly, in May or June of 1997, Murdock applied for the position of Locomotive Engineer Trainee in Florence, South Carolina. He

43

was again denied this position, which was awarded to an equally or less qualified white employee.

125.    As a result of being continuously denied promotions to positions such as Conductor and Locomotive Engineer Trainer, Murdock has become discouraged from trying to advance to higher and better paying jobs.

126.    As a result of Amtrak's discriminatory actions, Murdock has suffered extreme harm.

127.    **Plaintiff Charmin Barrow** is presently employed as a Lead Service Attendant in the Intercity SBU.  She began working for Amtrak on or around October 9, 1996 as a Train Attendant.   In January of 1999, Barrow was promoted to the position of Lead Service Attendant.  During her employment by Amtrak, Barrow has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which have deprived her of the opportunity to work in an integrated environment in which African-American employees hold management positions.  In particular, Barrow has been discriminated against in promotions to better and higher paying positions. The promotions sought by Barrow were given to white employees equally or less qualified than her.  Amtrak has further discriminated against Barrow by subjecting her to a racially hostile work environment and adverse terms, conditions and privileges of employment.

128.    In January of 1998, several white employees were promoted over Barrow to Lead Service Attendant.  These white employees were Michelle Lott, Lucinda Demarest and Veronica LeCroix.  Supervisor Brett Samples told Barrow she could not go through the Lead Service Attendant class, which is necessary to obtain the Lead Service Attendant

44

position, because she had not been with the company for one year. However, white employees employed less than one year, such as Traci Strickland, were permitted to attend the Lead Service Attendant class.

129. Amtrak also pre-selects less qualified white employees and creates positions for them. African-American employees are not informed about these positions until the pre-selected white employees are already in them. For example, in February of 1999, Barrow was denied a promotion to the position of Select Service Training Coordinator. Because Amtrak failed to post this position, Barrow was even denied an opportunity to bid on this position. A less qualified, white employee named Bill Rawlins was selected for this position. Similarly, in March of 1999, Barrow was denied a promotion to Trainer for newly hired Train Attendants and Service Attendants. Because Amtrak failed to post this position, Barrow was also denied an opportunity to even apply for it. Judy Eaton, a less qualified white employee, was selected for this position.

130. In 1997, Barrow was denied a promotion to the position of On Board Service Chief. Because Amtrak failed to post this position for bid before filling it, Barrow was again denied an opportunity to even apply for it. After filling this position, Amtrak ultimately posted it on the bulletin board. When Barrow saw the posting for this job and asked about it, her supervisor, Gilda Lowe, informed her that the job of On Board Service Chief had been created specifically for Bill Rowlins, a white male .

131. In October of 1998, Barrow was denied a promotion to the position of Point of Sale Coordinator. Again, because Amtrak failed to post this position, Barrow was denied an opportunity to even apply for it. A less qualified white female, Michelle Lott, was promoted over Barrow to this position.

45

132.    White employees at Amtrak are given training which is denied to African-American employees. For example, on or around February of 1999, David Strohmer, Jeff Strickland, Tracey Morgan and Michelle Lott were sent to Jacksonville, Florida for Customer Service training. All of these employees were white. No African-American Train Attendants, Service Attendants or Lead Service Attendants were sent to Florida for this Customer Service training.

133.    Amtrak has discriminated against Barrow by disciplining her for actions for which her white co-workers are not disciplined. On or around April 13, 1999, Deborah Wetter and Dave White, both white, disciplined Barrow for bringing her husband on the train on a "blue day" (a day on which Amtrak employees are allowed to bring family members on the train for free). Barrow's white co-workers bring their spouses or companions on the train on "red" and "white" days (days on which family members are not permitted to ride for free) and are not disciplined for doing so, despite the fact that management is aware of it.   Indeed, in June of 1999, a white Train Attendant named Suzanne Williams brought someone on board the train without paying  on a "red day". Barrow brought this violation to the attention of management.  Although Barrow was pulled out of service for three days for bringing her family member on the train on a "blue day", Williams was not similarly disciplined for bringing her family member on board on the train on a "red day".

134.    Barrow has additionally been subjected to adverse terms, conditions, and privileges of employment and a racially hostile work environment at Amtrak.  Nancy Lozano, a white co-worker of Barrow, has stated that she was "tired of being around niggers and listening to nigger music."  Barrow reported Lozano's statement to Amtrak

46

management; however, Lozano continues to work for Amtrak. Barrow is also aware of threats by white employees about "hanging niggers." Whites who make racially offensive statements or tell racially offensive jokes receive only minor disciplinary penalties, if any.

135. As a result of Amtrak's discriminatory actions, Barrow has suffered extreme harm.

136. **Plaintiff Timothy McKissic** is presently employed as an Engineer in the Intercity SBU. He has been employed in this position since April 1992. During his employment by Amtrak, McKissic has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which have deprived McKissic of the opportunity to work in an integrated environment in which African-American employees hold management positions. In particular, McKissic has been discriminated against by being denied promotions to better and higher paying positions. The promotions sought by McKissic were given to white employees equally or less qualified than him.

137. One method utilized by the white supervisors at Amtrak to keep African-Americans out of the better and higher paying positions is by refusing to allow them to qualify on these jobs. For example, on or around March of 1999, McKissic attempted to qualify for an Engineer position on the Charlotte-to-Atlanta-and-Charlottesville, Virginia line. John Quigley, a white Service Manager, refused to pay McKissic to qualify. Quigley told McKissic that to qualify on that line, McKissic would have qualify on his own time without pay. The qualification process takes approximately one year to complete and during that period of time, the employee can not work on another route. On or around February of 1999, John Miller, a white employee, was paid by Quigley to qualify as an Engineer

47

between Greensborough and Raleigh, N.C. Similarly, in March 1999, McKissic applied for, and was entitled to qualify for an Extra Board Engineer position. McKissic was awarded the position, but was later told that the position would have to be advertised twice before he could be paid to qualify on the position. Quigley ultimately abolished the position rather than allow McKissic to be paid to qualify on it.

138. McKissic has also been disciplined excessively for acts for which similarly situated white employees were not disciplined or receive less harsh discipline. McKissic was terminated and put out of service for 19 months before an arbitrator reinstated him, without backpay. White employees do not receive such harsh discipline for similar infractions.

139. McKissic has also been forced to work in a racially hostile work environment. In this regard, he has been exposed to racist comments in the Amtrak crew base restrooms in Washington D.C. These comments include terms such as "nigger" and the telling of racial jokes.

140. As a result of Amtrak's discriminatory actions, McKissic has suffered extreme harm.

141. **Plaintiff Carlos Belgrave** is presently employed as a Carman/Car Inspector in the Mechanical Department. Since he was hired in 1973, Belgrave has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Belgrave from advancing into higher and better paying positions, such as Relief Foreman and Foreman II, and have deprived him of the

48

opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.

142.    Amtrak has discriminated against Belgrave by removing him from his Relief Foreman position before he could complete his ninety-day probationary period.  This action was taken against Belgrave because of his race.  It precludes him from advancing to a permanent Foreman II position.  On January 28, 1996, Belgrave was transferred to the Hialeah facility where the permanent Foreman positions are predominantly filled by white employees.  There are presently only three African-American Foremen at the Hialeah facility, and each of them transferred into the Hialeah facility in that position.  None were promoted into that position by Amtrak management at the Hialeah facility.  In October of 1997, Belgrave approached Bob Cochran, his white supervisor, and applied for the position of Relief Foreman.  Company policy requires a Relief Foreman to fulfill the relief duties for ninety days before he can be promoted to Foreman II.  There must also be a vacancy before the Relief Foreman can  be promoted.  As foremen went on vacation, Belgrave was allowed to fill in for them as a Foreman II.   In May of 1998, Belgrave heard from union personnel that he would no longer be allowed to fill in as a Relief Foreman.  Such action was taken against Belgrave because he is African-American and because, had he remained in the Relief Foreman position, he would have been entitled to the next permanent Foreman II vacancy.  Upon learning of his removal,  Belgrave approached Amtrak General Foreman Figuenick, a white male,  and asked for an assessment of his job performance.  He was told that his work performance had been good.  Belgrave also talked with Amtrak General Foreman Ed Alderman, a white male, who informed Belgrave that his removal from the Relief Foreman position was in no way related to his job performance.

49

Belgrave was more qualified, and was more senior, than Ed Jones and John Villanella, white co-employees of Belgrave who were allowed to remain Relief Foremen and were then promoted to permanent Foreman II positions.

143.    Belgrave was told by Alderman that he had to attend "charm school" training, which includes effective EEO and diversity training, before he could be promoted to Foreman II; however, Belgrave has been denied such training.  John Villanella and Ed Jones, less senior and less experienced white employees, have received this training.  The denial of this training to Belgrave directly effects his promotional opportunities to Foreman II.

144.    African-American employees of Amtrak as a group, like Belgrave himself, have been similarly precluded from training programs and on-the-job training provided to white employees.  This lack of training is then subsequently used to justify the refusal to select African-Americans for various positions, thereby adversely impacting African-American employees desiring to move to higher and better paying positions.

145.    On or about January 13, 1999, Belgrave filed a charge of discrimination with the Equal Employment Opportunity Commission, charging that Amtrak has discriminated against him on the basis of his race.  As a result of Belgrave's complaints of discrimination, his supervisors, including General Foreman, Ed Alderman, subjected Belgrave to unlawful retaliation.  Since the filing of his charge of discrimination, Belgrave has been disqualified from the position of Airman and has been subjected to unwarranted disciplinary actions. The reasons proffered by Amtrak for these actions are pretextual.

146.    As a result of Amtrak's discriminatory actions, Belgrave has suffered extreme harm.

147.   **Plaintiff Audley Boland** is presently employed as an Electrician in the Mechanical Department.   Since he was hired in 1993, Boland has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which have deprived Boland of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

148.   Boland is qualified for both the Relief Foreman and Foreman II positions.   On March 24, 1999, Boland was removed from the Relief Foreman program, which now prevents him from advancing to a permanent Foreman II position.   Boland was told that he was being removed because he was not a "team player."   Actually, Boland is a "team player", and the allegation that he is not  is a pretext for his removal.  John Villanella, a less senior white employee with less experience and fewer qualifications than Boland, was allowed to remain a Relief Foreman.  Villanella did not meet the minimum work experience requirements for this position.   Boland was removed from the Relief Foreman position because of his race.   Amtrak then placed Villanella into a permanent Foreman II position over Boland, despite Boland's superior qualifications.   Villanella did not meet the minimum work experience requirements for this position.

149.   As a result of Amtrak's discriminatory actions, Boland has suffered extreme harm.

150.   **Plaintiff Donald Rodgers** was hired as an Assistant Conductor in the Transportation Department of Amtrak's Intercity SBU on August 25, 1986.   In May of 1995, Rodgers was finally promoted to Conductor.   During his employment by Amtrak, Rodgers has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and discipline policies,

51

practices and procedures which have deprived Rodgers of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. Rodgers has also been retaliated against by Amtrak for the filing in 1996 of an EEOC charge protesting the imposition of harsher discipline against African-American employees.

151.    In April of 1996, Rodgers was disciplined as the result of his train passing a station without permitting passengers to disembark.  After charging Rodgers with this offense, John Quigley, Rodgers' white supervisor, asked Rodgers to sign a waiver of his right to defend against the charge.  When Rodgers indicated that he did not want to sign the waiver, Quigley told Rodgers that he would see to it that Rodgers was fired.  Quigley also called Rodgers a "fucking asshole."  Rodgers was disciplined in connection with this incident and in September of 1996 filed a charge of discrimination with the EEOC.  White employees engaging in similar incidents have not been subjected to discipline in this regard.

152.    Similarly, on or about March 26, 1998, Rodgers was unlawfully charged with being rude to customers and was taken out of service for forty-five (45) days. Rodgers' treatment in this regard was because of his race, was in retaliation for his filing of an EEOC charge in 1996, and was different from Amtrak's treatment of white Conductors.

153.    Rodgers is one of few African-American Conductors at Amtrak.  Because of this fact, he has been treated differently from his white co-workers and has been subjected to a hostile environment by John Quigley, his white supervisor.  Quigley has imposed disparate discipline on Rodgers and has referred to him as a "fucking asshole."  Rodgers does not treat or address his white subordinates in such a discriminatory and demeaning manner.

154.    As a result of Amtrak's discriminatory actions, Rodgers has suffered extreme

harm.

155.    **Plaintiff Harold Redfern** was initially hired by Amtrak in 1991 as an engineer in the Salisbury, North Carolina crewbase in Amtrak's Intercity SBU.  He is still employed in that capacity.  In February 1997, Redfern was injured at work, and he has been on disability leave since that time.   During his employment by Amtrak, Redfern has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and discipline policies, practices and procedures which have deprived Redfern of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

156.    White trainmaster John Quigley repeated demeaned and disrespected Redfern in the workplace.  In 1993, he assigned Redfern to drive a train from Salisbury to Washington, D.C., through the night, and then immediately to take the next train back to Salisbury, without any opportunity to sleep.  When Redfern got to Washington, D.C., the Washington trainmaster countermanded Quigley's directive, and directed Redfern to got to a hotel to sleep before returning to Salisbury.  Redfern did as he was directed, and took the afternoon train back to Salisbury.  When Redfern returned to Salisbury, Quigley was furious that Redfern had not followed his order to come directly back, and called him a "g-d- troublemaker."  Quigley cursed Redfern on other occasions as well.  Quigley did not treat white employees in this manner, but was respectful to them.

157.    In 1997, Quigley sceduled a safety breakfast in Salisbury.  Attendance was optional for white employees, but Quigley ordered Redfern to attend, even though Redfern was working 44 miles away in Charlotte, North Carolina.  Redfern prtested to the staion agent, Gilbert White, but was told that he could not be excused because of Quigley's

orders.    White engineers who worked right in Salisbury were permitted to miss this breakfast.

158.    Throughout his tenure with Amtrak, Redfern experienced and observed numerous other incidents of racial harassment by Quigley, directed at Redfern and other African-American employees.

159.    As a result of Amtrak's discriminatory actions, Redfern has suffered extreme harm.

160.    **Plaintiff Reachelle Francis** was employed by Amtrak as a probationary Train Attendant/Service Attendant from June 16, 1997 until her discharge on December 1, 1997.  During her probationary period with Amtrak, Francis was adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and disciplinary policies, practices, and procedures which have prevented Francis from obtaining permanent employment status with Amtrak and have deprived Francis of an opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.

161.    Amtrak discriminated against Francis on the basis of her race by rejecting her application for employment, while approving applications of equally or less qualified white applicants.  As a newly hired employee, Francis was supposed to serve a ninety (90) day probationary period.  On September 4, 1997, Product Line Director, David White (white), and Service Manager, James Brzezinski (white), advised Francis that her application for employment was being rejected effective immediately.  When Francis inquired as to the reason for the rejection of her application, Brzezinski told Francis that he did not have to give her a reason.  On September 8, 1997, Francis met with Brzezinski and Allen Thomas, Francis's union representative.  During this meeting, Brzezinski conceded that a number

54

of individuals had spoken to him on Francis's behalf.  Brzezinski then agreed to reinstate Francis effective September 10, 1997 for an additional ninety (90) day probationary period. Equally or less qualified white Train Attendants and Service Attendants are only required to serve a single ninety (90) day probationary period.  Ms. Francis was forced to work an extra ninety (90) day probationary period because of her race.

162.    Francis continued as a probationary employee through November 1997.  On December 1, 1997, Brzezinski asked Francis to meet with him.  During this meeting, Brzezinski told Francis that her performance did not meet the requirements of the position and rejected Francis's application for a second time.  Amtrak discriminated against Francis on the basis of her race by rejecting her application for employment while granting permanent employee status to equally or less qualified white Train Attendants and Service Attendants whose performance had been the same as, or worse than, that of Francis.

163.    Amtrak has further discriminated against Francis on the basis of her race by failing to investigate her complaints of racial discrimination, thereby ratifying and perpetuating the racially discriminatory practices and procedures of its predominately white management.  On December 9, 1997, Francis wrote a letter to Amtrak's EEO Officer, Steve Tallackson, complaining of discrimination on the basis of race.  When Francis persisted in her allegations of racial discrimination against Amtrak and Brzezinski, Tallackson became hostile toward Francis and defensive with respect to Amtrak and Brzezinski.  Tallackson refused to investigate Francis's allegations of race discrimination and ultimately dismissed her complaint.

164.    As a result of Amtrak's discriminatory actions, Francis has suffered extreme harm.

165.    **Plaintiff Bertha Kelly** was denied the position of Cook in Amtrak's Intercity SBU in June of 1998. Kelly was adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices, and procedures which prevented Kelly from obtaining employment with Amtrak and deprived Kelly of an opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.

166.    Amtrak discriminated against Kelly on the basis of her race by rejecting her application for employment, while approving applications of equally or less qualified white applicants. In particular, in June of 1998, Kelly applied at Amtrak for the position of Cook in the Intercity SBU. At the time of her application, Kelly was about to graduate from culinary arts school, and met all of the requirements for the Cook position. Kelly was sent to Amtrak to apply for the position by the administrators of her culinary arts school because she was one of its top ranking students. Amtrak denied Kelly the Cook position, claiming that she did not pass a general aptitude test.

167.    Amtrak awarded the Cook position to an equally or less qualified white candidate, Joe Delgado. Delgado turned down the job because he did not want to travel. However, even after Delgado turned down the job, Amtrak refused to offer the Cook position to Kelly despite her qualifications.

168.    As a result of being denied the Cook position, Kelly became discouraged and did not apply again for a job with Amtrak.

169.    As a result of Amtrak's discriminatory actions, Kelly has suffered extreme harm.

170.    **Plaintiff Mike Helton** is presently employed as a Baggage Clerk in Amtrak's Intercity SBU. He has been employed by Amtrak in its Intercity SBU since October 23,

56

1989. During his employment with Amtrak, Helton has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's hostile work environment and its subjective selection and disciplinary policies, practices, and procedures which have deprived Helton of an opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.

171.    Amtrak has discriminated against Helton by maintaining a racially hostile work environment. Dale Craig Thomas, Helton's white Commissary Department Supervisor, constantly tells racially biased jokes, such as:

      a.    "What will happen when you stick your hand in a jar full of mixed jelly beans?
         ...The black one will steal your watch."

      b.    "How do you stop black kids from jumping on the sofa?
         ...You put velcro on the ceiling."
         "How do you get them down?
         ...You get a bunch of Mexican kids and tell them they are pinatas."

Bill Minick, another white supervisor at Amtrak, often refers to African-Americans as "nigger" and once referred to Helton as a "char-broiled black ass nigger." Helton reported these racial remarks, but no action was taken.

172.    Helton worked as a Commissary Clerk from 1989 to 1995. In 1995, Helton became a partially exempt Lead in the Chicago Commissary. In May of 1998, Helton was recognized as the departmental Employee of the Month for the Commissary. One week later, still in May of 1998, Helton was removed form the partially exempt Lead position after having an accident, which was not his fault. Alice Ragsdale, a white employee, has had a number of accidents; however, she has not been removed from her partially exempt Lead

position. In fact, she has been promoted to Product Line Agent. Other white employees have caused serious accidents, some even causing injuries to customers; however, to Helton's knowledge, none of these individuals have been disciplined.    a)    Amtrak's subjective selection policies, practices and procedures, and its discriminatory terms, conditions, and privileges of employment, have adversely affected Helton's work and have discouraged him from seeking further promotions.

173. As a result of Amtrak's discriminatory actions, Helton has suffered extreme harm.

174. **Plaintiff William Miller** is currently a Lead in the Intercity SBU at Amtrak's Chicago Terminal. He was employed by Amtrak on February 29, 1988 as a Commissary Clerk. During his employment by Amtrak, Miller has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's hostile work environment and its subjective selection and disciplinary policies, practices, and procedures which have deprived Miller of an opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.

175. Amtrak has also discriminated against Miller on the basis of his race by maintaining a racially hostile work environment. An Assistant Conductor at the Chicago Terminal wears a t-shirt and scarf bearing a picture of a Confederate Flag. Miller reported this fact to his white supervisor, Samantha Nolder, in September of 1998 and told her he found it racially offensive. Nolder told Miller that she could not do anything about what someone wears to work. Miller has additionally heard a co-worker make racial slurs including the word "nigger" on a regular basis. Another employee has previously reported

this employee for making such slurs; however, to Miller's knowledge, no disciplinary action has been taken against the employee uttering these racial slurs.

176.    Miller has attempted on numerous occasions to move to higher level and better paying positions in other departments, including Engineer and General Foreman in the diesel pit. However, equally or less qualified white employees have been selected for these positions. Amtrak's subjective selection practices, policies and procedures, including those described above, have discouraged Miller from seeking further promotions.

177.    As a result of Amtrak's discriminatory actions, Miller has suffered extreme harm.

178.    **Plaintiff Darryl Latham** is presently employed in Amtrak's Intercity SBU as an Administrative Chief. He has been employed by Amtrak since August 6, 1983. During his employment at Amtrak, Latham has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have deprived Latham of the opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions and have prevented him from advancing into higher and better paying positions in the On Board Services Department and other departments.

179.    Amtrak has discriminated against Latham by assigning him more work than his white co-workers. Although receiving the same pay as his white counterpart, Latham is responsible for the oversight of six trains as compared to one or two trains for his white co-workers. Similarly, when the regular Service Manager is gone, Latham is required to perform that job as well as his job. However, he is never assigned the job title of, or paid

as, a Service Manager. Rather, the Service Manager pay and job title are assigned temporarily to a white employee who cannot even perform the duties of the position.

180.    Throughout the fifteen years of Latham's employment at Amtrak, less qualified white employees have been selected over him for higher paying positions in other departments.  For example, Steve Piper, a less qualified white in the Transportation Department, was hired as an Active Service Manager in 1997.  Similarly, in 1998, Jill Kowalt, a less qualified white in the Transportation Department, was moved to Active Service Manager in Transportation.  Latham has been denied the opportunity to move to these higher level, contract positions in other departments because of the use of subjective decision-making by Amtrak's mostly white managers. As a result, Latham remains segregated in the On Board Services Department, which has one of the highest concentrations of African-Americans.

181.    During his employment at Amtrak, Latham has also been discriminated against in the discipline he has received. In particular, management falsely accused Latham of not maximizing his time.  After Latham explained that he was working more trains than his co-workers, Amtrak retracted the discipline.  Latham, and African-American employees generally, are treated more harshly in discipline than are their white co-workers.

182.    Latham has been subjected to racially derogatory and hostile comments by his white supervisors/managers and co-workers.  For example, a manager of Amtrak stated in the presence of other managers that the "nigger" picking up dishes was doing the type of work that his people should be doing.

183.    As a result of Amtrak's discriminatory actions set forth above, Latham has suffered extreme harm.

184.   **Plaintiff Lysa Ridley-Jones** has been employed by Amtrak since 1986 and is presently a Ticket Agent in Atlanta, Georgia.   During her employment at Amtrak, Ridley-Jones has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions and have prevented her from advancing into these positions. Ridley-Jones also has been subjected to a racially hostile work environment.

185.   On one occasion, a white paper gown with the letters "KKK" on it was displayed in the locker room used by Jones and other African-American employees. Ridley-Jones made Amtrak supervisors aware of the existence of the gown but no corrective action was taken.

186.   In the spring of 1999, Tim Dicks, white male, engaged in racially hostile behavior by imitating a black employee as though that employee were a monkey.   This occurred during a meeting with Amtrak supervisor J.T. Elridge.   The racial gestures were reported to Eldridge who took no action in response to the protests of Dicks' behavior.

187.   Amtrak has discriminated against Ridley-Jones by failing to promote her to higher positions such as station agent manager (T.C.U position), and to conductor positions for which she applied.

188.   In January 1998, Ridley-Jones bid on the position of station agent manager. The position is responsible for the geographic location encompassing Meridian, Mississippi, to Greenville, Mississippi.   The position was awarded to Bob Hasty, a white male employee.

189.    In June 1999, Ridley-Jones applied for a conductor position which had been posted in the computer system.  The posting invited applicants to apply for the position which was based in Washington D.C. After applying for the position, Ridley-Jones received a letter informing her that only local candidates would be considered for the position.  The redrawing of qualification guidelines after a job announcement has negatively effected Ridley-Jones' ability to receive promotions and transfers.

190.    In the last two years, Ridley-Jones has bid on conductor jobs in Chicago, Illinois and Salisbury, North Carolina.    Ridley-Jones has not received either position. Ridley-Jones has not been informed what she can do to increase the chances of her being selected for a promotion to a conductor position.

191.    As a result of Amtrak's discriminatory actions set forth above, Ridley-Jones has suffered extreme harm.

192.    **Plaintiff Darrell Johnson**  has been employed at Amtrak since September 25, 1989 presently works in Charlotte, North Carolina  as a ticket agent/baggageman. During his employment at Amtrak, Johnson has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which have deprived Johnson of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  Johnson also has been subjected to a racially demeaning environment.

193.    In May 1999, Jeff Ashenfelter became lead station agent.  Ashenfelter informed  white employees in the station aware of his belief that the black employees do not know what they are doing.  Johnson has also been informed that Ashenfelter uses racial slurs outside the presence of the black employees.

194.    In approximately June 1999, an incident occurred involving a missing sum of money.  Ashenfelter wanted Johnson to complete certain forms in connection with the missing money.  Ashenfelter spoke to Johnson in a demeaning fashion by stating such things as "You are going to sign this!" and "I am gonna be on top of you!" and "you're gonna learn this!".  White manager John Quigley has also demeaned Johnson by cursing at him.  Neither Ashenfelter nor Quigley speaks to white employees in this manner.

195.    Johnson has also been discriminated against with respect to promotions to lead station agent and fiscal/clerical clerk.  In May 1999, Ashenfelter began working the as lead station agent, prior to the posting of a job vacancy.  Ashenfelter replaced Gil White, black male, as lead station agent.   Allowing Ashenfelter to work on the job prior to posting the vacancy, allowed him a significant additional training opportunity for the lead station agent position which was denied to Johnson and other African-Americans.    After Ashenfelter began working as lead station agent, the job was posted and he was selected for the position.

196.    In the last year Johnson has also applied for a day shift fiscal clerk position.  Johnson is currently assigned to the night shift.  After Johnson applied, the job was abolished and then re-advertised with an additional requirement of typing 50 words per minute.  Jim Fetchro, a white male with less seniority than Johnson, was selected for the position.  The job description was written specifically to fit the qualifications of Fetchero who was preselected for the position.

197.    In 1998 and 1999, Johnson applied for the position of Safety Training Coordinator.  In 1998, the job was given to Jim Turner (white), who was less qualified for the position than Johnson.  In 1999, he was denied the position again, supposedly on the basis that he was not qualified, which is untrue.

198.    As a result of Amtrak's discriminatory actions, Johnson has suffered extreme harm.

199.    **Plaintiff Kirk Marshall** was employed by Amtrak in the Intercity SBU from November 26, 1986 until his resignation in 1997.    During his employment by Amtrak, Marshall was adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which prevented Marshall from advancing into higher and better paying positions and deprived Marshall of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  Throughout his employment with Amtrak, Marshall sought numerous promotions.  The promotions sought by Marshall were given to less qualified white employees.

200.    In June of 1996, the position of Safety Coordinator in Chicago, previously held by Ada Mallet, became available.  During the time when Mallet was Safety Coordinator, Marshall assisted Mallet, performed all of the Safety Coordinator functions, and was a member of the Safety Committee.  Marshall performed the Safety Coordinator functions so well that Mallet recommended Marshall to replace her in the position. Marshall applied for the position of Safety Coordinator and interviewed for the position. Despite Mallet's recommendation and Marshall's qualifications for the position, Amtrak selected a less qualified white employee, Don Cushin, for the Safety Coordinator position.

201.    As a result of being continuously denied promotions to higher paying positions, Marshall became discouraged from trying to advance to higher and better paying jobs and eventually resigned from his employment with Amtrak.

202.    As a result of Amtrak's discriminatory actions, Marshall has suffered extreme harm.

203.    **Plaintiff Carl Betterson** has been continuously employed by Amtrak since July 16, 1975, and is currently working as a Ticket Agent in Atlanta, Georgia. During his employment at Amtrak, Betterson has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which have deprived Betterson of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. Betterson also has been subjected to a racially demeaning environment.

204.    Amtrak has discriminated against Betterson by refusing to promote him to higher positions, such as Product Line Agent, for which he applied.

205.    In August of 1998, Betterson bid on the position of Product Line Agent. This position is responsible for responding to Amtrak customers regarding complaints, inquiries, and comments for a geographic area ranging from Birmingham, Alabama to Culpepper, Virginia. The position was awarded instead to Bob Hasty, a white employee with less experience than Betterson.

206.    Betterson had more experience than did Hasty working with Amtrak guests to respond to their inquiries, complaints, and concerns. During the course of his 24-year Amtrak career, Betterson has worked in customer services positions at many stations in the product line, including Savannah, Georgia, Florence, South Carolina, Fayetteville, North Carolina, Columbia, South Carolina, Southern Pines, North Carolina, Thomasville, Georgia, and Atlanta, Georgia. Betterson also has two years of college education and an unblemished service record.

207.    Bob Hasty has less seniority than Betterson, and Hasty has worked in only two small Amtrak stations. Hasty has no college education. Hasty also was taken out of

service and removed from a station agent position in connection with a serious disciplinary charge.

208.    In Atlanta, where Betterson works, the daily passenger count is typically 125 persons, and it is a hub where many customer service complaints and inquiries are lodged. Where Hasty worked prior to his promotion, in Birmingham, Alabama, the daily passenger count is approximately 15 persons.

209.    Hasty was selected for the Product Line Agent job by his crony, white Amtrak manager J.T. Eldridge, also based in Birmingham.  Hasty's selection by Eldridige was a product of the "buddy" system, whereby white managers select white employees with whom they socialize and work for promotional opportunities.  Eldridge also has supervisory responsibility for the Atlanta station.  Betterson applied for the Product Line Agent job despite indications that Eldridge had pre-selected Hasty for the job.

210.    Since Hasty was awarded the Product Line Agent job, he  has, nevertheless, generally ignored his Product Line Agent responsibilities in Atlanta.  Betterson has had to fulfill the duties of the position in the Atlanta station, without any increase in pay or any title change or any recognition whatsoever.

211.    Betterson filed a discrimination complaint with Amtrak regarding denial of the promotion, but nothing has been done to address it.

212.    Betterson also has witnessed African-American employees disciplined by Amtrak for a few minutes' tardiness, whereas white employees have been allowed to be an hour late without disciplinary consequence.

213.    As a result of Amtrak's discriminatory actions, Betterson has suffered extreme harm.

66

214. **Plaintiff PFBMWE** represents, and at all pertinent times has represented, maintenance of way workers in Chicago working for the Amtrak Intercity SBU. During their employment by Amtrak, members of the PFBMWE have adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which prevented them from advancing into higher and better paying positions and deprived them of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

215. As a result of Amtrak's discriminatory actions, members of the PFBMWE have suffered extreme harm.

## VIII. PLAINTIFFS' CLAIMS

### A. The Civil Rights Act of 1866, 42 U.S.C. § 1981

216. The plaintiffs restate and reallege paragraphs 1 through 216 as though set forth here in full.

217. Amtrak has discriminated against the named Plaintiffs and all members of the proposed classes by denying them the same rights as are enjoyed by white non-exempt employees and applicants for non-exempt employment in the making, performance, modification and termination of their employment relationship with Amtrak and to the enjoyment of all benefits, privileges, terms and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended.

218. Amtrak's conduct has been intentional, deliberate, willful, and conducted in callous disregard of the rights of the named Plaintiffs and members of the proposed classes.

219. By reason of the continuous nature of Amtrak's discriminatory conduct,

persistent throughout the employment of the named Plaintiffs and class members, the named Plaintiffs and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

220.    By reason of Amtrak's discrimination, the named Plaintiffs and the members of the proposed classes are entitled to all legal and equitable remedies available under §1981, including, but not limited to, damages for mental anguish and punitive damages.

**B.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e**

221.    Plaintiffs restate and reallege paragraphs 1 through 221 as though set forth here in full.

222.    Amtrak has discriminated against the named Plaintiffs and all members of the proposed classes with respect to terms and conditions of their employment because of their race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991.

223.    Amtrak's conduct has been disparate, intentional, deliberate, willful, and conducted in callous disregard of the rights of the named Plaintiffs and the members of the proposed classes.

224.    Amtrak's policies and/or practices have produced a disparate impact against the named Plaintiffs and the class members with respect to the terms and conditions of employment.

225.    By reason of Amtrak's discrimination, the named Plaintiffs and the members of the proposed classes are entitled to all legal and equitable remedies available under §2000e.

## IX.    PRAYER FOR RELIEF

226.    Wherefore, the named Plaintiffs, on behalf of themselves and the members of the classes whom they seek to represent, request the following relief:

a.    Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a),  (b)(2) and/or (b)(3) , on behalf of the proposed Plaintiff classes, and designation of the Plaintiffs as representatives of these classes and their counsel of record as class counsel; b.    A declaratory judgment that Amtrak's employment policies, practices and procedures challenged herein are illegal and in violation of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. Section 2000(e), et seq. and 42 U.S.C. §1981;

c.    A permanent injunction against Amtrak and its partners, officers, owners, agents, successors, employees, and representatives and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, racial discrimination and retaliation by Amtrak as set forth herein;

d.    An Order requiring Amtrak to initiate and implement programs that (i) will provide equal employment opportunities for African-American employees and applicants in the Intercity SBU; (ii) will remedy the effects of Amtrak's past and present unlawful employment policies, practices and procedures in the Intercity SBU; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described above in the Intercity SBU;

e.    An Order requiring Amtrak to initiate and implement systems of hiring, assigning, training, transferring, compensating, and promoting African-American applicants and employees in a non-discriminatory manner;

f.      An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (b) through (e) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (b) through (e), above;

g.      An Order placing or restoring the named Plaintiffs and the classes they seek to represent into those jobs they would now be occupying, but for Amtrak's discriminatory policies, practices and procedures;

h.      An Order directing Amtrak to adjust the wage rates and benefits for the named Plaintiffs and the classes they seek to represent to the level that they would be enjoying but for Amtrak's discriminatory policies, practices and procedures;

i.      An award of back pay, front pay, compensatory damages, punitive damages, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the named Plaintiffs and the classes they seek to represent;

j.      Any other appropriate equitable relief to the named Plaintiffs and proposed class members;

k.      An award of litigation costs and expenses, including reasonable attorneys' fees, to the Plaintiffs and class members;

l.      Pre-judgment interest;

m.      Such other and further relief as the Court may deem just and proper; and

n.    Retention of jurisdiction by the Court until such time as the Court is

satisfied that Amtrak has remedied the practices complained of herein

and is determined to be in full compliance with the law.

## X.    JURY DEMAND

The Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted this 9th day of November, 1999.

Timothy B. Fleming (DC Bar No. 351114)
Derek B. Brett (FL Bar No. 0090750)
**Gordon, Silberman, Wiggins & Childs, P.C.**
1621 Connecticut Avenue N.W.
Suite 400
Washington, D.C. 20009
(202) 238-0690

Robert F. Childs, Jr. (AL Bar No. CHI003)
Jon C. Goldfarb (AL Bar No. GOL015)
Joel S. Isenberg (DC Bar No. 453812)
**Gordon, Silberman, Wiggins & Childs, P.C.**
1400 SouthTrust Tower
Birmingham, Alabama 35203
(205) 328-0640

Avis E. Buchanan (DC Bar No. 365208)
Warren K. Kaplan (DC Bar No. 034470)
Susan E. Huhta (DC Bar No. 4534478)
**Washington Lawyers' Committee for Civil
Rights and Urban Affairs**
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000

*ATTORNEYS FOR THE PLAINTIFFS*