# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KENNETH CAMPBELL                                  )
365 Lowther Street                                )
Lemoyne, Pennsylvania 17043                       )
                                                  )
and                                               )
                                                  )
DONALD BATTS                                      )        CIVIL ACTION NO. 1:99CV02979
545 Lincoln Drive                                 )                    (EGS)
Rocky Mount, North Carolina 27801                 )
                                                  )        [Jury Trial Demanded]
and                                               )
                                                  )
PATRICIA YOUNG-BOSEMAN                            )        CLASS ACTION
336 11th Street, S.E.                             )
Washington, D.C. 20003                            )
                                                  )
and                                               )
                                                  )
KENNETH MCDANIEL                                  )
19755 Framingham Drive                            )
Gaithersburg, Maryland 20879                      )
                                                  )
and                                               )
                                                  )
VICKI JONES-WHITTIES                              )
4008 Livingstone Place                            )
Durham, North Carolina 27707                      )
                                                  )
and                                               )
                                                  )
TREADWELL SMITH                                   )
12401 South Yale Avenue                           )
Chicago, Illinois 60628-7211                      )
                                                  )
and                                               )
                                                  )
SABRENNA MUMPHREY                                 )
7437 Heronwood Lane                               )
Charlotte, North Carolina 28227                   )
                                                  )
and                                               )

**FILED**

**MAR 1 3 2000**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



**RICKY MURDOCK**
**773 Harris Street**
**Concord, North Carolina 28025**                              )
                                                               )
and                                                            )
                                                               )
**CHARMIN BARROW**                                             )
**3800 Texas Drive**                                           )
**Apt. 130**                                                   )
**New Orleans, Louisiana 72114**                               )
                                                               )
and                                                            )
                                                               )
**TIMOTHY MCKISSIC**                                           )
**3819 Lovett Circle**                                         )
**Charlotte, North Carolina 28210**                            )
                                                               )
and                                                            )
                                                               )
**CARLOS BELGRAVE**                                            )
**5214 Bethany Lane**                                          )
**West Palm Beach, Florida 33415**                             )
                                                               )
and                                                            )
                                                               )
**AUDLEY BOLAND**                                              )
**2367 Northwest 82nd Way**                                    )
**Sunrise, Florida 33322**                                     )
                                                               )
and                                                            )
                                                               )
**DONALD RODGERS**                                             )
**102 Gettys Drive**                                           )
**Gaffney, South Carolina 29341**                              )
                                                               )
and                                                            )
                                                               )
**HAROLD REDFERN**                                             )
**9225 Otter Creek Drive**                                     )
**Charlotte, North Carolina 28277**                            )
                                                               )
and                                                            )
**REACHELLE FRANCIS**                                          )
**9327 Stroelitz Street**                                      )
**New Orleans, Louisiana 70118**                               )

and                                              )
                                                 )
**BERTHA KELLY**                                 )
**1480 West 73rd Place**                         )
**Chicago, Illinois 60636**                      )
                                                 )
and                                              )
                                                 )
**MICHAEL HELTON**                               )
**4838 West Washington Boulevard**               )
**Chicago, Illinois 60644**                      )
                                                 )
and                                              )
                                                 )
**WILLIAM MILLER**                               )
**2015 South 10th Avenue**                       )
**Maywood, Illinois 60153**                      )
                                                 )
and                                              )
                                                 )
**DARYL LATHAM**                                 )
**14351 South Lincoln Avenue**                   )
**Dalton, Illinois 60419**                       )
                                                 )
and                                              )
                                                 )
**LYSA RIDLEY-JONES**                            )
**1048 Flat Shoals Road #404**                   )
**College Park, Georgia 30309**                  )
                                                 )
and                                              )
                                                 )
**DARRELL JOHNSON**                              )
**4149 Blenheim Road**                           )
**Charlotte, North Carolina 28208**              )
                                                 )
and                                              )
                                                 )
**KIRK MARSHALL**                                )
**131 North Mason**                              )
**Unit 203**                                     )
**Chicago, Illinois 60644**                      )
                                                 )
and                                              )
                                                 )

CARL BETTERSON,                    )
5634 Hunters Valley               )
Lithonia, Georgia 30038,          )
                                   )
and                                )
                                   )
AUGUSTINE GLASS, JR.,             )
169 Enola Road                    )
Enola, Pennsylvania 17025         )
                                   )
and                                )
                                   )
ARSHELL QUALLS                    )
5958 Overhill Drive               )
Los Angeles, CA 90043             )
                                   )
and                                )
                                   )
LINDA STROUD                      )
1227 West 49th Street             )
Los Angeles, CA 90037             )
                                   )
and                                )
                                   )
INEZ TARVER                       )
5206 West 97th Place              )
Los Angeles, CA 90045             )
                                   )
and                                )
                                   )
VERNON BROWN                      )
621 East 99th Street              )
Apt. 4                            )
Inglewood, CA 90301               )
                                   )
and                                )
                                   )
CASTRO LANDERS                    )
1608 Cahuenga #1224               )
Los Angeles, CA 90028             )
                                   )
and                                )
                                   )
                                   )
                                   )

4

**ED CARR**                                                    )
**8827 South Orchard Avenue**                                 )
**Apt. 3**                                                    )
**Los Angeles, CA 90044**                                     )
                                                              )
and                                                           )
                                                              )
**DEVERN FLEMING, SR.**                                       )
**22502 Mountain View Road**                                  )
**Moreno Valley, CA 92557**                                   )
                                                              )
and                                                           )
                                                              )
**DAVID TUCKER**                                              )
**26083 Elder Avenue**                                        )
**Moreno Valley, CA 92555**                                   )
                                                              )
and                                                           )
                                                              )
**CYRIL HUNTE**                                               )
**8580 Edwin Street**                                         )
**Rancho Cucamonga, CA 91730**                                )
                                                              )
and                                                           )
                                                              )
**BRYANT COX**                                                )
**4158 Francis Avenue**                                       )
**Chino, CA 91710**                                           )
                                                              )
and                                                           )
                                                              )
**JAMES SILAS**                                               )
**4420 Don Felipe Drive**                                     )
**Los Angeles, CA 90008**                                     )
                                                              )
and                                                           )
                                                              )
**KELVIN BENTON**                                             )
**2024 Illinois Drive**                                       )
**West Covina, CA 91792**                                     )
                                                              )
and                                                           )
                                                              )
                                                              )
                                                              )

5

DONALD SHEPARD
5230 Ruthenlen Street
Los Angeles, CA 90062

and

ALVIN RANDOLPH
6200 Pershing Avenue
Apt. 268
Fort Worth, TX 76116

and

ALBERT MILLER
512 Street Main
Burbank, CA 91506

and

FAYE WILLIAMS
329 East Plymouth Street
Inglewood, CA 90302

and

MOYSE HOWARD
109 Violet Road
Hercules, CA 94547

and

TWILVA SIMPSON
22556 Northview Drive
Hayward, CA 94541

and

TIMEKA COLLIER
2703 Fruitvale Avenue
Apt. 1
Oakland, CA 94601

and

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**RAYMOND BURDITT**
1474 Northwest 92nd Street
Seattle, WA 98117

and

**KIMBERLIE HORNES**
6310 Green Valley Circle
Apt. 313
Culver City, CA 90230

and

**WANDA JOHNSON**
2061 Daisy Avenue
Long Beach, CA 90806

and

**DAISY MOORE**
1000 McDonald Avenue
#315
Richmond, CA 94801

and

**TED BAILEY**
7518 Cantone Court
Oxonhill, MD 20745

and

**CLYDE BRISCOE**
7725 Willow Hill Drive
Landover, MD 20785

and

**MICHAEL STEWARD**
8652 Fountain Valley Drive
Gaithersburg, MD 20886

and

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

7

**BARRY PRICE**
9240 B Livery Lane
Laurel, MD 20723                                    )
                                                    )
and                                                 )
                                                    )
**WILSON HUTCHINSON**                               )
1425 4th Street SW                                  )
Apt. 713A                                           )
Washington, DC 20024                                )
                                                    )
and                                                 )
                                                    )
**GAVIN CLARKE**                                    )
5908 Somerset Road                                  )
Riverdale, MD 20737                                 )
                                                    )
and                                                 )
                                                    )
**QUINTON SAUNDERS**                                )
99 Brookside Place                                  )
Waldorf, MD 20601                                   )
                                                    )
and                                                 )
                                                    )
**TAKEELA SAUDERS**                                 )
99 Brookside Place                                  )
Waldorf, MD 20601                                   )
                                                    )
and                                                 )
                                                    )
**BRIAN WATKINS**                                   )
1615 Kenyon Street, NW                              )
#53                                                 )
Washington, DC 20010                                )
                                                    )
and                                                 )
                                                    )
**JOHN MCCARGO**                                    )
3506 Dennlyn Road                                   )
Baltimore, MD 21215-7417                            )
                                                    )
and                                                 )
                                                    )
                                                    )

8

**CARMEN WILSON**
521 N. King Street
Apt. 404
Wilmington, DE 19801

and

**WAYNE BAILEY**
5711 Woodcrest Avenue
Philadelphia, PA 19131

and

**JOSEPH PEARSON**
260 North Wycomb Avenue
Apt. 102
Lansdowne, PA 19050

and

**MARY MITCHELL**
1443 Elson Road
Brookhaven, PA 19015

and

**STEVEN JOHNSON**
171 Washington Park
Apt. 1
Brooklyn, NY 11205

and

**MINNIE BAKER**
564 Magnolia Avenue
Daytona Beach, FL 32114

and

**ROBERT GUERRA**
15-27 Skytop Gardens
Parlin, NJ 08859

and

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**BONITA STEPHNEY**
**19 Fern Avenue**
**Randolph, MA 02368**

**and**

**TERENCE WHITESIDES**
**35 Oak Ridge Street**
**Mattapan, MA 02126**

**and**

**SONIA HODGE**
**130 Neptune Blvd.**
**Apt. 804**
**Lynn, MA 01905**

**and**

**CASSANDRA CATO-LOUIS**
**7 Riverbank Place**
**Mattapan, MA 02126**

**and**

**KARL THOMPSON**
**163 West Patterson Avenue**
**Columbus, OH 43202**

**and**

**CLINTON DANIELS**
**50 East 191st Street**
**Apt. 6M**
**Bronx, NY 10468**

**and**

**VICTOR KIPPING**
**65 Polk Street**
**Apt. 32**
**Charlestown, MA 02129**

**Individually and on Behalf of Others**
**Similarly Situated, and**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

10

THE PENNSYLVANIA FEDERATION OF                    )
THE   BROTHERHOOD   OF                             )
MAINTENANCE OF WAY EMPLOYES                        )
1930 Chestnut Street                              )
Suite 607-609                                     )
Philadelphia, PA 19103                            )
                                                  )
        PLAINTIFFS,                               )
                                                  )
v.                                                )
                                                  )
NATIONAL RAILROAD PASSENGER                       )
CORPORATION                                       )
400 North Capitol Street, N.W.                    )
Washington, D.C. 20001                            )
                                                  )
        DEFENDANT, and                            )
                                                  )
INTERNATIONAL BROTHERHOOD OF                      )
ELECTRICAL WORKERS,                               )
                                                  )
NATIONAL   CONFERENCE   OF                         )
FIREMEN & OILERS,                                 )
                                                  )
BROTHERHOOD   OF   LOCOMOTIVE                      )
ENGINEERS,                                        )
                                                  )
TRANSPORTATION COMMUNICATION                      )
INTERNATIONAL UNION,                              )
                                                  )
UNITED TRANSPORTATION UNION,                      )
                                                  )
AMERICAN RAILWAY SUPERVISORS                      )
ASSOCIATION (DIVISION OF TCU),                    )
                                                  )
SHEET   METAL   WORKERS                            )
INTERNATIONAL ASSOCIATION,                        )
                                                  )
BROTHERHOOD   OF   RAILWAY                         )
SIGNALMEN,                                        )
                                                  )
TRANSPORT WORKERS' UNION,                         )
                                                  )
JOINT   COUNCIL   OF   CARMEN                      )
(DIVISION OF TCU),                                )
                                                  )

11

BROTHERHOOD OF RAILWAY )
CARMEN -TCU )
)
INTERNATIONAL ASSOCIATION OF )
MACHINISTS AND AEROSPACE )
WORKERS, )
)
INTERNATIONAL BROTHERHOOD OF )
BOILERMAKERS AND BLACKSMITHS, )
)
AMERICAN FEDERATION OF )
RAILROAD POLICE, and )

AMTRAK SERVICE WORKERS'
COUNCIL,

   AS ADDITIONAL DEFENDANTS
   UNDER RULE 19, FED. R. CIV. P.

**FILED**

**MAR 1 3 2000**

### FIRST AMENDED COMPLAINT — CLASS ACTION

MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## I.    NATURE OF THIS ACTION

   1.    The Plaintiffs bring this action against the National Railway Passenger Corporation (hereinafter "Amtrak") to redress race discrimination in employment. Specifically, the named Plaintiffs, all of whom are present or former employees of Amtrak or applicants for employment with Amtrak, bring this class action against Amtrak on behalf of themselves and all other African-American employees of Amtrak and applicants for employment with Amtrak who are similarly situated pursuant to 42 U.S.C. § 1981 and Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000(e), et seq. (hereinafter "Title VII").

   2.    The named Plaintiffs are seeking, on behalf of themselves and the classes they seek to represent, declaratory and injunctive relief, back pay, front pay, compensatory

and punitive damages, and attorneys' fees, costs, and expenses to redress Amtrak's pervasive and racially discriminatory employment policies, practices and procedures.

## II.   JURISDICTION AND VENUE

3.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201, and 2202, 42 U.S.C. § 1981, and Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000(e), *et seq.*

4.   Venue is proper in the District of Columbia because Amtrak resides here, maintains its corporate headquarters here, maintains its personnel records here, determines and implements here its company-wide policies, practices and procedures which have affected the named Plaintiffs, engages in and/or ratifies here illegal conduct which has adversely affected the named Plaintiffs, and engages in corporate activities, such as the implementation of discriminatory employment policies, practices and procedures, which are conceived and carried out here.

## III.   CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII

5.   The named Plaintiffs have fulfilled or are in the process of fulfilling all conditions precedent to the institution of this action under Title VII.  Specifically, Daryl Latham, Carlos Belgrave, Audley Boland, and Kenneth Campbell have filed  charges with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the last discriminatory action and have filed suit within ninety (90) days of receipt of their right-to-sue letters from the EEOC.  Since this suit was originally filed, Donald Batts has received a right-to-sue letter from the EEOC.  Other named Plaintiffs, including Arshell Qualls, Linda Stroud, Inez Tarver, and Kimberli Hornes have filed charges of classwide and/or individual discrimination with the EEOC and are in the process of perfecting their Title VII rights-to-

sue.  This pleading will be supplemented as additional right-to-sue letters are received.

6.    The named Plaintiffs are relying on their own EEOC charges and/or those of other named Plaintiffs.  The Plaintiffs' claims arising under 42 U.S.C. § 1981 do not require administrative exhaustion.

## IV.    PARTIES

### A.    Plaintiffs

7.    Plaintiff Kenneth Campbell is an African-American citizen of the United States and a resident of the State of Pennsylvania.  He has been continuously employed by Amtrak in its Intercity SBU from May 19, 1986 to the present and is presently working as an Assistant Conductor in the Transportation Department of the Intercity SBU.  Campbell is represented for purposes of collective bargaining by the United Transportation Union (hereinafter "UTU").

8.    Plaintiff Donald Batts is an African-American citizen of the United States and a resident of the State of North Carolina.  He has been continuously employed with Amtrak since October 1987, and is presently working as a Station Agent in the Intercity SBU.  Batts is represented for purposes of collective bargaining by the UTU.

9.    Plaintiff Patricia Young-Boseman is an African-American citizen of the United States and a resident of the District of Columbia.  She was hired by Amtrak as a Coach Attendant in the Intercity SBU on June 14, 1994.  She became a Food Specialist in November of 1994 and was made a Lead Service Attendant in October of 1995.  During her employment with Amtrak, Young-Boseman has been represented for purposes of collective bargaining by the Amtrak Service Workers' Council ("ASWC").

10.     Plaintiff Kenneth McDaniel is an African-American citizen of the United States and a resident of the State of Maryland.  He has been employed by Amtrak as a Service Attendant/Train Attendant in the Onboard Services Department of its Intercity SBU from November 12, 1973 to the present.  During his employment with Amtrak, McDaniel has been represented for purposes of collective bargaining by the ASWC.

11.     Plaintiff Vicki Jones-Whitties is an African-American citizen of the United States and a resident of the State of North Carolina.  She has been continuously employed by Amtrak since 1989, and is presently working as a Station Agent in the Intercity SBU. Jones-Whitties is represented for purposes of collective bargaining by the Transportation Communications Union ("TCU").

12.     Plaintiff Treadwell Smith is an African-American citizen of the United States and a resident of the State of Illinois.  He is presently employed by Amtrak as a Foreman III in the Engineering Department, Maintenance of Way Division, of the Intercity SBU. Smith has been continuously employed by Amtrak in its Intercity SBU since November 16, 1987 and is currently represented for purposes of collective bargaining by the TCU and the American Railway Supervisors Association ("ARSA"), a division of the TCU.

13.     Plaintiff Sabrenna Mumphrey is an African-American citizen of the United States and a resident of the State of North Carolina.  She has been continuously employed by Amtrak since July 14, 1994 and is presently working as a Relief Lead Ticket Agent in the Customer Services Department of the Intercity SBU.  Mumphrey is represented for purposes of collective bargaining by the TCU.

14.     Plaintiff Ricky Murdock is an African-American citizen of the United States and a resident of the State of North Carolina.  He has been continuously employed by

Amtrak in its Intercity SBU since October 30, 1992, and is presently working as a Ticket Clerk in the Customer Services Department of its Intercity SBU.  Murdock is represented for purposes of collective bargaining by the TCU.

15.    Plaintiff Charmin Barrow is an African-American citizen of the United States and a resident of the State of Louisiana.  She has been continuously employed by Amtrak in its Intercity SBU since October 9, 1996, and is presently working as a Lead Service Attendant in the On Board Services Department of its Intercity SBU.  Barrow is represented for purposes of collective bargaining by the TCU.

16.    Plaintiff Timothy McKissic is an African-American citizen of the United States and a resident of the State of North Carolina.  He has been continuously employed by Amtrak since May 23, 1986, and is presently working as a Locomotive Engineer in the Transportation Department of its Intercity SBU.   McKissic is represented for purposes of collective bargaining by the Brotherhood of Locomotive Engineers ("BLE").

17.    Plaintiff Carlos Belgrave is an African-American citizen of the United States and a resident of the State of Florida.  He has been continuously employed by Amtrak since 1973 and is presently working as Carman/Car Inspector in the Mechanical Department of its Intercity SBU.  Belgrave is represented for purposes of collective bargaining by the TCU.

18.    Plaintiff Audley Boland is an African-American citizen of the United States and a resident of the State of Florida.  He has been employed by Amtrak since July 30, 1993 and is presently working as an Electrician in the Mechanical Department of its Intercity SBU.  Boland is represented for purposes of collective bargaining by the International Brotherhood of Electrical Workers ("IBEW").

19.    Plaintiff Donald Rodgers is an African-American citizen of the United States

and a resident of the State of Florida.  He has been employed by Amtrak in its Intercity SBU since August 25, 1986, and is presently working as a Conductor in the Transportation Department of Amtrak's Intercity SBU. Rodgers is represented for purposes of collective bargaining by the UTU.

20.    Plaintiff Harold Redfern is an African-American citizen of the United States and a resident of the State of North Carolina.  He has been, since 1991, and is presently employed by Amtrak in its Intercity SBU as an engineer.   During his employment by Amtrak, Redfern has been represented for purposes of collective bargaining by the BLE.

21.    Plaintiff Reachelle Francis is an African-American citizen of the United States and a resident of the State of Louisiana.  She was employed by Amtrak as a Train Attendant/Service Attendant in the Customer Services Department of its Intercity SBU from June 16, 1997 until her discharge on December 1, 1997.  During her employment with Amtrak, Francis was represented for purposes of collective bargaining by the ASWC.

22.    Plaintiff Bertha Kelly is an African-American citizen of the United States and a resident of the State of Illinois.  Kelly applied for the position of Cook in Amtrak's Intercity SBU in June, 1998, but was denied the position.

23.    Plaintiff Michael Helton is an African-American citizen of the United States and a resident of the State of Illinois.  He has been continuously employed by Amtrak since October 23, 1989, and is presently working as a Baggage Clerk in the Mail Baggage and Express Department of its Intercity SBU.  Helton is represented for purposes of collective bargaining by the TCU.

24.    Plaintiff William Miller is an African-American citizen of the United States and a resident of the State of Illinois.  He has been continuously employed by Amtrak in its

Intercity SBU since February 29, 1988, and is presently working as a Release Lead in the Mail Baggage & Express Department of its Intercity SBU.  Miller is represented for purposes of collective bargaining by the TCU.

25.    Plaintiff Darryl Latham is an African-American citizen of the United States and a resident of the State of Illinois.  He has been continuously employed by Amtrak in its Intercity SBU since August 6, 1983, and is presently working as an Administrative Chief in the On Board Services Department of its Intercity SBU.  Latham is represented for purposes of collective bargaining by the ARSA.

26.    Plaintiff Lysa Ridley-Jones is an African-American citizen of the United States and a resident of the State of Georgia.  Jones has been continuously employed by Amtrak since 1986, and is presently working as a Ticket Agent in Atlanta, Georgia.  Ridley-Jones is represented for purposes of collective bargaining by the TCU.

27.    Plaintiff Darrell Johnson is an African-American citizen of the United States and a resident of the State of Georgia.  He has been employed at Amtrak since September 25, 1989, and is presently working in Charlotte Facility as a ticket agent/baggageman.  Johnson is represented for purposes of collective bargaining by the TCU.

28.    Plaintiff Kirk Marshall is an African-American citizen of the United States and a resident of the State of Illinois.  He was initially employed by Amtrak in its Intercity SBU in Chicago on November 26, 1986 as a Commissary Clerk.  In approximately 1992, Marshall transferred to the position of ticket clerk in the Ticket Office.  In approximately 1997, Marshall transferred back to the position of Commissary Clerk.  Marshall remained in that position until his resignation in 1997.  During his employment with Amtrak, Marshall was represented for purposes of collective bargaining by the TCU.

18

29.     Plaintiff Carl Betterson is an African-American citizen of the United States and a resident of the State of Georgia.  He has been continuously employed by Amtrak since July 16, 1975, and is currently working as a Ticket Agent in Atlanta, Georgia.  Betterson is represented for purposes of collective bargaining by the TCU.

30.     Plaintiff Augustine Glass, Jr., is an African-American citizen of the United States and a resident of the State of Pennsylvania.  He has been employed by Amtrak in its Intercity SBU as a Coach Cleaner in Harrisburg, Pennsylvania, from June 1980 through the present.  Throughout his employment by Amtrak, Glass has been represented for purposes of collective bargaining by the TWU.

31.     Plaintiff The Pennsylvania Federation of the Brotherhood of Maintenance of Way Employes ("PFBMWE") is a labor organization headquartered in the State of Pennsylvania and doing business in the District of Columbia.  The Pennsylvania Federation of the BMWE represents, for purposes of collective bargaining with Amtrak, the maintenance of way workers, such as trackmen, in the Chicago portion of Amtrak's Intercity SBU.

32.     Plaintiff Arshell Qualls is an African-American citizen of the United States and a resident of the State of California.  She has been employed by Amtrak from 1974 through the present, first in the Intercity SBU, and since 1993, in the West SBU.  She is presently a Travel Clerk at Union Station in the Station Services Department in Los Angeles.  During her employment by Amtrak, Qualls has been represented for purposes of collective bargaining by the TCU.  On February 2, 1997, Qualls filed a classwide charge of race discrimination with the United States Equal Employment Opportunity Commission in Los

Angeles.  She is currently in the process of completing administrative requirements for issuance of a Notice of Right To Sue.

33.     Plaintiff Linda Stroud is an African-American citizen of the United States and a resident of the State of California.  She has been employed  by Amtrak in its Amtrak West SBU since 1980, and is currently employed in the mechanical department. Stroud is represented for purposes of collective bargaining by ARSA , IBEW and UTU.  On March 20, 1997, Stroud filed a classwide charge of race discrimination, and on March 10, 1999, Stroud filed a charge of discrimination and retaliation, both with the United States Equal Employment Opportunity Commission in Los Angeles.  She is currently in the process of completing administrative requirements for issuance of a Notice of Right To Sue.

34.     Inez Tarver is an African-American citizen of the United States and a resident of the State of California.  She has been employed by Amtrak in its West SBU since 1980, and presently works as a material management clerk in Los Angeles.  She is represented for purposes of collective bargaining by the TCU.  On April 8, 1997, Tarver filed a classwide charge of race discrimination, and on January 27, 1999, Tarver filed a charge of discrimination and retaliation, both with the United States Equal Employment Opportunity Commission in Los Angeles.  She is currently in the process of completing administrative requirements for issuance of a Notice of Right To Sue.

35.     Plaintiff Vernon Brown is an African-American citizen of the United States and a resident of the State of California.  He has been continuously employed by Amtrak in its Amtrak West SBU since 1985, and is presently working as an On-board services attendant. Brown is represented for purposes of collective bargaining by the TCU.

20

36.     Plaintiff Castro Landers is an African-American citizen of the United States and a resident of the State of California.  He has been was employed by Amtrak in its West SBU as from 1988 through the present, as a ticket clerk, ticket agent, ticket trainer, assistant conductor, and conductor working out of the Los Angeles crew base.  During his employment by Amtrak, Landers has been represented for purposes of collective bargaining by the TCU while in the ticketing jobs, and by the UTU while working as an assistant conductor.

37.     Plaintiff Ed Carr is an African-American citizen of the United States and a resident of the State of California.  He has been continuously employed by Amtrak in its West SBU from 1977 through the present, as a Coach Cleaner, Sheet Metal Worker, Assistant Conductor, and as an Engineer Trainee working out of the Los Angeles crew base.   Throughout his employment by Amtrak during the 1990's, Carr has been represented for purposes of collective bargaining by the UTU and the BLE.

38.     Plaintiff Devern Fleming, Sr. is an African American citizen of the United States and a resident of the state of California.  He has been employed by Amtrak in the West SBU as a reservation agent and supervisor since  June, 1992, and is currently  so employed.  Fleming is currently represented for purposes of collective bargaining by the TCU.

39.     Plaintiff David Tucker is an African-American citizen of the United States and a resident of the State of California.  He has been employed by Amtrak in its West SBU as a Reservations Sales Agent ("RSA") and a Reservation/Statistics Clerk at the Reservations Office in Riverside, California, from 1990 through the present.  Throughout his employment by Amtrak, Tucker has been represented for purposes of collective bargaining by the TCU.

40.     Plaintiff Cyril Hunte is an African-American citizen of the United States and a resident of the State of California. He has been employed by Amtrak in its West SBU as a RSA at the Reservation Office in Riverside, California, from November 1996 through the present.    Throughout his employment by Amtrak, Hunte has been represented for purposes of collective bargaining by the TCU.

41.     Plaintiff Bryant Cox is an African-American citizen of the United States and resident of the State of California. He has been employed by Amtrak in the Amtrak West SBU  since 1986, and is presently working as a redcap/baggage handler at the Los Angeles station. Cox is represented for purposes of collective bargaining by, and is a local representative of the TCU.

42.     Plaintiff James Silas is an African-American citizen of the United States and a resident of the State of California. He has been continuously employed by Amtrak in its West SBU since 1987. He occupies the position of Lead Baggage Handler in Los Angeles. Throughout his employment by Amtrak, Silas has been represented for purposes of collective bargaining by the TCU.

43.     Plaintiff Kelvin Benton is an African-American citizen of the United States and a resident of the State of California. He has been continuously employed by Amtrak in its West SBU since February 1988.  He has worked both at the Reservations Office in Riverside, California, and at the commissary in Los Angeles.  He presently occupies the position of commissary truck driver in Los Angeles.  During his employment by Amtrak, Benton has been represented for purposes of collective bargaining by the TCU.

44.     Plaintiff Donald Shepard is an African-American citizen of the United States and a resident of the State of California.  He has been continuously employed by Amtrak

in its West SBU from 1971 through the present, working most recently as a Carman and Mechanic in Los Angeles.  Throughout his employment by Amtrak, Shepard has been represented for purposes of collective bargaining by the TCU.

45.     Plaintiff Alvin Randolph is an African-American citizen of the United States and a resident of the State of Texas.  He has been employed by Amtrak from 1983 through the present, and worked in its West SBU from 1983 until November 1999 as a Train Attendant and an Assistant Conductor and a Conductor out of the Los Angeles Crew Base. At present, he is a conductor working out of Fort Worth, Texas.  During his employment by Amtrak, Randolph has been represented for purposes of collective bargaining by the TCU and the UTU.

46.     Plaintiff Albert Miller is an African-American citizen of the United States and a resident of the State of California.  He has been employed by Amtrak in its West SBU from 1982 through the present as a Trackman, Coach Cleaner, and, since 1989, as a Carman, working in Los Angeles.  During his employment by Amtrak, Miller has been represented for purposes of collective bargaining by the Joint Council of Carmen ("JCC").

47.     Plaintiff Faye Williams is an African American citizen of the United States and a resident of the State of California.  She has been employed by Amtrak in its West SBU since 1981 and is presently working as a ticket clerk at Union Station in Los Angeles. Williams is represented for purposes of collective bargaining by the TCU.

48.     Plaintiff Moyse Howard is an African-American citizen of the United States and a resident of the State of California.  He has been employed by Amtrak in its West SBU from 1994 through the present.  He has worked as an On Board Services Chief and a Crew Base Supervisor, and has worked out of both the Los Angeles and Oakland crew bases.

Presently he works at the Oakland crew base.  During his employment by Amtrak, Howard has been represented for purposes of collective bargaining by the ARSA.

49.     Plaintiff Twilva "Cookie" Simpson is an African-American citizen of the United States and a resident of the State of California.  She has been employed by Amtrak in its West SBU as a Commissary Clerk from 1988 through the present, working in tickets, material control, and at the commissary in Sacramento, San Francisco, and at the Oakland crew base.  Throughout her employment by Amtrak, Simpson has been represented for purposes of collective bargaining by the TCU.

50.     Plaintiff Timeka Collier is an African-American citizen of the United States and a resident of the State of California.  She was employed by Amtrak in its West SBU as a Lead Service Attendant and as a Commissary Clerk from June 1993 until her termination on October 22, 1997.  She worked at the commissary at the Oakland crew base.  During her employment by Amtrak, Collier was represented for purposes of collective bargaining by the TCU.

51.     Plaintiff Raymond Burditt is an African-American citizen of the United States and a resident of the State of Washington.  He has been employed by Amtrak in its West SBU as a Coach Cleaner in the King Street Coach Yard in Seattle from 1989 through the present.  During his employment by Amtrak, Burditt has been represented for purposes of collective bargaining by the TCU.

52.     Plaintiff Kimberli Hornes is an African-American citizen of the United States and a resident of the State of California.  She was employed by Amtrak in its West SBU as an On Board Service Train Attendant from March 25, 1998 until she was terminated on July 6, 1998.  She worked out of Union Station in Los Angeles.  During her employment by

Amtrak, Hornes was represented for purposes of collective bargaining by the TCU.  On July 13, 1998, Hornes filed a charge of race discrimination with the United States Equal Employment Opportunity Commission in Los Angeles.  She is currently in the process of completing administrative requirements for issuance of a Notice of Right To Sue.

53.     Plaintiff Wanda Johnson is an African-American citizen of the United States and a resident of the State of California.  She was hired by Amtrak in its West SBU to work as a Coach Cleaner in Los Angeles on March 1, 1999, but was refused an opportunity to start work on her reporting day, March 11, 1999.

54.     Plaintiff Daisy Moore is an African-American citizen of the United States and a resident of the State of California.  She applied for employment with Amtrak in its West SBU in Oakland and San Jose in 1996, 1997, and/or 1998.

55.     Plaintiff Ted Bailey is an African-American citizen of the United States and a resident of the State of Maryland.  He has been employed by Amtrak in its NEC SBU as an Electrician in Ivy City, Maryland, near Washington D.C., from 1984 through the present.  Throughout his employment by Amtrak, Bailey has been represented for purposes of collective bargaining by the IBEW.

56.     Plaintiff Clyde Briscoe is an African-American citizen of the United States and a resident  of the State of Maryland.  He was employed by Amtrak in its NEC SBU as an Electrician at the Amtrak Maintenance Facility in Washington D.C., from May 1992 until his constructive discharge in late 1999.  Throughout his employment by Amtrak, Bailey was represented for purposes of collective bargaining by the IBEW.

57.     Plaintiff Michael Steward is an African-American citizen of the United States and a resident of the State of Maryland.  He has been employed by Amtrak in its NEC SBU

25

since June, 1994, and is presently working as a conductor based in Washington, D.C. Steward is represented for purposes of collective bargaining by the UTU.

58.     Plaintiff Barry L. Price is an African-American citizen of the United States and resident of the State of Maryland.  He has been employed by Amtrak in its NEC SBU since 1986, and is presently working as a Class 4 Engineer in Washington, D.C.  Price is represented for purposes of collective bargaining by the NCF&O.

59.     Plaintiff Wilson Hutchinson is an African-American citizen of the United States and a resident of the District of Columbia.  He has been employed by Amtrak in its West and NEC SBU's as a Train Attendant, Sleeping Car Attendant, Service Attendant, and Lead Service Attendant in the On Board Services Department continuously from 1991 through the present.  He has worked out of Union Station in Los Angeles and Union Station in Washington, D.C.   Throughout his employment by Amtrak, Hutchinson has been represented for purposes of collective bargaining by the TCU.

60.     Plaintiff Gavin Clarke is an African-American citizen of the United States and a resident of Maryland.  He has been employed by Amtrak in its NEC SBU as a Commissary Clerk, Lead Commissary Clerk, and as an Assistant Train Director at Union Station in Washington D.C., from 1988 through the present.  Throughout his employment by Amtrak, Clarke has been represented for purposes of collective bargaining by the TCU.

61.     Plaintiff Quinton Saunders is an African American citizen of the United States and resident of the State of Maryland.  He was employed by Amtrak in its NEC SBU from 1979 until he was wrongfully terminated in 1995.  Saunders was represented during his employment by the TCU.

62.    .Plaintiff Takeela Saunders is an African American citizen of the United States and resident of the State of Maryland.  She has been continuously employed with Amtrak in its NEC SBU since September 1, 1984, and is currently a Clerk-Stenographer. Saunders is represented for purposes of collective bargaining by the TCU.

63.    Plaintiff Brian Watkins is an African-American citizen of the United States and a resident of the District of Columbia.  He was employed by Amtrak in its West and NEC SBU's as a Lead Service Attendant in the On Board Services Department from 1986 until 1999.  He has worked out of Union Station in Los Angeles and, more recently, out of Union Station in Washington, D.C.  Throughout his employment by Amtrak, Watkins has been represented for purposes of collective bargaining by the TCU.

64.    Plaintiff John McCargo is an African-American citizen of the United States and a resident of the State of Maryland.  He has been employed by Amtrak since 1983 in its NEC SBU, and is presently working as a train attendant out of Washington, D.C.  McCargo is represented for purposes of collective bargaining by the TCU and ARASA.

65.    Plaintiff Carmen Wilson is an African-American citizen of the United States and a resident of the State of Delaware.  She has been employed by Amtrak in its NEC SBU as a Crew Dispatcher from 1998 through the present, working at the Consolidated National Operations Center ("CNOC") in Wilmington.  Throughout her employment at Amtrak, Wilson has been represented for purposes of collective bargaining by the TCU.

66.    Plaintiff Wayne Bailey is an African-American citizen of the United States and a resident of the State of Pennsylvania.  He has been employed by Amtrak in its NEC SBU from 1986 through the present and is currently a Signalman's Helper in Philadelphia.

27

During his employment by Amtrak, Bailey has been represented for purposes of collective bargaining by the Brotherhood of Railway Signalmen ("BRS").

67.    Plaintiff Joseph Pearson is an African-American citizen of the United States and a resident of the State of Pennsylvania.  He has been employed by Amtrak in its NEC SBU from 1988 through the present as a Station Cleaner, a Coach Cleaner, and presently as a Heavy Equipment Operator.  He works in Philadelphia in the Race Street Engine House at the Penn Coach Yard.  Pearson is presently represented for purposes of collective bargaining by the National Conference of Firemen & Oilers ("NCF&O").

68.    Plaintiff Mary Mitchell is an African-American citizen of the United States and a resident of the State of Pennsylvania.  She has been employed by Amtrak in its NEC SBU as a secretary and clerical worker from 1987 through the present, working in various departments including Material Control, Transportation, Revenue Accounting, Purchasing, Accounts Payable, Payroll, and Engineering at the 30th Street Station in Philadelphia.  Throughout her employment by Amtrak, Mitchell has been represented for purposes of collective bargaining by the TCU.

69.    Plaintiff Steven Johnson is an African-American citizen of the United States and a resident of the State of New York.  He was employed by Amtrak in its NEC SBU as a Service Attendant in the On Board Services Department from 1993 until his termination on March 3, 1999, working out of the New York City crew base.  Throughout his employment by Amtrak, Johnson was represented for purposes of collective bargaining by the TWU.

70.    Plaintiff Minnie Baker is an African-American citizen of the United States and a resident of the State of New York.  She was employed by Amtrak in its NEC SBU as an

Usher/Information Booth Clerk from 1987 until her termination on April 2, 1998, working in Pennsylvania Station in New York City. Throughout her employment by Amtrak, Baker was represented for purposes of collective bargaining by the TCU.

71.     Plaintiff Robert Guerra is an African-American citizen of the United States and a resident of the State of New Jersey. He has been employed by Amtrak in its NEC SBU as a Policeman in New York City from 1986 through the present. Throughout his employment by Amtrak, Guerra has been represented for purposes of collective bargaining by the American Federation of Railroad Police ("AFRP").

72.     Plaintiff Bonita Stephney is an African-American citizen of the United States and a resident of the State of Massachusetts. She has been employed by Amtrak in its NEC SBU as a Coach Cleaner and a Carman Helper from 1993 through the present, working at the Southampton Yard in Boston. Throughout her employment by Amtrak, Stephney has been represented for purposes of collective bargaining by the TWU.

73.     Plaintiff Terence Whitesides is an African-American citizen of the United States and a resident of the State of Massachusetts. He has been employed by Amtrak in its NEC SBU as a Car Cleaner and a Laborer from 1997 through the present, working at the Southampton Yard in Boston. Throughout his employment by Amtrak, Whitesides has been represented for purposes of collective bargaining by the TWU and the NCF&O.

74.     Plaintiff Sonia Hodge is an African-American citizen of the United States and a resident of the State of Massachusetts. She has been employed by Amtrak in its NEC SBU as a Coach Cleaner at the Southampton Shop in Boston from 1997 through the present. Throughout her employment by Amtrak, Hodge has been represented for purposes of collective bargaining by the TWU.

75.    Plaintiff Cassandra Cato-Louis is an African-American citizen of the United States and a resident of the State of Massachusetts. She has been employed by Amtrak in its NEC SBU as an Electrician from 1989 through the present, working at the Boston Engine Terminal in Somerville, Massachusetts.  Throughout her employment by Amtrak, Cato-Louis has been represented for purposes of collective bargaining by the IBEW.

76.    Plaintiff Karl Thomson is an African-American citizen of the United States and a resident of the State of Ohio. He has applied several times for employment with Amtrak in its NEC SBU for work in Boston since 1994.

77.    Plaintiff Clinton Daniels is an African-American citizen of the United States and a resident of the State of New York. He has applied for employment with Amtrak in its NEC SBU in New York many times since the 1980's, most recently in 1999.

78.    Plaintiff Victor Kipping is an African-American citizen of the United States and a resident of the State of Massachusetts.  He has applied for employment with Amtrak in its West NEC SBU in Boston since 1998.

79.    Defendant Amtrak is a corporation incorporated under the laws of, and with its principal place of business in, the District of Columbia.  It provides passenger rail service to more than five hundred (500) stations in forty-four (44) states.  From its corporate office in the District of Columbia, located at 400 North Capitol Street, N.W., Amtrak maintains actual and/or constructive control, oversight, and/or direction over all of its operations at all of its various locations, including the employment policies, practices and procedures to be utilized and adhered to at all of its locations.  The acts set forth in this Complaint were authorized, ordered and/or done by Amtrak's officers, agents, employees, and/ or representatives while actively engaged in the management of Amtrak's business.

80.     Defendants IBEW, NCF&O, BLE, TCU, BRC, UTU, ARSA, ASWC, AFRP, BRS, TWU, JCC, Sheet Metal Workers' International Association ("SMWIA"), International Brotherhood of Blacksmiths and Boilermakers ("IBBB"), and International Association of Machinists ("IAM") (collectively the "Unions") are labor organizations, each representing some of the named Plaintiffs and/or some of the putative class members for purposes of collective bargaining with Amtrak.  The Unions are entities subject to suit under 42 U.S.C. § 1981 and Title VII of the Act of Congress known as the "Civil Rights Act of 1964", 42 U.S.C. § 2000e et seq. as amended by the Civil Rights Act of 1991.

## V.     CLASS ACTION ALLEGATIONS

### A.     General Facts and Class Definition

81.     Amtrak is divided into three strategic business units, or "SBUs": the Northeast Corridor, Amtrak Intercity, and Amtrak West.   Amtrak's Northeast Corridor refers to the territory between Newport News, Virginia and Boston, Massachusetts, including connections to Springfield, Massachusetts, St. Albans, Vermont, Harrisburg, Pennsylvania, Buffalo, New York, and Toronto and Montreal in Canada.  Amtrak West refers to the geographic region of California, Oregon, and Washington (state).  The Amtrak Intercity SBU refers to the geographic region within the continental United States bordered by Amtrak West and the Northeast Corridor.  The Intercity SBU consists of a coordinated network of intercity rail services, including both short distance and long distance services. Twenty-four (24) of the named Plaintiffs have been employed, or have applied for employment, in Amtrak's Intercity SBU.  Twenty-three (23) of the named Plaintiffs have been employed, or have applied for employment, in Amtrak's West SBU.  Twenty-four (24)

of the named Plaintiffs and proposed class members have been employed, or have applied for employment, in Amtrak's NEC SBU.

82.    All hourly, non-exempt employees who work in Amtrak's Mechanical Department are represented for purposes of collective bargaining by the IBEW, the IAM, the NCF&O, the BRC, the JCC, the SMWIA, the IBBB, or the ARSA.  There have been collective bargaining agreements in existence between Amtrak and, respectively, the IBEW, the IAM, the NCF&O, the BRC, the JCC, the SMWIA, the IBBB, and the ARSA concerning some of the named Plaintiffs and/or some members of the proposed classes throughout the applicable liability period.

83.    All hourly, non-exempt employees who work in Amtrak's Transportation Department are represented for purposes of collective bargaining by the UTU, the BLE, or the AFRP.  There have been collective bargaining agreements in existence between Amtrak and, respectively, the UTU, the BLE, and the AFRP concerning some of the named Plaintiffs and/or some members of the proposed classes throughout the applicable liability period.

84.    All hourly, non-exempt employees who work in Amtrak's Customer Services Department are represented for purposes of collective bargaining by the TCU, the ASWC, the TWU, or the ARSA.   There have been collective bargaining agreements between Amtrak and, respectively, the TCU, the ASWC, the TWU, and the ARSA concerning some of the named Plaintiffs and/or some members of the proposed classes throughout the applicable liability period.

85.    All hourly, non-exempt employees who work in Amtrak's Engineering Department are represented for purposes of collective bargaining by the PFBMWE, the

BRS or the ARSA.  Excluded from the scope of this Amended Complaint are all track workers in Amtrak's NEC SBU who are represented by PFBMWE and are covered by the settlement agreement in *Thornton et al. v. Amtrak*, Civil Action Number 1:98CV00890 (EGS).  There have been collective bargaining agreements between Amtrak and, respectively, the PFBMWE, the BRS, and the ARSA concerning some of the named Plaintiffs and/or some members of the proposed classes throughout the applicable liability period in this case.

86.    The named Plaintiffs seek to maintain claims on their own behalf and on behalf of two classes of Amtrak employees and applicants.  One or both of these classes may be divided into two or more subclasses at such time as the plaintiffs move for class certification.  Each of the named Plaintiffs is a member of one of these two classes.

87.    The first class consists of all African-Americans who are, or have been, employed by Amtrak in hourly, non-exempt positions and have experienced race discrimination at any time during the liability period (the "employee class").  All of the named Plaintiffs, except Bertha Kelly, Reachelle Francis, Daisy Moore, Wanda Johnson, Kimberli Hornes, Karl Thomson, Clinton Daniels, and Victor Kipping are proposed representatives of this class.  Upon information and belief, there are more than 6,500 members of the proposed employee class.

88.    The second class consists of all African-Americans who have applied and been rejected for employment by Amtrak for hourly, non-exempt positions at any time during the liability period (the "rejected applicant class").  This class includes applicants who have applied and been rejected and those who have been terminated by Amtrak during their probationary period.  Plaintiffs Bertha Kelly, Reachelle Francis, Daisy Moore,

Wanda Johnson, Kimberli Hornes, Karl Thomson, Clinton Daniels, and Victor Kipping are the class representatives of this class.  At present, it is impossible to determine even an approximate number of the members of the proposed rejected applicant class; however, the Plaintiffs believe that the members of this class will number in the thousands.

89.    The named Plaintiffs seek to represent all of the African-American employees and rejected applicants described above who have been subjected to one or more aspects of the systemic racial discrimination and racial harassment described in this Complaint, including, but not limited to: discriminatory hiring and advancement policies, practices and procedures; disparate and hostile working conditions; discriminatory training policies, practices and procedures; disparate disciplinary policies, practices and procedures, discriminatory work and equipment assignments; the failure to promulgate, maintain and enforce effective racial harassment and/or non-discrimination policies, practices and procedures;  and unequal terms and conditions of employment.  The systemic racial discrimination and racial harassment described in this Complaint reaches many years back in time, and has been and is continuing in nature.

**B.    Efficiency of Class Prosecution of Common Claims**

90.    Certification of classes of African-American applicants and employees similarly situated to the named Plaintiffs is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the named Plaintiffs and the proposed classes.  The individual claims of the named Plaintiffs require resolution of the common question of whether Amtrak has engaged in a systemic pattern and/or practice of racial discrimination and racial harassment against African-American applicants and employees.  The named Plaintiffs seek remedies to eliminate the adverse

effects of such discrimination in their own lives, careers and working conditions and in the lives, careers and working conditions of the proposed class members, and to prevent continued racial discrimination and/or racial harassment in the future.  The named Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination and/or harassment has had on them individually, and on African-Americans generally.  In order to gain such relief for themselves, as well as for the putative class members, the named Plaintiffs will first establish the existence of systemic racial discrimination as the premise for the relief they seek.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed classes of African-Americans who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the named Plaintiffs, the proposed classes, and Amtrak.  The named Plaintiffs' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case.  Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

**C.    Numerosity and Impracticability of Joinder**

91.    The classes which the named Plaintiffs seek to represent are too numerous to make joinder practicable.  The proposed classes consist of thousands of current, former, and future African-American employees and applicants for employment during the liability period.   By way of illustration, in 1996, Amtrak employed approximately 25,000 non-management employees, approximately 6,500 of whom were African-American.  Turnover

increases those numbers by an unknown amount.  Amtrak's pattern and/or practice of race discrimination also makes joinder impracticable by discouraging African-Americans from applying for or pursuing promotional, training or transfer opportunities, thereby making it impractical and inefficient to identify many members of the classes prior to determination of the merits of Amtrak's class-wide liability.

### D.   Common Questions of Law and Fact

92.   The prosecution of the claims of the named Plaintiffs will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the putative classes they seek to represent.   The common questions of law ould include, *inter alia*, whether Amtrak has engaged in unlawful, systemic race discrimination in its hiring, advancement, transfer, training, and discipline policies, practices and procedures, and in the general terms and conditions of work and employment; whether Amtrak is liable for a continuing systemic violation of Title VII and/or Section 1981; and what are the proper standards for proving a pattern or practice of discrimination by Amtrak against its African-American applicants and employees.  The common questions of fact would include, *inter alia*: whether Amtrak has, through its policies, practices and procedures, (a) precluded or delayed the hiring of African-Americans and/or the promotion of African-Americans into jobs traditionally held by white employees; (b) discouraged African-Americans from applying for employment and/or from seeking promotions and/or transfers into jobs traditionally held by white employees; (c) prevented African-Americans from learning about or competing for opportunities in jobs traditionally held by white employees; (d) subjected African-Americans to a racially hostile work environment; (e) segregated African-Americans into jobs and departments traditionally held and occupied

by African-Americans;  (f) failed to train or offer training to African-Americans so they could compete for positions traditionally held by white employees; (g) subjected African-Americans to disparate disciplinary policies, practices, and procedures; and (h) retaliated against employees who complained about race discrimination.

93.      The employment policies, practices and procedures to which the Plaintiffs and the class members are subject are set at Amtrak's corporate level and do not vary from one geographic location to another within Amtrak.  These employment policies, practices and procedures are not unique or limited to any particular station or geographic area; rather, they apply to all stations and geographic areas and thus, affect the named Plaintiffs and proposed class members in the same ways no matter where they work.

94.      The collective bargaining agreements ("CBAs") between each of the Unions and Amtrak cover various topics relevant to the claims of the named Plaintiffs and the putative class members in this case, including: (1)  the filling of vacant positions; (2) the right of employees to demonstrate qualifications for positions; (3) the right of employees to train on equipment or for a particular job; (4) the right of employees to transfer; (5) discipline and/or termination for cause; (6) layoffs; and (7) the impact of seniority on each of these topics.  The rules established by the CBAs concerning these issues are uniform throughout Amtrak.  This uniformity among the CBAs gives Amtrak's predominately white managers/supervisors freedom to make subjective decisions affecting the employees throughout Amtrak despite the various Unions representing the employees.

95.      Throughout the liability period, about 25% of the approximately 25,000 non-exempt Amtrak employees have been African-American.  Throughout this same period, a disproportionately large percentage of Amtrak's managers/supervisors have been white.

96.     Discrimination in advancement occurs as a pattern and/or practice throughout all levels and all geographic areas of Amtrak.  The white managers manipulate the CBA rules so that white employees receive better job assignments, better training opportunities, and better opportunities to demonstrate their qualifications for advancement.   White managers also utilize their discretion under the CBAs to decide: whether to permit on-the-job training, and if so, which employees will receive opportunities to train; whether an employee is ready to be tested on a particular job or piece of equipment; the type of test to be used; and the ultimate determination of whether the employee is qualified for advancement to a better work assignment or position.  As a result, white employees have advanced and continue to advance more rapidly to better and higher paying non-exempt jobs, including Foreman positions, than do African-American employees.

97.     Amtrak's policies, practices and procedures have had an adverse impact on African-American employees seeking advancement to better and higher paying positions. In general, the higher the level of the job classification, the lower  the percentage of African-American employees holding it.

**E.     Typicality of Claims and Relief Sought**

98.     The claims of the named Plaintiffs are typical  of the claims of the proposed classes.  The named Plaintiffs assert claims in each of the categories of claims asserted on behalf of the proposed classes.  The relief sought by the named Plaintiffs is also typical of the relief which is sought on behalf of the proposed classes.

99.     The named Plaintiffs are all hourly, non-exempt employees who have worked, or applicants who have sought employment, in the same departments and classifications

as those where the members of the proposed classes in this case have worked or sought employment.

100.   Discrimination in training, qualifications, and advancement affects the compensation of the named plaintiffs and all the employee class members in the same ways: wages are tied to job level, and opportunities for overtime work are greater for employees with better qualifications and training.   In situations involving layoffs, qualifications and training affect bumping rights of the named Plaintiffs and the employee class members in the same ways.

101.   Discrimination in discipline occurs as a pattern and/or practice throughout all levels and geographic areas of Amtrak.  Amtrak's white managers have manipulated the rules in the CBAs so that African-American, non-exempt employees, including both the named Plaintiffs and the employee class members, have been disciplined more frequently and more severely than their white counterparts.

102.   Discrimination in the form of a hostile work environment occurs as a pattern and/or practice throughout all levels and all geographical areas of Amtrak and affects the named Plaintiffs and the members of the employee class in the same ways.  Amtrak's white managers and supervisors have used derogatory language when speaking to and about African-American employees, have described African-Americans generally in negative and stereotypical terms, have retaliated against African-American, non-exempt employees who have sought to enforce their rights, have made it clear in various ways that they favor white, non-exempt employees, and otherwise have created a working environment hostile to African-American employees.  They have also condoned hostile words and actions by white, non-exempt employees which has added to the already hostile working environment.

103.    Several of the named Plaintiffs, and numerous other African-American non-exempt employees have complained repeatedly to Amtrak management about race discrimination and the racially hostile work environment.  Amtrak's investigations into these complaints have been inadequate and unresponsive.  The named Plaintiffs and the class members have been affected in the same ways by Amtrak's failure to implement adequate procedures to detect and correct this pattern and/or practice of discrimination, and by Amtrak's retaliation against those who complained.

104.    Amtrak has failed to create adequate incentives for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices and procedures described in this Complaint and/or has failed to adequately discipline its managers and other employees when they violate the law.  These failures have affected the named Plaintiffs and the class members in the same ways.

105.    The relief necessary to remedy the claims of the named Plaintiffs is exactly the same as that necessary to remedy the claims of the proposed class members in this case.  The named Plaintiffs seek the following relief for their individual claims and those of the members of the proposed classes: (a) a declaratory judgment that Amtrak has engaged in systemic racial discrimination against African-American applicants and employees by subjecting them to a racially hostile work environment, by limiting their ability to be promoted to better and higher paying positions, by limiting their employment opportunities to lower and less desirable classifications, by limiting their training and transfer opportunities, by exposing them to less desirable terms and conditions of employment, and by limiting the number of them hired into Amtrak and hired into preferable higher paying contract positions; (b) a permanent injunction against such continuing discriminatory

40

conduct; (c) injunctive relief which effects a restructuring of Amtrak's hiring, promotion, transfer, training, work environment, and discipline policies, practices and procedures so that African-Americans will be able to fairly compete in the future for hire and for promotion, transfer and/or assignment to better and higher paying classifications with terms and conditions of employment traditionally enjoyed by white employees; (d) injunctive relief which effects a restructuring of Amtrak's workforce so that African-Americans are hired into and promoted into higher and better paying classifications which they would have held in the absence of Amtrak's past racial discrimination; (e) back pay, front pay, compensatory and punitive damages and other equitable remedies necessary to make the African-American applicants and employees whole from Amtrak's past discrimination; and (f) attorneys' fees, costs and expenses.

### F.   Adequacy of Representation

106.    The named Plaintiffs/Class Representatives' interests are co-extensive with those of the members of the proposed classes in this case.   Each seeks to remedy Amtrak's discriminatory employment policies, practices and procedures so that African-Americans will no longer be subjected to a racially hostile work environment, will not be segregated into lower paying positions, will not be prevented from being hired, and once hired, will not be prevented from obtaining higher paying and more desirable positions.   The named plaintiffs are willing and able to represent the two (2) proposed classes fairly and vigorously as they pursue their similar individual claims in this action.   The named Plaintiffs have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.   The combined interests, experience and resources

of the named Plaintiffs and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Fed.R.Civ.P. 23(a)(4).

### G.    Requirements of Rule 23(b)(2)

107.    Amtrak has acted on grounds generally applicable to the named Plaintiffs and proposed classes by adopting and following systemic policies, practices and procedures which are racially discriminatory.  Racial discrimination is Amtrak's standard operating procedure rather than a sporadic occurrence.  Amtrak has refused to act on grounds generally applicable to the classes by, *inter alia*:  (a) refusing to adopt and apply selection, transfer, discipline and training policies, practices and procedures which do not have a disparate impact on or otherwise systemically discriminate against African-Americans; (b) refusing to provide equal terms and conditions of employment for African-Americans; and (c) refusing to provide a working environment free of racial harassment.  Amtrak's systemic discrimination and refusal to act on grounds that are not racially discriminatory has made appropriate final injunctive and declaratory relief with respect to both classes as a whole.

108.    Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of Amtrak's individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the named Plaintiffs' and class members' entitlement to monetary and non-monetary remedies at Stage II of such trial.  Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic racial discrimination against African-American applicants and employees at Amtrak.

### H.     Requirements of Rule 23(b)(3)

109.    The common issues of fact and law affecting the claims of the named Plaintiffs and proposed class members, including, but not limited to, the common issues identified in paragraphs 92 - 97 above, predominate over any issues affecting only individual claims.

110.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the named Plaintiffs and members of the proposed classes.

111.    The cost of proving Amtrak's pattern or practice of discrimination makes it impracticable for the named Plaintiffs and members of the proposed classes to control the prosecution of their claims individually.

112.    The Plaintiffs are aware of one pending race discrimination lawsuit brought against Amtrak by a member of the proposed classes in this case, specifically a case brought by Larry Turner.

113.    The District of Columbia is the most logical forum in which to litigate the claims of the named Plaintiffs and the proposed classes in this case.    Amtrak's headquarters are in Washington, D.C.; Washington, D.C. is one of the major Amtrak crew bases; and the related cases of *Thornton et al. v. Amtrak*, Civil Action Number 1:98CV00890 (EGS) and *McLaurin et al. v. Amtrak*, Civil Action Number 1:98CV02019 (EGS) are pending in this Court.

## VI.    CLASS CLAIMS

114.    The named Plaintiffs and the putative classes they seek to represent, have been subjected to a systemic pattern and/or practice of racial discrimination involving a battery of practices, including the use of written tests, which have had an unlawful disparate

impact on them and their employment opportunities.  Such racial discrimination includes adhering to a policy and practice of restricting the hiring of African-Americans and, if hired, restricting the advancement opportunities of African-American employees so that they remain in the lower classification and compensation levels.  Amtrak in effect bars African-Americans from better and higher paying contract positions which have traditionally been held by white employees.  The systemic means of accomplishing such racial stratification include, but are not limited to, Amtrak's selection, training and transfer policies, practices and procedures.

115.    Amtrak's hiring, advancement, training, and transfer policies, practices and procedures incorporate the following racially discriminatory practices: (a) relying upon subjective judgments, procedures and criteria which permit and encourage the incorporation of racial stereotypes and bias by Defendant's predominately white managerial staff in making hiring, promotion, transfer and training decisions; (b) refusing or failing to provide equal training opportunities to African-Americans; (c) refusing or failing to provide African-Americans with opportunities to demonstrate their qualifications for advancement; (d) refusing or failing to establish and/or follow policies, practices, procedures or criteria that reduce or eliminate disparate impact and/or intentional racial bias or stereotypes; (e) refusing or failing to post or announce all vacancies or employment opportunities in a manner that would allow African-American employees and applicants to learn about such opportunities and compete for them before they are filled by white employees or applicants; (f) using informal subjective selection methods which do not rely upon formal applications or other safeguards to open the procedure to competition by African-Americans; (g) pre-selecting whites, through the use of selective training opportunities, before full-time job

44

vacancies become generally known; (h) disqualifying African-American employees for vacancies by discriminatorily disciplining them; (i) discouraging applications and expressions of interest by African-Americans; (j) requiring employees and applicants seeking employed or to be promoted to higher and better paying positions to pass unnecessary written examinations; and (k) subjecting African-Americans to a racially hostile work environment.

116.   Amtrak's selection policies, practices and procedures have had a disparate impact on the African-American classes represented by the named Plaintiffs. Such procedures are not valid, job related or justified by business necessity. There are alternative objective, structured and more valid selection procedures available to Amtrak, which are more closely related to the actual responsibilities of the position, which would have less of a disparate impact on African-Americans. However, Amtrak has refused to consider or use such alternative procedures.

117.   Amtrak's selection, training and transfer policies, practices and procedures are intended to have a disparate impact on the named Plaintiffs and the classes they seek to represent. Such practices form a part of Amtrak's overall pattern and/or practice of keeping African-Americans in the lower classifications which have less desirable terms and conditions of employment.

118.   Because of Amtrak's systemic pattern and/or practice of racial discrimination, the named Plaintiffs and classes they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, wages, back and front pay, other employment benefits, embarrassment, emotional distress, humiliation, indignity and resulting injury and loss.  This pattern and/or practice of racial discrimination includes: not

being considered for traditionally white job classifications at the time of application, not being able to learn about or compete for employment opportunities in traditionally white job classifications after hire, not being appointed to traditionally white job classifications, not being given an opportunity to work in historically white positions, being denied training opportunities provided to white applicants and employees, being held in classifications and compensation levels traditionally occupied by African-Americans, being subjected to a racially hostile work environment, and being required to work in positions in which they and the other members of their race are demeaned.

119.    The named Plaintiffs and the classes they seek to represent have been subjected to a racially hostile work environment, both severe and pervasive, which affects the terms and conditions of their employment.  For example, white managers have used derogatory terms with respect to African-American employees, have described African-American employees, and African-Americans in general, in negative stereotypical terms, have made it clear that they favor white employees over African-American employees, and otherwise have created a working environment hostile to African-American employees. Amtrak has condoned similar words and actions by white, non-exempt employees. Discrimination in this form occurs throughout Amtrak.

120.    African-American employees of Amtrak have repeatedly complained to their supervisors, including upper-level management at Amtrak, about the racially hostile work environment.    Amtrak managers have conducted inadequate and/or superficial investigations of these complaints and have failed to implement adequate procedures to alter the hostile working environment.

121.    Amtrak has failed to impose adequate discipline on any manager or employee violating the equal employment opportunity laws and has failed to create adequate incentives for its managerial and supervisory personnel to comply with these laws regarding each of the employment policies, practices and procedures described above.

122.    The Plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief. The Plaintiffs are now suffering and will continue to suffer irreparable injury from Amtrak's unlawful policies, practices and procedures as set forth herein unless those policies, practices and procedures are enjoined by this Court.

VII.    **ALLEGATIONS OF THE NAMED PLAINTIFFS.**

123.    **Plaintiff Kenneth Campbell** is presently employed in Amtrak's Intercity SBU as an Assistant Conductor. He has been employed at Amtrak since May 19, 1986. During his employment at Amtrak, Campbell has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented Campbell from advancing into higher and better paying positions for which he was qualified, and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, Campbell has been subjected to a hostile working environment.

124.    Campbell began working for Amtrak on May 19, 1986 as a full-time Attendant. In July, 1988, he became an Assistant Conductor. In January, 1991, Campbell became a "Promoted Conductor." In order to work as a Full-Time Conductor, Amtrak requires employees to complete "physical characteristics training." This training is conducted by

other Conductors and Engineers, the vast majority of whom are white. During Campbell's physical characteristics training, the white Conductors, Engineers, Supervisors, and Managers withheld vital information from Campbell which he needed to pass. Because of these actions by the white Conductors, Engineers and Supervisors/Managers, it took Campbell much longer to complete his physical characteristics training than it should have taken. Campbell finally completed his written and oral examinations and became a Full-Time Conductor in January, 1995. Once in this position, the white Conductors, Engineers, and Supervisors/Managers began to severely harass, criticize and ridicule Campbell in an attempt to discourage him from continuing to hold the Full-Time Conductor position. These employees made it clear that they had no intention of taking orders from an African-American Conductor.

125.    In May, 1998, the racially hostile treatment encountered by Campbell became so severe and difficult to endure that he felt he had no other choice but to step down from his Conductor position to the Assistant Conductor position which he presently holds. Because of the severely hostile working conditions faced by him, Campbell has become discouraged from seeking further promotions to higher and better paying positions, like Full-Time Conductor.

126.    In June, 1996, Campbell complained to Amtrak's EEO representative, Sheila Davidson, about the continuing harassment to which he was being subjected at Amtrak. Davidson told Campbell that there was not much she could do for him, other than investigate his allegations, that she could not protect him from retaliation if she investigated his charges, and that she could not discipline the harassers even if it were proven that they were harassing him.

48

127.    In October, 1998, Campbell contacted Amtrak's Employee Advisory Program Representative, Mike Cipressi, and again complained about the retaliation and harassment he continued to face after his move back to Assistant Conductor.  Cipressi's only advice was for Campbell to file a complaint.

128.    The racially motivated harassment which Campbell has had to endure includes: being falsely accused of rule violations, having his car vandalized, placing a sign on the wall stating "the all new and improved Campbell coupler coming soon", and placing a sign on Campbell's radio battery stating "Dumb, Dumb Campbell."

129.    As a result of Amtrak's discriminatory actions, Campbell has suffered extreme harm.

130.    **Plaintiff Donald Batts** is presently employed in Amtrak's Intercity SBU as a Station Agent.   He was initially employed on October 18, 1987, as a Ticket Clerk/Baggage Handler in Alexandria, Virginia.  Batts remained in this position until 1989 when he became a Ticket Clerk.  In May, 1998, Batts was promoted to the position of Station Agent at Wilson, North Carolina.

131.    During his employment with Amtrak, Batts has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented Batts from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Batts has been subjected to a hostile working environment.

132.    Amtrak has discriminated against Batts during his employment by denying him promotions to those better and higher paying positions which are traditionally held by white employees and from which he could have had a better opportunity to be promoted to still better and higher paying positions.  For example, on November 27, 1996, Batts applied for Temporary Customer Service Supervisor, a contract position.  At the time of his application, Batts was qualified for this position: he held a four (4) year college degree, had three (3) years of managerial experience, and had approximately nine (9) years of total experience with Amtrak.  In January, 1997, Batts was interviewed for the Temporary Customer Service Supervisor position by Jerry Bridgeforth, a white supervisor, Sharon Gray, a white Human Resources Representative, and Daniel Aboud, a white District Supervisor.  On January 29, 1997, Batts received a letter from Amtrak stating that he had not been selected for the position.  Elizabeth Hill, a white female, was awarded the Temporary Customer Service Supervisor position.

133.    Batts was denied the position of Temporary Customer Service Supervisor because of his race.  Batts was better qualified for this position than was Hill.  He had more education, experience and seniority than did Hill.  Batts learned after Hill's selection that Tom Fortune, a white train manager, had stated two (2) months before the position was formally advertised, that Hill would be selected as the successful candidate for the position.  As a result of Amtrak's discriminatory actions, Batts has suffered extreme harm.

134.    **Plaintiff Patricia Young-Boseman** was hired on June 14, 1994 as a Coach Attendant in Amtrak's Intercity SBU.  She was promoted to Food Specialist in November, 1994 and to Lead Service Attendant in October, 1995.  She has remained a Lead Service Attendant since October, 1995.

135.    During her employment by Amtrak, Young-Boseman has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented her from advancing into higher and better paying positions for which she was qualified and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, she has been subjected to a hostile working environment.

136.    During her employment at Amtrak, Young-Boseman has been discriminated against in the discipline she has received.   Young-Boseman and African-American employees generally are treated more harshly in discipline than are their white co-workers. This pattern of harsher discipline culminated in Young-Boseman's discharge on January 19, 1998. Young-Boseman was terminated for alleged misappropriation of funds; however, Young-Boseman was not guilty of this conduct.  In fact, she was told that she could avoid discipline if she falsely accused another black employee of theft, which she refused to do. White employees, who are actually guilty of the same or similar misconduct alleged about Young-Boseman, have not been terminated by Amtrak.  Young-Boseman was terminated solely because of her race.  After her discharge, Young-Boseman filed a union grievance. After a hearing on the merits in June, 1999, the Public Law Board found that Amtrak's articulated reason for discharging Young-Boseman was unworthy of credence and that Amtrak's termination of Young-Boseman was not justified.  Therefore, Amtrak was ordered to reinstate Young-Boseman into her position of Lead Service Attendant.

137.    The inconsistent and discriminatory decisions by Amtrak described in the immediately proceeding paragraph were accomplished through the use of subjective

decision-making by the predominantly white Amtrak managerial staff.  Indeed, Amtrak has a pattern and/or practice of issuing Notices of Intent to Impose Discipline on white employees, but never imposing such discipline.  African-American employees, on the other hand, are not treated this way; rather, Amtrak issues either a Notice of Intent to Impose Discipline or a Notice To Withhold From Service, or both, against them and then proceeds to impose the discipline or dismissal.

138.    Amtrak discriminated against Young-Boseman during her employment by denying her training for, and promotions into, those better and higher paying positions which are traditionally held by white employees and from which she could have had a better opportunity to promote to still higher positions.  For example, in May, 1997, Young-Boseman submitted a letter application to Dan Butler, her white Train Manager, requesting assignment to the position of Chief Of On Board Services and requesting training for this position.  However, Butler denied Young-Boseman the training, and refused to interview her for the position.  Through a subjective decision-making process, the Chief of On Board Services position was awarded to a number of people, several of whom were white, less qualified, and junior to Young-Boseman.  Young-Boseman was denied the position of Chief On Board Services because of her race.

139.    As a result of Amtrak's discriminatory actions, Young-Boseman has suffered extreme harm.

140.    **Plaintiff Kenneth McDaniel** was hired on November 12, 1973 as a Service Attendant/Train Attendant in the On Board Services Department.  He has remained in this position to the present, and has worked in the Intercity SBU since August 1996.

141.    During his employment by Amtrak, McDaniel has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

142.    During his employment at Amtrak, McDaniel has been discriminated against in the discipline he has received.   McDaniel and African-American employees generally are disciplined more harshly than are their white co-workers.   This pattern of harsher discipline culminated in McDaniel's discharge on January 19, 1998.   McDaniel was terminated for alleged misappropriation of funds; however, McDaniel was not guilty of this conduct.  Rather, he was terminated solely because of his race.  In fact, he was told that he could avoid discipline if he falsely accused another black employee of theft, which he refused to do.  After his discharge, McDaniel filed a union grievance.  A hearing on the merits of this grievance was held in June, 1999 and the Public Law Board found that Amtrak's articulated reason for discharging McDaniel was unworthy of credence and that Amtrak's termination of McDaniel was not justified.   Amtrak was ordered to reinstate McDaniel into his position of Service Attendant/Train Attendant.  White employees, who are guilty or suspected of the same or similar misconduct alleged about McDaniel, including, but not limited to Michael Cammarata, have not been investigated, disciplined or terminated by Amtrak.

143.   These inconsistent and discriminatory decisions by Amtrak were accomplished through the use of subjective decision-making by the predominantly white Amtrak managerial staff.  Indeed,  Amtrak has a pattern and/or practice of issuing  Notices of Intent to Impose Discipline on white employees, but never imposing such discipline. African-American employees, on the other hand, are not treated this way; rather, Amtrak issues either a Notice of Intent to Impose Discipline or a Notice To Withhold From Service, or both, against them and then proceeds to impose the discipline or dismissal.

144.   Amtrak has discriminated against McDaniel during his employment by denying him promotions to those better and higher paying positions which are traditionally held by white employees and from which he could have had a better opportunity for promotion to still higher positions.  For example, McDaniel submitted an application for the Supervisor of Terminal Services position in Washington, D.C., on or about March 11, 1998. McDaniel was qualified for this position.  However, McDaniel received a letter dated June 3, 1998, stating that, although he was in fact qualified for the position, he would not be considered for it.  Amtrak continued to seek other persons to fill this position.  McDaniel was denied the position of Supervisor of Terminal Services because of his race and in retaliation for his prior complaints of race discrimination.

145.   As a result of Amtrak's discriminatory actions, McDaniel has suffered extreme harm.

146.   **Plaintiff Vicki Jones-Whitties** was initially hired by Amtrak on November 2, 1989 as a Baggage Agent in the Intercity SBU.  On July 7, 1996, Jones-Whitties was promoted to Lead Station Agent.  She has remained in this position to the present.

147.   During her employment at Amtrak, Vicki Jones-Whitties has been adversely

affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented Jones-Whitties from advancing into higher and better paying positions such as Safety Training Coordinator, and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Jones-Whitties has been subjected to a racially hostile work environment.

148.   In 1995, Jones-Whitties was referred to as a "lazy nigger" by a white fellow employee, Allen Scalsboro.  She reported this incident to her supervisor.  At the conclusion of the resulting investigation, Scalsboro was told, "Don't do this anymore", but no disciplinary action was taken against him by Amtrak.

149.   Subsequent to this incident, another black ticket agent, who had been dating a white woman, was told by Scalsboro that if he (Scalsboro) ever again saw the black agent leaving the white woman's house, he would "...have to go get his rope".  Jones-Whitties told her white supervisor, Danny Best, how outraged she was by this incident.  Best told Jones-Whitties that he could not talk to her about the incident because "there will probably be an investigation."  However, no investigation ever took place and Scalsboro is still employed by Amtrak today.  Because of these incidents and the stress of working in such a racially hostile environment, Jones-Whitties obtained a transfer out of this district.

150.   On July 7, 1996, Jones-Whitties transferred from Virginia to Durham, North Carolina, to take the job of Lead Station Agent, a job which was supposed to have a significant amount of overtime built into it.  The North Carolina Amtrak supervisory personnel did not want Jones-Whitties to receive this position; rather, they wanted Tim

Carol, a white male, to receive it.  In approximately April or May of 1997, the Lead Station Agent was re-bulletined and the overtime aspect removed, thereby depriving Jones-Whitties of her overtime pay.

151.   In July, 1997, J. McArthur, Jones-Whitties' white General District Manager, told Jones-Whitties that he was watching her, and that her job was in jeopardy if she deviated in any way from the established procedures.   Jones-Whitties was so traumatized by McArthur's threat that she had to "mark off" from work.

152.   After General District Manager McArthur's threat in 1997, Jones-Whitties was subjected to five (5) audits during the next year by her white supervisor, Bea Hill, including three (3) audits during the latter part of 1997 and early 1998. The first audit accused Jones-Whitties of several deviations from standard office procedures.  When Jones-Whitties, in her response to this audit, stated that the deviations were not attributable to her but rather, to her white predecessor, Michael Parnell, Jones-Whitties was asked by Hill not to submit her reply "because it makes Michael look so bad."

153.   In October, 1997, Jones-Whitties inadvertently violated Amtrak's rule about giving at least two (2) hours notice if you are too sick to come to work.  Due to her illness, Jones-Whitties called in sick only 45 minutes before her starting time.   As a result of this violation, she was brought up on charges which, if sustained, could have led to her termination.  White employees who violate this rule are not brought up on such charges. The charges against Jones-Whitties were not dropped until the day of the hearing.  By contrast, a white ticket agent during the same week failed to show up for work, and never called in at all.  The white ticket agent (who had been arrested, was in jail, and was

subsequently convicted), was never brought up on any charges or disciplined by Amtrak in any way.

154.    As a result of the third audit in early 1998, Jones-Whitties was again brought up on unsubstantiated charges of non-performance which could have led to her termination by Amtrak.  As with the previous audit, these charges were only dropped the day before the hearing.

155.    In the Spring of 1998, Brett McDaniel, a white ticket agent, was working under the supervision of Jones-Whitties.  B. McDaniel had previously been given two (2) years probation for making racial slurs about a black employee in Charlotte, North Carolina.  After being transferred to Durham, North Carolina, B. McDaniel was again written up and suspended for thirty (30) days for making rude remarks to a black passenger.  After B. McDaniel's return to work, Jones-Whitties admonished B. McDaniel for inadequate performance.  B. McDaniel responded with a contemptuous gesture, which was witnessed by a passenger.  When Jones-Whitties called her white supervisor to report this act of insubordination, the supervisor responded that if she had to come over to the office, she would put both Jones-Whitties and B. McDaniel out of service.  White supervisors who complain of insubordination are not treated in this manner.

156.    In the ensuing investigation regarding B. McDaniel, Amtrak failed to call the eyewitness, whose name and number had been furnished to Amtrak by Jones-Whitties.  Thus, when B. McDaniel denied the charge, Amtrak told Jones-Whitties that nothing could be done about it because it was a case of "his word against your word."  Any black employee who committed such an act of insubordination similar to that committed by B. McDaniel would have been terminated on the spot by Amtrak.

57

157.   In 1998, Jones-Whitties applied for the position of Safety Training Coordinator.  The job was given to white employee Jim Turner, who had less experience and seniority than Jones-Whitties.  When Jones-Whitties inquired why she was not even interviewed for the position, she was told that it was because there was a negative letter in her file.  (This letter related to her having been tardy in calling in sick one time in the previous year.)  Jones-Whitties was given no explanation as to why this same rule did not also disqualify Turner, who had been written up for acts of actual dishonesty, such as putting an employee's time card through the time clock long after the employee had left the premises.  Indeed, white employees similarly situated to Jones-Whitties are not disciplined for such conduct.  White supervisor Bea Hill placed the negative letter in Jones-Whitties' file because of Jones-Whitties' race and in retaliation for her being awarded the Lead Station Agent position in Durham, North Carolina.

158.   As a result of Amtrak's discriminatory actions, as set forth above, Jones-Whitties has suffered extreme harm.

159.   **Plaintiff Treadwell Smith** is presently employed as a Foreman III in the Intercity SBU. He has been employed by Amtrak since November 16, 1987.

160.   During his employment by Amtrak, Smith has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, he has been subjected to a hostile working environment.

161.    In 1998, the Foreman II position at Union Station became open. There were no qualified white applicants for this position; only Ron Sutton, an African-American employee, was qualified for this position.  However, Sutton was told he was not what Amtrak was looking for and was rejected for the job.  This position was subsequently upgraded to a Foreman III position.  Because the Foreman III position at Union Station was a more desirable job than the Foreman III position he held, Smith applied for the Union Station position.  Smith was well qualified for the Union Station Foreman III position, as he had previously held the Foreman II position at Union Station.  On August 10, 1998, Smith was awarded this position.  However, Amtrak's personnel department rescinded the decision to re-assign Smith on August 14, 1998.  The job was re-posted for bid on August 24, 1998 and Smith was the only black applicant.  A less qualified, white employee, Patrick Sleigher, who had worked under Smith's supervision, was selected over Smith for the Foreman III position at Union Station on September 22, 1998. When Smith asked Steve Reynolds, the white decision-maker, why he had not been selected for the Foreman III position at Union Station, Reynolds said that Sleigher's interview responses regarding safety were more impressive than Smith's.  However, the interviewers never questioned Smith about safety during his interview.

162.    Smith is currently working as a Foreman III in the Yard.  The Foreman III position at Union Station, which was denied to Smith because of his race, would have paid Smith more money than his present job because of the available overtime and would have offered Smith more desirable hours, which would have allowed him to attend school.  The Foreman III position at Union Station is also preferable because its proximity to higher level positions offers more opportunity to advance.

59

163.    In addition to being denied promotions and/or transfers to better and higher paying positions, the white managers for whom Smith has worked have repeatedly tried to bully him into disciplining African-American employees for actions for which white employees are not disciplined.  Smith has resisted imposing any such discipline on African-American employees, and the white managers have retaliated against him by accusing him of failing to perform his duties.

164.    Smith's current supervisor, Facility Maintenance Manager Ken Bibley, who is white, has referred to Hispanics as "wet backs" and has called an African-American an "uppity nigger."

165.    As a result of Amtrak's discriminatory actions, Smith has suffered extreme harm.

166.    **Plaintiff Sabrenna Mumphrey** was last employed as a Relief Lead Ticket Clerk in the Customer Services Department of Amtrak's Intercity SBU.   She was initially hired on July 14, 1994, as a Ticket Agent.  Mumphery's employment was terminated on March 12, 1998, by Deborah Wetter, a white Regional Manager, because Mumphrey had allegedly been sleeping on the job.

167.    During her employment by Amtrak, Mumphrey was adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented her from advancing into higher and better paying positions for which she was qualified and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition,

she was subjected to a hostile working environment and was retaliated against when she objected to such hostile work environment.

168.   In approximately November, 1997, Mumphrey observed a white Ticket Agent named Brett McDaniel ask Pamela Micheaux, an African-American employee who was sweeping the floor and had who recently had her hair colored, if black blondes were as "ditsy" as white blondes.  McDaniel then taunted  Micheaux by kicking her broom and tearing up pieces of paper and throwing them on the floor in front of her.  The actions of McDaniel caused Micheaux to start crying.  Mumphrey was offended by the conduct and comments of McDaniel and reported him to Station Manager John Quigley, a white male. Quigley took no formal disciplinary action against McDaniel; Mumphrey, on the other hand, was continually harassed by white Amtrak managers and co-employees after taking this action.

169.   Mumphrey was denied certain privileges of employment which were enjoyed by her white co-workers.  For example, it is the common practice at Amtrak to allow relatives of employees to ride the train free of charge.  Indeed, Mumphrey had been directed by Quigley to allow his relatives to ride free on numerous occasions.  However, when Mumphrey put her aunt on the train to ride free, Quigley took her out of service for thirty (30) days.

170.   Quigley discriminated against Mumphrey in the terms and conditions of her employment by forcing her to work excessive overtime.  On one occasion, when Mumphrey had already worked twenty-one (21) consecutive hours, Quigley refused to allow her to leave and forced her to work an additional six (6) hours.

171.   Quigley constantly disciplined and/or threatened to discipline Mumphrey for acts for which similarly situated white employees were not disciplined or threatened with discipline.  On or around February 8, 1998, Quigley falsely accused Mumphrey of sleeping on the job.  As a result of these false accusations by Quigley, Mumphrey was fired. Similarly situated white employees have in fact slept on the job and not been fired. Mumphrey, who was not sleeping on the job, was discharged because of her race.

172.   As a result of Amtrak's discriminatory practices, Mumphrey has suffered extreme harm.

173.   **Plaintiff Ricky Murdock** is presently employed as a Ticket Clerk in the Intercity SBU.  He has been employed in this position since October 30, 1992.

174.   During his employment by Amtrak, Murdock has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

175.   Murdock has been discriminated against in being denied promotions to better and higher paying positions.  Throughout his employment at Amtrak, Murdock sought promotions to better and higher paying positions.  However, he has never been awarded any of these jobs; rather, they have been awarded to white employees less qualified than him.  For instance, in October, 1995, Murdock applied, and was tested, for the position of Conductor in Jacksonville, Florida.  After completing and passing the written examination

62

for Conductor, Murdock was denied an interview.   Four white employees, three of whom had less seniority than Murdock, were appointed as Conductors instead of him. Murdock contacted Sharon Gray in the Personnel Department and received confirmation that he had passed the test.  Murdock should have been awarded a Conductor's position; however, he was denied this position because of his race.   Similarly, in May or June of 1997, Murdock applied for the position of Locomotive Engineer Trainee in Florence, South Carolina.  He was again denied this position, which was awarded to an equally or less qualified white employee.

176.   As a result of being continuously denied promotions to positions such as Conductor and Locomotive Engineer Trainer, Murdock has become discouraged from trying to advance to higher and better paying jobs.

177.   As a result of Amtrak's discriminatory actions, Murdock has suffered extreme harm.

**178.   Plaintiff Charmin Barrow** is presently employed as a Lead Service Attendant in the Intercity SBU.  She began working for Amtrak on or around October 9, 1996 as a Train Attendant.   In January, 1999, Barrow was promoted to the position of Lead Service Attendant.

179.   During her employment by Amtrak, Barrow has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented her from advancing into higher and better paying positions for which she was qualified and have deprived her of the opportunity to work in

an integrated environment in which African-American employees hold higher level positions. In addition, she has been subjected to a hostile working environment.

180.    In particular, Barrow has been discriminated against in promotions to better and higher paying positions. The promotions sought by Barrow were given to white employees equally or less qualified than her.  In January, 1998, several white employees were promoted over Barrow to Lead Service Attendant, including Michelle Lott, Lucinda Demarest and Veronica LeCroix.  Supervisor Brett Samples told Barrow she could not attend the Lead Service Attendant class, which is necessary to obtain the Lead Service Attendant position, because she had not been with the company for one year.  However, white employees employed less than one year, such as Traci Strickland, were permitted to attend the Lead Service Attendant class.

181.    Amtrak also pre-selects less qualified white employees and creates positions for them. African-American employees are not informed about these positions until the pre-selected white employees are already in them.  For example, in February, 1999, Barrow was denied a promotion to the position of Select Service Training Coordinator.  Because Amtrak failed to post this position, Barrow was even denied an opportunity to bid on this position.  A less qualified, white employee named Bill Rawlins was selected for this position.  Similarly, in March, 1999, Barrow was denied a promotion to Trainer for newly hired Train Attendants and Service Attendants. Because Amtrak failed to post this position, Barrow was also denied an opportunity to even apply for it.  Judy Eaton, a less qualified white employee, was selected for this position.

182.    In 1997, Barrow was denied a promotion to the position of On Board Service Chief.  Because Amtrak failed to post this position for bid before filling it, Barrow was again

denied an opportunity to even apply for it.  After filling this position, Amtrak ultimately posted it on the bulletin board.  When Barrow saw the posting for this job and asked about it, her supervisor, Gilda Lowe, informed her that the job of On Board Service Chief had been created specifically for Bill Rowlins, a white male .

183.   In October, 1998, Barrow was denied a promotion to the position of Point of Sale Coordinator.  Again, because Amtrak failed to post this position, Barrow was denied an opportunity to even apply for it.   A less qualified white female, Michelle Lott, was promoted over Barrow to this position.

184.   White employees at Amtrak are given training which is denied to African-American employees. For example, on or around February, 1999, David Strohmer, Jeff Strickland, Tracey Morgan and Michelle Lott were sent to Jacksonville, Florida for Customer Service training.  All of these employees were white.  No African-American Train Attendants, Service Attendants or Lead Service Attendants were sent to Florida for this Customer Service training.

185.   Amtrak has discriminated against Barrow by disciplining her for actions for which her white co-workers are not disciplined.  On or around April 13, 1999, Deborah Wetter and Dave White, both white, disciplined Barrow for bringing her husband on the train on a "blue day" (a day on which Amtrak employees are allowed to bring family members on the train for free). Barrow's white co-workers bring their spouses or companions on the train on "red" and "white" days (days on which family members are not permitted to ride for free) and are not disciplined for doing so, despite the fact that management is aware of it. Indeed, in June, 1999, a white Train Attendant named Suzanne Williams brought someone on board the train without paying  on a "red day".  Barrow brought this violation to the

attention of management.   Although Barrow was pulled out of service for three days for bringing her family member on the train on a "blue day", Williams was not similarly disciplined for bringing her family member on board on the train on a "red day".

186.   Barrow has additionally been subjected to adverse terms, conditions, and privileges of employment and a racially hostile work environment at Amtrak.   Nancy Lozano, a white co-worker of Barrow, has stated that she was "tired of being around niggers and listening to nigger music."   Barrow reported Lozano's statement to Amtrak management; however, Lozano continues to work for Amtrak.   Barrow is also aware of threats by white employees about "hanging niggers."   Whites who make racially offensive statements or tell racially offensive jokes receive only minor disciplinary penalties, if any.

187.   As a result of Amtrak's discriminatory actions, Barrow has suffered extreme harm.

188.   **Plaintiff Timothy McKissic** is presently employed as an Engineer in the Intercity SBU.  He has been employed in this position since April 1992.

189.   During his employment by Amtrak, McKissic has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

190.   In particular, McKissic has been discriminated against by being denied promotions to better and higher paying positions. The promotions sought by McKissic were given to white employees equally or less qualified than him.

191.   One method utilized by the white supervisors at Amtrak to keep African-Americans out of the better and higher paying positions is by refusing to allow them to qualify on these jobs.   For example, on or around March, 1999, McKissic attempted to qualify for an Engineer position on the Charlotte-to-Atlanta-and-Charlottesville, Virginia line.  John Quigley, a white Service Manager, refused to pay McKissic to qualify.  Quigley told McKissic that to qualify on that line, McKissic would have qualify on his own time without pay.  The qualification process takes approximately one year to complete and during that period of time, the employee can not work on another route.   On or around February, 1999, John Miller, a white employee, was paid by Quigley to qualify as an Engineer between Greensborough and Raleigh, North Carolina. Similarly, in March 1999, McKissic applied for, and was entitled to qualify for an Extra Board Engineer position. McKissic was awarded the position, but was later told that the position would have to be advertised twice before he could be paid to qualify on the position. Quigley ultimately abolished the position rather than allow McKissic to be paid to qualify on it.

192.   McKissic has also been disciplined excessively for acts for which similarly situated white employees were not disciplined or receive less harsh discipline.  McKissic was terminated and put out of service for 19 months before an arbitrator reinstated him, without backpay.   White employees do not receive such harsh discipline for similar infractions.

193.   McKissic has also been forced to work in a racially hostile work environment. In this regard, he has been exposed to racist comments in the Amtrak crew base restrooms in Washington D.C.   These comments include terms such as "nigger" and the telling of racial jokes.

194.   As a result of Amtrak's discriminatory actions, McKissic has suffered extreme harm.

195.   **Plaintiff Carlos Belgrave** was hired in 1973 and is presently employed as a Carman/Car Inspector in the Mechanical Department.

196.   During his employment with Amtrak, Belgrave has been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Belgrave from advancing into higher and better paying positions, such as Relief Foreman and Foreman II, and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.  He has also been subjected to a racially hostile work environment.

197.   Amtrak has discriminated against Belgrave by removing him from his Relief Foreman position before he could complete his ninety-day probationary period.  This action was taken against Belgrave because of his race.  It precludes him from advancing to a permanent Foreman II position.  On January 28, 1996, Belgrave was transferred to the Hialeah facility where the permanent Foreman positions are predominantly filled by white employees.   There are presently only three African-American Foremen at the Hialeah facility, and each of them transferred into the Hialeah facility in that position.  None were promoted into that position by Amtrak management at the Hialeah facility.  In October,

68

1997, Belgrave approached Bob Cochran, his white supervisor, and applied for the position of Relief Foreman.   Company policy requires a Relief Foreman to fulfill the relief duties for ninety days before he can be promoted to Foreman II.   There must also be a vacancy before the Relief Foreman can be promoted.  As foremen went on vacation, Belgrave was allowed to fill in for them as a Foreman II.    In May, 1998, Belgrave heard from union personnel that he would no longer be allowed to fill in as a Relief Foreman.   Such action was taken against Belgrave because he is African-American and because, had he remained in the Relief Foreman position, he would have been entitled to the next permanent Foreman II vacancy.   Upon learning of his removal,   Belgrave approached Amtrak General Foreman Figuenick, a white male,  and asked for an assessment of his job performance.  He was told that his work performance had been good.  Belgrave also talked with Amtrak General Foreman Ed Alderman, a white male, who informed Belgrave that his removal from the Relief Foreman position was in no way related to his job performance. Belgrave was more qualified, and was more senior, than Ed Jones and John Villanella, white co-employees of Belgrave who were allowed to remain Relief Foremen and were then promoted to permanent Foreman II positions.

198.   Belgrave was told by Alderman that he had to attend "charm school" training, which includes effective EEO and diversity training, before he could be promoted to Foreman II, but Belgrave has been denied such training.  John Villanella and Ed Jones, less senior and less experienced white employees, have received this training.  The denial of this training to Belgrave directly affects his promotional opportunities to Foreman II.

199.   African-American employees of Amtrak as a group, like Belgrave himself, have been similarly precluded from training programs and on-the-job training provided to

white employees.  This lack of training is then subsequently used to justify the refusal to select African-Americans for various positions, thereby adversely impacting African-American employees desiring to move to higher and better paying positions.

200.   On or about January 13, 1999, Belgrave filed a charge of discrimination with the Equal Employment Opportunity Commission, charging that Amtrak has discriminated against him on the basis of his race.  As a result of Belgrave's complaints of discrimination, his supervisors, including General Foreman, Ed Alderman, subjected Belgrave to unlawful retaliation.  Since the filing of his charge of discrimination, Belgrave has been disqualified from the position of Airman and has been subjected to unwarranted disciplinary actions. The reasons proffered by Amtrak for these actions are pretextual.

201.   As a result of Amtrak's discriminatory actions, Belgrave has suffered extreme harm.

202.   **Plaintiff Audley Boland** was hired in 1993 by Amtrak and is presently employed as an Electrician in the Mechanical Department.

203.   During his employment with Amtrak, Boland has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

204.   Boland is qualified for both the Relief Foreman and Foreman II positions.  On March 24, 1999, Boland was removed from the Relief Foreman program, which now

prevents him from advancing to a permanent Foreman II position.   Boland was told that he was being removed because he was not a "team player."  Actually, Boland is a "team player", and the allegation that he is not  is a pretext for his removal.  John Villanella, a less senior white employee with less experience and fewer qualifications than Boland, was allowed to remain a Relief Foreman even though Villanella did not meet the minimum work experience requirements for this position.  Boland was removed from the Relief Foreman position because of his race.  Amtrak then placed Villanella into a permanent Foreman II position over Boland, despite Boland's superior qualifications, even though, again, Villanella did not meet the minimum work experience requirements for this position.

205.   As a result of Amtrak's discriminatory actions, Boland has suffered extreme harm.

206.   **Plaintiff Donald Rodgers** was hired as an Assistant Conductor in the Transportation Department of Amtrak's Intercity SBU on August 25, 1986.   In May, 1995, Rodgers was finally promoted to Conductor.

207.   During his employment by Amtrak, Rodgers has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.  Rodgers has also been retaliated against by Amtrak for the filing in 1996 of an EEOC charge protesting the imposition of harsher discipline against African-American employees.

208.   In April, 1996, Rodgers was disciplined as the result of his train passing a station without permitting passengers to disembark.  After charging Rodgers with this offense, John Quigley, Rodgers' white supervisor, asked Rodgers to sign a waiver of his right to defend against the charge.  When Rodgers indicated that he did not want to sign the waiver, Quigley told Rodgers that he would see to it that Rodgers was fired.  Quigley also called Rodgers a "fucking asshole."  Rodgers was disciplined in connection with this incident and in September, 1996 filed a charge of discrimination with the EEOC.  White employees engaging in similar incidents have not been subjected to discipline in this regard.

209.   Similarly, on or about March 26, 1998, Rodgers was unlawfully charged with being rude to customers and was taken out of service for forty-five (45) days. Rodgers' treatment in this regard was because of his race, was in retaliation for his filing of an EEOC charge in 1996, and was different from Amtrak's treatment of white Conductors.

210.   Rodgers is one of few African-American Conductors at Amtrak.  Because of this fact, he has been treated differently from his white co-workers and has been subjected to a hostile environment by John Quigley, his white supervisor.  Quigley has imposed disparate discipline on Rodgers and has referred to him as a "fucking asshole."   Rodgers does not treat or address his white subordinates in such a discriminatory and demeaning manner.

211.   As a result of Amtrak's discriminatory actions, Rodgers has suffered extreme harm.

212.   **Plaintiff Harold Redfern** was initially hired by Amtrak in 1991 as an

72

engineer in the Salisbury, North Carolina crewbase in Amtrak's Intercity SBU.  He is still employed in that capacity.  In February 1997, Redfern was injured at work, and he has been on disability leave since that time.

213.    During his employment by Amtrak, Redfern has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

214.    White trainmaster John Quigley repeated demeaned and disrespected Redfern in the workplace.  In 1993, he assigned Redfern to drive a train from Salisbury to Washington, D.C., through the night, and then immediately to take the next train back to Salisbury, without any opportunity to sleep.  When Redfern got to Washington, D.C., the Washington trainmaster countermanded Quigley's directive, and directed Redfern to got to a hotel to sleep before returning to Salisbury.  Redfern did as he was directed, and took the afternoon train back to Salisbury.  When Redfern returned to Salisbury, Quigley was furious that Redfern had not followed his order to come directly back, and called him a "goddamn troublemaker."  Quigley cursed Redfern on other occasions as well.  Quigley did not treat white employees in this manner, but was respectful to them.

215.    In 1997, Quigley scheduled a safety breakfast in Salisbury.  Attendance was optional for white employees, but Quigley ordered Redfern to attend, even though Redfern was working 44 miles away in Charlotte, North Carolina.  Redfern protested to the staion

agent, Gilbert White, but was told that he could not be excused because of Quigley's orders.   White engineers who worked right in Salisbury were permitted to miss this breakfast.

216.   Throughout his tenure with Amtrak, Redfern experienced and observed numerous other incidents of racial harassment by Quigley, directed at Redfern and other African-American employees.

217.   As a result of Amtrak's discriminatory actions, Redfern has suffered extreme harm.

218.   **Plaintiff Reachelle Francis** was employed by Amtrak as a probationary Train Attendant/Service Attendant from June 16, 1997 until her discharge on December 1, 1997.

219.   During her probationary period with Amtrak, Francis was adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and disciplinary policies, practices, and procedures which have prevented Francis from obtaining permanent employment status with Amtrak and have deprived Francis of an opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.   In addition, Francis was subjected to a racially hostile work environment.

220.   Amtrak discriminated against Francis on the basis of her race by rejecting her application for employment, while approving applications of equally or less qualified white applicants.   As a newly hired employee, Francis was supposed to serve a ninety (90) day probationary period.   On September 4, 1997, Product Line Director, David White (white), and Service Manager, James Brzezinski (white), advised Francis that her application for employment was being rejected effective immediately.   When Francis inquired as to the

reason for the rejection of her application, Brzezinski told Francis that he did not have to give her a reason.  On September 8, 1997, Francis met with Brzezinski and Allen Thomas, Francis's union representative.  During this meeting, Brzezinski conceded that a number of individuals had spoken to him on Francis's behalf.  Brzezinski then agreed to reinstate Francis effective September 10, 1997 for an additional ninety (90) day probationary period.  Equally or less qualified white Train Attendants and Service Attendants are only required to serve a single ninety (90) day probationary period.  Ms. Francis was forced to work an extra ninety (90) day probationary period because of her race.

221.    Francis continued as a probationary employee through November 1997.  On December 1, 1997, Brzezinski asked Francis to meet with him.  During this meeting, Brzezinski told Francis that her performance did not meet the requirements of the position and rejected Francis's application for a second time.  Amtrak discriminated against Francis on the basis of her race by rejecting her application for employment while granting permanent employee status to equally or less qualified white Train Attendants and Service Attendants whose performance had been the same as, or worse than, that of Francis.

222.    Amtrak has further discriminated against Francis on the basis of her race by failing to investigate her complaints of racial discrimination, thereby ratifying and perpetuating the racially discriminatory practices and procedures of its predominately white management. On December 9, 1997, Francis wrote a letter to Amtrak's EEO Officer, Steve Tallackson, complaining of discrimination on the basis of race.  When Francis persisted in her allegations of racial discrimination against Amtrak and Brzezinski, Tallackson became hostile toward Francis and defensive with respect to Amtrak and Brzezinski.  Tallackson

75

refused to investigate Francis's allegations of race discrimination and ultimately dismissed her complaint.

223.   As a result of Amtrak's discriminatory actions, Francis has suffered extreme harm.

224.   **Plaintiff Bertha Kelly** was denied the position of Cook in Amtrak's Intercity SBU in June, 1998.  Kelly was adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices, and procedures which prevented Kelly from obtaining employment with Amtrak and deprived Kelly of an opportunity to work in an integrated environment in which African-American employees hold higher level and better paying positions.

225.   Amtrak discriminated against Kelly on the basis of her race by rejecting her application for employment, while approving applications of equally or less qualified white applicants.   In particular, in June, 1998, Kelly applied at Amtrak for the position of Cook in the Intercity SBU.   At the time of her application, Kelly was about to graduate from culinary arts school, and met all of the requirements for the Cook position.   Kelly was sent to Amtrak to apply for the position by the administrators of her culinary arts school because she was one of its top ranking students.  Amtrak denied Kelly the Cook position, claiming that she did not pass a general aptitude test.

226.   Amtrak awarded the Cook position to an equally or less qualified white candidate, Joe Delgado.  Delgado turned down the job because he did not want to travel. However, even after Delgado turned down the job, Amtrak refused to offer the Cook position to Kelly despite her qualifications.

227.    As a result of being denied the Cook position, Kelly became discouraged and did not apply again for a job with Amtrak.

228.    As a result of Amtrak's discriminatory actions, Kelly has suffered extreme harm.

229.    **Plaintiff Mike Helton** is presently employed as a Baggage Clerk in Amtrak's Intercity SBU.  He has been employed by Amtrak in its Intercity SBU since October 23, 1989.

230.    During his employment with Amtrak, Helton has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

231.    Amtrak has discriminated against Helton by maintaining a racially hostile work environment.  Dale Craig Thomas, Helton's white Commissary Department Supervisor, constantly tells racially biased jokes, such as:

a.      "What will happen when you stick
        your hand in a jar full of mixed jelly
        beans?
        ...The black one will steal your watch."

b.      "How do you stop black kids from jumping
        on the sofa?
        ...You put velcro on the ceiling."
        "How do you get them down?
        ...You get a bunch of Mexican kids
        and tell them they are pinatas."

Bill Minick, another white supervisor at Amtrak, often refers to African-Americans as "nigger" and once referred to Helton as a "char-broiled black ass nigger."  Helton reported these racial remarks, but no action was taken.

232.    Helton worked as a Commissary Clerk from 1989 to 1995.  In 1995, Helton became a partially exempt Lead in the Chicago Commissary.  In May, 1998, Helton was recognized as the departmental Employee of the Month for the Commissary.   One week later, still in May, 1998, Helton was removed form the partially exempt Lead position after having an accident, which was not his fault.  Alice Ragsdale, a white employee, has had a number of accidents; however, she has not been removed from her partially exempt Lead position.  In fact, she has been promoted to Product Line Agent.  Other white employees have caused serious accidents, some even causing injuries to customers; however, to Helton's knowledge, none of these individuals have been disciplined.

233.    Amtrak's subjective selection policies, practices and procedures, and its discriminatory terms, conditions, and privileges of employment, have adversely affected Helton's work and have discouraged him from seeking further promotions.

234.    As a result of Amtrak's discriminatory actions, Helton has suffered extreme harm.

235.    **Plaintiff William Miller** is currently a Lead in the Intercity SBU at Amtrak's Chicago Terminal.  He was employed by Amtrak on February 29, 1988 as a Commissary Clerk.

236.    During his employment by Amtrak, Miller has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures

78

which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

237.   Amtrak has also discriminated against Miller on the basis of his race by maintaining a racially hostile work environment. An Assistant Conductor at the Chicago Terminal wears a t-shirt and scarf bearing a picture of a Confederate Flag. Miller reported this fact to his white supervisor, Samantha Nolder, in September, 1998 and told her he found it racially offensive. Nolder told Miller that she could not do anything about what someone wears to work. Miller has additionally heard a co-worker make racial slurs including the word "nigger" on a regular basis. Another employee has previously reported this employee for making such slurs; however, to Miller's knowledge, no disciplinary action has been taken against the employee uttering these racial slurs.

238.   Miller has attempted on numerous occasions to move to higher level and better paying positions in other departments, including Engineer and General Foreman in the diesel pit. However, equally or less qualified white employees have been selected for these positions. Amtrak's subjective selection practices, policies and procedures, including those described above, have discouraged Miller from seeking further promotions.

239.   As a result of Amtrak's discriminatory actions, Miller has suffered extreme harm.

240.   **Plaintiff Darryl Latham** is presently employed in Amtrak's Intercity SBU as an Administrative Chief. He has been employed by Amtrak since August 6, 1983.

241.   During his employment at Amtrak, Latham has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

242.   Amtrak has discriminated against Latham by assigning him more work than his white co-workers.  Although receiving the same pay as his white counterpart, Latham is responsible for the oversight of six trains as compared to one or two trains for his white co-workers.  Similarly, when the regular Service Manager is gone, Latham is required to perform that job as well as his job.  However, he is never assigned the job title of, or paid as, a Service Manager. Rather, the Service Manager pay and job title are assigned temporarily to a white employee who cannot  even perform the duties of the position.

243.   Throughout the fifteen years of Latham's employment at Amtrak, less qualified white employees have been selected over him for higher paying positions in other departments.  For example, Steve Piper, a less qualified white in the Transportation Department, was hired as an Active Service Manager in 1997.  Similarly, in 1998, Jill Kowalt, a less qualified white in the Transportation Department, was moved to Active Service Manager in Transportation.  Latham has been denied the opportunity to move to these higher level, contract positions in other departments because of the use of subjective decision-making by Amtrak's mostly white managers. As a result, Latham remains

80

segregated in the On Board Services Department, which has one of the highest concentrations of African-Americans.

244.    During his employment at Amtrak, Latham has also been discriminated against in the discipline he has received. In particular, management falsely accused Latham of not maximizing his time.  After Latham explained that he was working more trains than his co-workers, Amtrak retracted the discipline. Latham, and African-American employees generally, are treated more harshly in discipline than are their white co-workers.

245.    Latham has been subjected to racially derogatory and hostile comments by his white supervisors/managers and co-workers.  For example, a manager of Amtrak stated in the presence of other managers that the "nigger" picking up dishes was doing the type of work that his people should be doing.

246.    As a result of Amtrak's discriminatory actions set forth above, Latham has suffered extreme harm.

247.    **Plaintiff Lysa Ridley-Jones** has been employed by Amtrak since 1986 and is presently a Ticket Agent in Atlanta, Georgia.

248.    During her employment at Amtrak, Ridley-Jones has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented her from advancing into higher and better paying positions for which she was qualified and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, she has been subjected to a hostile working environment.

249. On one occasion, a white paper gown with the letters "KKK" on it was displayed in the locker room used by Jones and other African-American employees. Ridley-Jones made Amtrak supervisors aware of the existence of the gown but no corrective action was taken.

250. In the Spring of 1999, Tim Dicks, white male, engaged in racially hostile behavior by imitating a black employee as though that employee were a monkey. This occurred during a meeting with Amtrak supervisor J.T. Elridge. The racial gestures were reported to Eldridge who took no action in response to the protests of Dicks' behavior.

251. Amtrak has discriminated against Ridley-Jones by failing to promote her to higher positions such as Station Agent Manager, a TCU position, and to Conductor positions for which she applied.

252. In January 1998, Ridley-Jones bid on the position of station agent manager. The position is responsible for the geographic location encompassing Meridian, Mississippi, to Greenville, Mississippi. The position was awarded to Bob Hasty, a white male employee.

253. In June 1999, Ridley-Jones applied for a conductor position which had been posted in the computer system. The posting invited applicants to apply for the position which was based in Washington D.C. After applying for the position, Ridley-Jones received a letter informing her that only local candidates would be considered for the position. The redrawing of qualification guidelines after a job announcement has negatively effected Ridley-Jones' ability to receive promotions and transfers.

254. In the last two years, Ridley-Jones has bid on conductor jobs in Chicago, Illinois and Salisbury, North Carolina. Ridley-Jones has not received either position.

Ridley-Jones has not been informed what she can do to increase the chances of her being selected for a promotion to a conductor position.

255.    As a result of Amtrak's discriminatory actions set forth above, Ridley-Jones has suffered extreme harm.

256.    **Plaintiff Darrell Johnson**  has been employed at Amtrak since September 25, 1989 presently works in Charlotte, North Carolina  as a ticket agent/baggageman.

257.    During his employment at Amtrak, Johnson has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

258.    In May 1999, Jeff Ashenfelter became lead station agent.  Ashenfelter informed  white employees in the station aware of his belief that the black employees do not know what they are doing.  Johnson has also been informed that Ashenfelter uses racial slurs outside the presence of the black employees.

259.    In approximately June 1999, an incident occurred involving a missing sum of money.  Ashenfelter wanted Johnson to complete certain forms in connection with the missing money.  Ashenfelter spoke to Johnson in a demeaning fashion by stating such things as "You are going to sign this!" and "I am gonna be on top of you!" and "you're gonna learn this!".  White manager John Quigley has also demeaned Johnson by cursing at him. Neither Ashenfelter nor Quigley speaks to white employees in this manner.

260.    Johnson has also been discriminated against with respect to promotions to lead station agent and fiscal/clerical clerk.  In May 1999, Ashenfelter began working the as lead station agent, prior to the posting of a job vacancy.  Ashenfelter replaced Gil White, black male, as lead station agent.   Allowing Ashenfelter to work on the job prior to posting the vacancy, allowed him a significant additional training opportunity for the lead station agent position which was denied to Johnson and other African-Americans.     After Ashenfelter began working as lead station agent, the job was posted and he was selected for the position.

261.    In the last year Johnson has also applied for a day shift fiscal clerk position. Johnson is currently assigned to the night shift.   After Johnson applied, the job was abolished and then re-advertised with an additional requirement of typing 50 words per minute.  Jim Fetchro, a white male with less seniority than Johnson, was selected for the position.  The job description was written specifically to fit the qualifications of Fetchero who was preselected for the position.

262.    In 1998 and 1999, Johnson applied for the position of Safety Training Coordinator.  In 1998, the job was given to Jim Turner (white), who was less qualified for the position than Johnson.  In 1999, he was denied the position again, supposedly on the basis that he was not qualified, which is untrue.

263.    As a result of Amtrak's discriminatory actions, Johnson has suffered extreme harm.

264.    **Plaintiff Kirk Marshall** was employed by Amtrak in the Intercity SBU from November 26, 1986 until his resignation in 1997.

265.    During his employment by Amtrak, Marshall has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

266.    Throughout his employment with Amtrak, Marshall sought numerous promotions.   The promotions sought by Marshall were given to less qualified white employees.

267.    In June, 1996, the position of Safety Coordinator in Chicago, previously held by Ada Mallet, became available.  During the time when Mallet was Safety Coordinator, Marshall assisted Mallet, performed all of the Safety Coordinator functions, and was a member of the Safety Committee.  Marshall performed the Safety Coordinator functions so well that Mallet recommended Marshall to replace her in the position.  Marshall applied for the position of Safety Coordinator and interviewed for the position.  Despite Mallet's recommendation and Marshall's qualifications for the position, Amtrak selected a less qualified white employee, Don Cushin, for the Safety Coordinator position.

268.    As a result of being continuously denied promotions to higher paying positions, Marshall became discouraged from trying to advance to higher and better paying jobs and eventually resigned from his employment with Amtrak.

269.    As a result of Amtrak's discriminatory actions, Marshall has suffered extreme harm.

270.   **Plaintiff Carl Betterson** has been continuously employed by Amtrak since July 16, 1975, and is currently working as a Ticket Agent in Atlanta, Georgia.

271.   During his employment at Amtrak, Betterson has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented him from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, he has been subjected to a hostile working environment.

272.   Amtrak has discriminated against Betterson by refusing to promote him to higher positions, such as Product Line Agent, for which he applied.

273.   In August, 1998, Betterson bid on the position of Product Line Agent.  This position is responsible for responding to Amtrak customers regarding complaints, inquiries, and comments for a geographic area ranging from Birmingham, Alabama to Culpepper, Virginia.  The position was awarded instead to Bob Hasty, a white employee with less experience than Betterson.

274.   Betterson had more experience than did Hasty working with Amtrak guests to respond to their inquiries, complaints, and concerns.  During the course of his 24-year Amtrak career, Betterson has worked in customer services positions at many stations in the product line, including Savannah, Georgia, Florence, South Carolina, Fayetteville, North Carolina, Columbia, South Carolina, Southern Pines, North Carolina, Thomasville, Georgia, and Atlanta, Georgia.  Betterson also has two years of college education and an unblemished service record.

275.   Bob Hasty has less seniority than Betterson, and Hasty has worked in only two small Amtrak stations.  Hasty has no college education.  Hasty also was taken out of service and removed from a station agent position in connection with a serious disciplinary charge.

276.   In Atlanta, where Betterson works, the daily passenger count is typically 125 persons, and it is a hub where many customer service complaints and inquiries are lodged. Where Hasty worked prior to his promotion, in Birmingham, Alabama, the daily passenger count is approximately 15 persons.

277.   Hasty was selected for the Product Line Agent job by his crony, white Amtrak manager J.T. Eldridge, also based in Birmingham.  Hasty's selection by Eldridige was a product of the "buddy" system, whereby white managers select white employees with whom they socialize and work for promotional opportunities.  Eldridge also has supervisory responsibility for the Atlanta station.  Betterson applied for the Product Line Agent job despite indications that Eldridge had pre-selected Hasty for the job.

278.   Since Hasty was awarded the Product Line Agent job, he has, nevertheless, generally ignored his Product Line Agent responsibilities in Atlanta.  Betterson has had to fulfill the duties of the position in the Atlanta station, without any increase in pay or any title change or any recognition whatsoever.

279.   Betterson filed a discrimination complaint with Amtrak regarding denial of the promotion, but nothing has been done to address it.

280.   Betterson also has witnessed African-American employees disciplined by Amtrak for a few minutes tardiness, whereas white employees have been allowed to be an hour late without disciplinary consequence.

281.   As a result of Amtrak's discriminatory actions, Betterson has suffered extreme harm.

282.   Plaintiff Augustine Glass, Jr., has been employed by Amtrak in its Intercity SBU as a Coach Cleaner in Harrisburg, Pennsylvania, from June 1980 through the present.

283.   During his employment with Amtrak, Augustine Glass, Jr., has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented Glass from maintaining and advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Glass has been subjected to a racially hostile work environment.

284.   In September 1999, Glass was demoted with loss of pay for at least one year from his position as Car Inspector due to an alleged safety violation.  However, a white employee directly involved in the same incident received only a minor suspension and was not demoted.   White employees who have committed similar or worse safety infractions received more lenient treatment.

285.   Glass has been continually subjected to a racially hostile work environment. He has been repeatedly harassed by white supervisors and co-workers, and unfairly accused of Amtrak policy violations.

286.   As a result of Amtrak's discriminatory actions, as set forth above, Glass has suffered extreme harm.

287.   **Plaintiff PFBMWE** represents, and at all pertinent times has represented, maintenance of way workers in Chicago working for the Amtrak Intercity SBU. During their

employment by Amtrak, members of the PFBMWE have been adversely affected by the systemic pattern and/or practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which prevented them from advancing into higher and better paying positions and deprived them of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

288.   As a result of Amtrak's discriminatory actions, members of the PFBMWE have suffered extreme harm.

289.   **Plaintiff Arshell Qualls** has been employed by Amtrak from 1974 through the present, first in the Intercity SBU, and since 1993, in the West SBU.  She is presently a Travel Clerk at Union Station in the Station Services Department in Los Angeles.

290.   During her employment with Amtrak, Arshell Qualls has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented Qualls from advancing into higher and better paying positions such as supervisor jobs and Uniform Coordinator, and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, Qualls has been subjected to a racially hostile work environment.

291.   In June 1993, Qualls was summarily disqualified, without justification, from her position as a reservation sales agent even though she had already been qualified as a reservations representative, and had worked in a similar capacity in Chicago.  The white director of the Reservation Sales Office in Riverside summarily escorted her to the back door of the facility, and literally put her out in the parking lot, leaving her in tears, without

the slightest consideration for her 19 years with the company, or the fact that she had only recently moved from Chicago.  The white manager did not treat white employees in this fashion.  Qualls was forced to work on the Extra Board, losing more than 75% of her income.

292.    Qualls' efforts to revive her career at Amtrak were met with more humiliation. After she won a battle to have her 19 years of seniority reinstated, she successfully bid on the position of Uniform Coordinator.  After she was in the job for 60 days, the company and the union took away her seniority again, and she was removed from the job and forced to return to the Extra Board.  Such action would not have been taken if she were white.

293.    In August 1996, Qualls applied for a Customer Service Supervisor position, a job involving tasks which she had performed for years in Chicago under more demanding circumstances.  Despite her qualifications, she was rejected, and a white employee with much less seniority as a Reservation Sales Agent, and no experience supervising train operations, received the job.

294.    In December 1996, Qualls was deterred from applying for a job as Crew Base Supervisor.  Before the application period was over and before any interviews were conducted, she was told that the company had already chosen the person which it wanted for the job, a white female who was being brought in from the Crew Management Center in Baltimore, Maryland.

295.    In January 1997, Qualls was discriminatorily denied approval for a slot on the Guaranteed Extra Board, which would have provided her with a full 40 hour per week work schedule, allegedly because a medical restriction disqualified her from working as a ticket

agent.  White employees in similar circumstances have been permitted slots to work on the Guaranteed Extra Board.

296.    In the summer of 1999, Qualls applied for a Crew Base Supervisor position. Despite her qualifications, she was rejected for the jobs, and a white male and a Hispanic male with lesser qualifications were chosen.

297.    As a result of Amtrak's discriminatory actions, as set forth above, Qualls has suffered extreme harm.

298.    **Plaintiff Linda Stroud** was hired by Amtrak in 1980, and has worked at a variety of jobs, including clerk, electrical, electrical foreman, and conductor in Los Angeles.

299.    During her employment with Amtrak, Stroud has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Stroud from advancing into higher and better playing positions, and have deprived her of the opportunity to work in an integrated environment in which African Americans hold higher level positions.  In addition, Stroud has been subjected to a racially hostile environment.

300.    In 1996, Stroud applied for a position as an engineer trainee.  She did not receive an interview. Five whites were hired for the positions.

301.    In 1996, Stroud applied for a position as an assistant conductor. Ten persons were to be hired. She received an interview but was not selected.  Rick Sajak, the white Road Foreman of Engineers, who was on the interview panel, subsequently, stated,  "I didn't have to hire any fucking niggers or fucking lesbians or fucking queers. I only had to hire two fucking Mexicans."

91

302.   In 1997, Stroud again applied for a position as a conductor, with ten positions to be filled. She was again interviewed, and Sajak was again on the interview panel. She was not hired, and upon information and belief, the persons selected were predominantly white.

303.   In 1997, Stroud again applied for the position of passenger engineer trainee. She did not get an interview.   Upon information and belief, the persons selected were predominantly white.

304.   In October, 1998, she applied again for the job of assistant conductor.   This time, Sajak was not on the interview panel, and Stroud was selected.   Throughout the training period, however, she was repeatedly tormented and harassed by Sajak.

305.   In February, 1999, Stroud was working as an assistant conductor, when an accident occurred in the yard involving her train.   All three employees at the scene were taken out of service, but the other two were brought back to work. Sajak told Stroud that she could not come back until charges against her were filed.

306.   In March, 1999, just before the end of her probation period as an assistant conductor, Stroud was disqualified from the conductor program by Sajak.   Later that same evening, Sajak stated. to another Amtrak employee, referring to Stroud, "I fired the black bitch."

307.   As a result of the unrelenting discrimination which she encountered at Amtrak, and in particular as relates to her effort to become a conductor, Stroud suffered severe mental anguish, and consequently was obliged to go out  on medical leave.

308.   As a result of Amtrak's discriminatory actions, as set forth above, Stroud has suffered extreme harm.

309.   **Plaintiff Inez Tarver** has been employed by Amtrak since 1980, and presently works as a Material Management Clerk in Los Angeles.

310.   During her employment with Amtrak, Tarver has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this complaint, including Amtrak's subjective transfer policies, practices and procedures which have prevented Tarver from advancing into higher and better paying positions for which she was qualified, and have deprived her of the opportunity to work in an integrated environment in which black employees hold higher level positions. She has also been subjected to retaliation for asserting her civil rights and complaining about discrimination at Amtrak.

311.   In 1995, Tarver organized several large group meetings of African-American employees who were concerned about the lack of advancement opportunities for blacks at Amtrak. This activity was known to management, and Amtrak West President Gil Mallory, who is white, attended one such meeting.  Tarver also protested discrimination in other ways, and in 1997, filed her first claim of race discrimination with the EEOC.

312.   As a result of these activities, Tarver was targeted for retaliation. This retaliation consisted in part of rejecting her applications for several management positions for which she was qualified.  In addition, she was been falsely accused of misappropriating an allegedly confidential document, and has been  unofficially designated as a person to be avoided, with the result that other employees who were previously friendly are now afraid to be associated with her.

313.   As a result of Amtrak's discriminatory actions, as set forth above, Tarver has suffered extreme harm.

314.   **Plaintiff Vernon Brown** was hired by Amtrak on May 25, 1985 as a food service attendant in the Amtrak West SBU, working out of Los Angeles.  He has remained an On-Board Service Attendant to the present time.

315.   During his employment with Amtrak, Brown has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies and practices which have prevented Brown from advancing into higher and better paying positions such as Chief of On-Board Services, and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Brown has been subjected to a racially hostile work environment.   He has also been subjected to retaliation for asserting his civil rights and complaining about discrimination at Amtrak.

316.   After observing a pattern of discrimination in various forms against black Amtrak employees, Brown in 1995 was the co-founder and vice president of the Black Employees Network, an organization devoted to focusing attention on racial discrimination against blacks at Amtrak.  Since then, Brown has been denied promotions, and has been otherwise subjected to  retaliatory statements and actions.

317.   In 1996, Brown applied for the job of Chief of On-Board Services. At his interview, Brown learned that eight positions were to be filled.  Brown was not selected. Of the eight successful selectees, five were white, and Brown had more experience and greater seniority than at least three of the five.

318.    During his employment at Amtrak, Brown has noticed that blacks are usually hired for positions where there is little chance of meeting the public. Thus, blacks are often hired as cooks, but less often hired as waiters or bartenders.

319.    In 1996, Brown was involved in a conversation with Jay Fountain, an On-Board Services Chief, and the president of ARSA, who is white. In response to a remark by Brown, Fountain said "If you don't like your job, why don't you go back to Burger King, where the rest of you people work?"

320.    As a result of Amtrak's discriminatory actions, as set forth above, Brown has suffered extreme harm.

321.    **Plaintiff Castro Landers** has been employed by Amtrak in its West SBU from 1988 through the present, as a Ticket Clerk, Ticket Agent, Ticket Trainer, Assistant Conductor, and Conductor working out of the Los Angeles crew base.

322.    During his employment with Amtrak, Castro Landers has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented and delayed Landers from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, Landers has been subjected to a racially hostile work environment.

323.    In September 1997, Landers returned to work after a period out of service on disability. When he went in to the train yard to perform his work duties, he found a black doll hanging from a switch pole with a rope around its neck. The doll was hung as a mock

95

lynching and had been placed where Landers would see it while performing his duties in the yard.

324.    Landers reported the incident to the Amtrak police and Amtrak management, but apparently little or nothing has been done to investigate the incident in the two and a half years since the occurrence.

325.    Landers was deeply affected by the racist effigy.  He has sought therapy by a psychiatrist to help him cope with this racist threat in the workplace.  Landers was still assigned to work in the same train yard, but he was afraid to do so because of the incident and the company's failure to pursue a proper investigation.   Therefore, he missed opportunities to earn overtime wages.  Eventually, his white foreman insisted he work in the yard or else be dropped to the bottom of the extra-board and would not be guaranteed full pay.  Therefore, despite his serious misgivings, Landers from time to time is required to work in the yard.

326.    As a result of Amtrak's discriminatory actions, as set forth above, Landers has suffered extreme harm.

327.    **Plaintiff Ed Carr** has been continuously employed by Amtrak in its West SBU from 1977 through the present, as a Coach Cleaner, Sheet Metal Worker, Assistant Conductor, and as an Engineer Trainee working out of the Los Angeles crew base.

328.    During his employment with Amtrak, Ed Carr has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and discipline policies which have prevented and delayed Carr from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American

employees hold higher level positions.  In addition, Carr has been subjected to a racially hostile work environment.

329.   In 1993, Carr was tested positive for a controlled substance.  He signed a waiver of hearing and went into a rehabilitation program on the representation that the incident would not be used against him in matters of career advancement.  However, for years, this violation was, and continues to be, held against him to hinder his career advancement.  The company has not implemented the disciplinary rules against whites in this manner.

330.   As a result of Amtrak's discriminatory actions, as set forth above, Carr has suffered extreme harm.

331.   **Plaintiff Devern Fleming, Sr.** has been employed by Amtrak in the Amtrak West SBU since  June, 1992, as a reservation agent and supervisor of the reservation agent pool.   He held the supervisor's job only until August, 1995, at which time he was forced to step down under Amtrak's anti-nepotism policy, since Fleming's son, Devern Fleming, Jr., became employed by Amtrak at that time.  He was wrongfully terminated in August, 1996, and not reinstated until December, 1997.

332.   During his employment with Amtrak, Fleming has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which prevented Fleming from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  Fleming also has been

97

adversely affected by Amtrak's discriminatory application of its anti-nepotism policy.  In addition, Fleming has been subjected to a racially hostile work environment.

333.    When Fleming's son started work at Amtrak, Fleming was told that he must resign as supervisor in light of Amtrak's anti-nepotism policy.  This policy is applied selectively against blacks.  At the same facility where the Flemings worked, and at numerous other Amtrak facilities, whites are allowed to hold supervisory positions even though they have a spouse or other immediate family member working at the same facility.

334.    In 1996, Fleming was terminated when a white female accused him of pinching her thigh, a charge which Fleming denied.  Prior to the hearing, the accuser attempted to recant her accusation, but Amtrak management threatened her with disciplinary charges if she did so.  At the hearing, there were no witnesses other than Fleming and the accuser, although the incident allegedly occurred within an enclosed area where several other people work.  Fleming was found guilty by Amtrak's hearing officer, and was terminated.  Sixteen months later, on appeal to a Special Board of Adjustment, the conviction was overturned, and Fleming was ordered to be  reinstated with back pay. The Special Board determined, in overturning the conviction, that Amtrak's action in terminating Fleming was "arbitrary, capricious and unjust".

335.    Although Fleming was terminated for the alleged pinching incident, a white employee who was accused of patting a woman on the buttocks was allowed to keep his job.

336.    As a result of being terminated, and during the 16 months until he was reinstated, Fleming was subjected to extreme financial hardship. As a black male in his fifties, he had difficulty in finding anything but menial low-paying work.  With his wife

suffering from terminal lupus, and with his medical benefits cut off after three months, Fleming exhausted his entire life savings  of $95,000 to pay his wife's medical bills, and went substantially into debt.

337.   Fleming has experienced a racially hostile environment in that the white Operations Officer, Kevin McLafferty, who is Fleming's boss, treats and speaks to blacks differently than he addresses whites.  In dealing with blacks, McLafferty often shouts and screams, and talks in a condescending manner.  He does not talk to whites in this manner. As a union representative in the office, Fleming has had an opportunity to observe this at first hand, and has himself had confrontations with McLafferty.

338.   As a result of Amtrak's discriminatory actions, as set forth above, Fleming has suffered extreme harm.

339.   **Plaintiff David Tucker** has been employed by Amtrak in its West SBU as a Reservations Sales Agent and a Reservation/Statistics Clerk at the Reservations Office in Riverside, California from 1990 through the present.

340.   During his employment with Amtrak, David Tucker has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented and delayed Tucker from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Tucker has been subjected to a racially hostile work environment.

341.   In 1995, Tucker applied for a Rate Clerk job in the Reservation Sales Department.  He took a test to qualify and did not pass, but he pointed out errors in the test

to the company.  He was rejected for the job.  Whites who failed the test were nevertheless awarded jobs.

342.   In August 1996, Tucker applied for an Assistant Conductor position, passed the test, and did well in the interview.  However, he did not get the job.  Whites have been awarded conductor positions under such circumstances.

343.   In May 1997, Tucker's white supervisor brought him up on a charge of fraud based on an unfounded accusation of one of Tucker's non-black co-workers, who had a previous altercation with Tucker.  The charge stood against Tucker for a year until it was finally thrown out for lack of evidence.

344.   In April 1997, Tucker applied for a Computer Technician job at Amtrak for which he was qualified.  He was rejected, and two white employees with less experience and seniority received the positions.

345.   Tucker and other black RSA's do not receive the same opportunities for customer service training at the Reservation Sales Office as white RSA's do.  Nor are black RSA's given the special assignments that whites are to receive additional training and achieve special recognition that white RSA's are.

346.   Tucker and other black RSA's at the Reservation Sales Office in Riverside are subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis.  Also, blacks are disciplined by white managers for minor rules infractions whereas whites are not.

347.   As a result of Amtrak's discriminatory actions, as set forth above, Tucker has suffered extreme harm.

348.   **Plaintiff Cyril Hunte** has been employed by Amtrak in its West SBU as an RSA at the Reservation Office in Riverside, California, from November, 1996 through the present.

349.   During his employment with Amtrak, Cyril Hunte has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented and delayed Hunte from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Hunte has been subjected to a racially hostile work environment.

350.   In 1997, Hunte applied for an Acting Supervisor job.  During his interview, managers told him he needed two years experience, and Hunte was rejected.  Numerous white employees were made Acting Supervisor without two years of experience.  Hunte was again rejected for the same position in 1998.

351.   In April, 1999, Hunte assumed leadership of a sales team which, under the previous leader had lagged in sales.  Under Hunte's leadership, the team's numbers improved every week, and Hunte received numerous compliments from team members on his work.  However, Hunte's white managers removed Hunte from this position, allegedly because Hunte did not have team support.  The managers also fabricated phoney issues to undermine Hunte's record as team leader.  White team leaders are not treated in this manner.  Although Hunte remains on the Acting Supervisor roster, he does not actually serve as an Acting Supervisor.

352.   In approximately October, 1999, Hunte filed an official complaint with Amtrak's Business Diversity Department.  Following Hunte's repeated attempts to meet

with, and provide documentation to, the Amtrak investigator, in February, 2000, Business Diversity rejected his claims without a hearing.

353.   Hunte and other black RSA's at the Reservation Sales Office in Riverside are subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis.  Also, blacks are disciplined by white managers for minor rules infractions whereas whites are not.

354.   As a result of Amtrak's discriminatory actions, as set forth above, Hunte has suffered extreme harm.

355.   **Plaintiff Bryant Cox** has been employed by Amtrak in the Amtrak West SBU since 1986, and is presently working as a Redcap / Baggage Handler at Union Station in Los Angeles.

356.   Plaintiff Bryant Cox was hired by Amtrak in July, 1986 in the customer service department. Over the next 10 years, he worked various jobs, including Ticket Agent, Travel Clerk, and, presently, Baggage Handler/Redcap.  He has been a union representative for the past two years.

357.   During his employment at Amtrak, Cox has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Cox from advancing into higher and better paying positions, and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.   In addition, Cox has been subjected to discriminatory working conditions, and to a racially hostile work environment.

358.   In 1997, Cox applied for the job of Supervisor in the Freight Department.  He was given a very arduous grilling at his interview, in contrast to two white applicants who

had very easy interviews.  The job was given to a white applicant, Norm Nicholson, who had been the subject of several charges of having made racist remarks.

359.    In 1996, Cox was called a "fucking nigger" by Norm Nicholson, a white redcap. He reported the incident to management, and although Nicholson admitted the statement, no disciplinary action was taken against Nicholson.  Amtrak's apparent tolerance for blatant racism was confirmed when it was later reported to management that Nicholson threw a dollar bill in the face of an Hispanic woman, whose son, a lawyer, observed the incident and reported it to white station manager Leonard Villamore.  Finally, in September, 1999, Nicholson unjustifiably ejected a black female passenger from a train.  Although all of these incidents have been reported to Amtrak management, Nicholson is still employed by Amtrak.

360.    White road foreman Rick Sajak, who has reportedly used racial slurs to refer to African-American Amtrak employees, used threatening language to Cox.  He does not talk this way to non-minorities.  His behavior was reported to Amtrak management, but no disciplinary action was taken.

361.    In July, 1999, Cox reported to Amtrak management that the Amtrak Inspector General, Wayne Stovall, who is white, was distributing a paper containing racist jokes on Amtrak property.  Cox had been given a copy of the paper and turned it in to managers Brian Rosenwald and Edward Monge.  Although these managers professed to be shocked at reading the document, Stovall remains employed in his job as Inspector General with no apparent change in his duties.

362.    As part of their compensation, Amtrak employees are entitled to be reimbursed for a portion of their commuting costs. For a long period of time, Cox and other black Amtrak employees were required by the white Transportation Coordinator to provide documentation that was not required from white employees, and were subjected to delays

in receiving their transit checks that were not imposed on white employees.  When Cox complained about this discriminatory treatment, the task of giving out the transit checks was reassigned to another employee, but, upon information and belief, no discipline was imposed in the white Transportation Coordinator.

363.    As a result of Amtrak's discriminatory actions, as set forth above, Cox has suffered extreme harm.

364.    **Plaintiff James Silas** has been continuously employed by Amtrak in its West SBU since 1987.  He occupies the position of Lead Baggage Handler, and is also a trainer, at Union Station in Los Angeles.

365.    During his employment with Amtrak, James Silas has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented and delayed Silas from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Silas has been subjected to a racially hostile work environment.

366.    In 1997, Silas applied for the position of Mailing Express Supervisor, a job for which he was qualified.  A white employee from a different department, who possessed less experience than Silas, received the job.

367.    In 1997, Silas applied for the job of Acting Supervisor, another position for which he was qualified.  He was rejected, and a white employee with no better qualifications, who is well known for his racist behavior in the work place, received the job instead.

368.    Silas and other black employees of Amtrak are subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis.

Silas and other blacks have also been ordered by white supervisors to perform menial tasks, such as cleaning trash from the railroad tracks, under dangerous circumstances and without appropriate safety gear.  Whites are not assigned such tasks.

369.   As a result of Amtrak's discriminatory actions, as set forth above, Silas has suffered extreme harm.

370.   **Plaintiff Kelvin Benton** has been continuously employed by Amtrak in its West SBU since February 1988.  He has worked both at the Reservations Office in Riverside, California, and at the commissary in Los Angeles.  He presently occupies the position of commissary truck driver in Los Angeles.

371.   During his employment with Amtrak, Kelvin Benton has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented and delayed Benton from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Benton has been subjected to a racially hostile work environment.

372.   Since 1998, Benton has applied for supervisory positions in the commissary. Toward this end, he has requesting training in the TPMS lead job, for which he was qualified, but Benton has always been rejected, even for training assignments.  Non-blacks with less seniority experience and experience have been consistently selected for such positions.

373.   Benton has lost opportunities to earn overtime pay.  Although seniority is supposed to dictate overnight trip opportunities for truck drivers, a white male in the department receives an inordinate number of these overnight/overtime trip offers.

374.    Benton and other black employees at Amtrak are subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis. Benton has even been asked to leave the room while white managers told offensive racial jokes because they knew he would be upset.    Benton complained about this to management, but nothing was done to address the problem.  Also, blacks are disciplined by white managers for minor rules infractions whereas whites are not.

375.    As a result of Amtrak's discriminatory actions, as set forth above, Benton has suffered extreme harm.

376.    **Plaintiff Donald Shepard** has been continuously employed by Amtrak in its West SBU from 1971 through the present, working most recently as a Carman and Mechanic in Los Angeles.

377.    During his employment with Amtrak, Donald Shepard has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented and delayed Shepard from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Shepard has been subjected to a racially hostile work environment.

378.    Shepard applied for a Locomotive Engineer position and was rejected.  The company told him it was not permitting any more employees from the Mechanical Department to become engineers.  However, a white employee from the Mechanical Department received the job.

379.    In 1996 or 1997, Shepard applied for an Assistant Conductor job.  He took a test and was told he did not pass it and was rejected.  Upon information and belief, whites have received the same job without having to pass the test.

380.   Shepard and other black employees of Amtrak are subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis.

381.   As a result of Amtrak's discriminatory actions, as set forth above, Shepard has suffered extreme harm.

382.   **Plaintiff Alvin Randolph** has been employed by Amtrak from 1983 through the present, and worked in its West SBU from 1983 until November 1999 as a Train Attendant and an Assistant Conductor and a Conductor out of the Los Angeles Crew Base. At present, he is a conductor working out of Fort Worth, Texas.

383.   During his employment with Amtrak, Alvin Randolph has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented and delayed Randolph from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Randolph has been subjected to a racially hostile work environment.

384.   In the fall of 1996, Randolph applied for an Assistant Conductor position in Oakland, California, a position which he was qualified.  Amtrak's Human Resources Department informed him that he was not eligible to be considered because he did not then live in the Oakland area.  After he moved there, however, he found that newly hired white conductors had never before lived in the Oakland area or in California.

385.   On October 11, 1999, Randolph, who was working in Los Angeles, was informed that his bid on a job for a Conductor's job in Fort Worth, Texas, was successful. Then, he was told by a white manager that the decision had been in error and he did not

get the job. Randolph bid again on a similar position and got it. However, he was told that the white conductors and engineers in Fort Worth did not want him to work there.

386.   As a result of Amtrak's discriminatory actions, as set forth above, Randolph has suffered extreme harm.

387.   **Plaintiff Albert Miller** has been employed by Amtrak in its West SBU from 1982 through the present as a Trackman, Coach Cleaner, and, since 1989, as a Carman, working in Los Angeles.

388.   During his employment with Amtrak, Albert Miller has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented and delayed Miller from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, Miller has been subjected to a racially hostile work environment.

389.   Repeatedly, Miller's white supervisors and managers have targeted him for harassment and ridicule because of his race. Numerous times, while Miller is among a group of white workers, his white manager or supervisor has singled him out for criticism or warnings that, if they are applicable at all, should be applicable to the whole group. He has been accused of being in the lunchroom too long, even though he is eating with some white employees who are not criticized. He was criticized for not wearing a helmet, even though he was wearing one and was standing in a group of white workers. Usually, the white manager or supervisor addresses Miller sarcastically as "Mr. Miller," but does not address white workers in such mock formal tones.

390.   As a result of Amtrak's discriminatory actions, as set forth above, Miller has suffered extreme harm.

391.   **Plaintiff Faye Williams** has been employed by Amtrak since 1981 when she was hired as a Reservations Sales Agent.  She subsequently held various positions, and has worked as a Ticket Clerk since 1994 at Union Station in Los Angeles.

392.   During her employment with Amtrak, Williams has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this complaint, including Amtrak's subjective transfer policies, practices and procedures which have prevented Williams from advancing into higher and better paying positions for which she was qualified, and have deprived her of the opportunity to work in an integrated environment in which black employees hold higher level positions.  She has also been subjected to a racially hostile working environment.

393.   In 1997, Williams applied for the position of Crew Base Supervisor.  She did not receive an interview.  One of the two positions filled went to a white employee with less seniority, less relevant experience and a lesser educational background.

394.   In 1997, Williams applied to participate in a six-month Employee Development Training Program.  She got an interview, but was not selected.  Two of the three selectees were non-black and had lesser qualifications than Williams.

395.   For several years, Williams has been trying without success to get proper training to be a Ticket Agent.  Only whites get this training.  For the past nine years, there has never been a permanent black Ticket Agent at Union Station in Los Angeles.

396.   The non-black ticket agents are often hostile and condescending in talking to Williams and other black ticket clerks.  They do not talk to white ticket clerks in this manner.

397.   Williams brought these complaints to the attention of Amtrak management, to Amtrak's in-house EEO department, and to the Employee Relations Representative, but to no avail.

398.    As a result of Amtrak's discriminatory actions, Williams has suffered extreme harm.

399.    **Plaintiff Moyse Howard** has been employed by Amtrak in its West SBU from 1994 through the present.  He has worked as an On Board Services Chief and a Crew Base Supervisor, and has worked out of both the Los Angeles and Oakland crew bases. Presently he works at the Oakland crew base.

400.    During his employment with Amtrak, Moyse Howard has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, discipline, and termination policies which have prevented and delayed Howard from advancing into and maintaining higher and better paying positions such as Crew Base Supervisor and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Howard has been subjected to a racially hostile work environment.

401.    On January 24, 1996, Howard was summarily removed from service in the presence of his co-workers because of an accusation by a female employee that he had groped her physically.  The white manager who made the decision to remove Howard from service was unable to provide any specific details about the alleged groping incident and provided no statements supporting such allegations.  The accusation was completely false. Howard and his family were devastated by the false accusation.

402.    Howard communicated with Robin Brown of Amtrak's Employee Relations Department.  Brown was present in the facility to investigate continuing race-related problems in the Oakland commissary.  Brown quickly ascertained that the alleged groping incident never happened in fact, and called Howard at home on the night of January 24, 1996 to tell him that the woman who originally made the allegation had recanted and told

her the incident never happened.  On or about January 29, 1996, Joe Dealy, the Director of Amtrak West's California Corridor, called a meeting with several managers involved in presenting the accusation, Howard, and a union representative, and apologized to Howard.

403.   Despite this apology from their boss, on February 16, 1996, Howard's managers sent a large burly white worker to require Howard to attend another meeting in a manager's office to be confronted by the female accuser, and did not allow Howard to bring in any union or other representative.  At this meeting, the accuser repeated her recantation and was dismissed by the managers, who then badgered Howard in an attempt to intimidate him and/or to induce him into making a damaging admission of some kind.

404.   Subsequently, management undertook a concerted attempt to displace Howard from his career path in Oakland.  In March 1996, an On Board Services Chief position became vacant.  Howard bid on the job, but his managers attempted to deter him, saying that he could not bid for vague technical reasons.  Howard bid anyway, and his manager, knowing that Howard was the senior bidder, recruited a white employee with more seniority than Howard to bid on the job.  To do so, a white manager had to tell the white employee, falsely, that he could not bump another white employee holding an Administrative Chief's position that the white employee actually wanted.  Since the white employee did not want the On Board Services Chief position, he bumped Howard from his Crew Base Supervisor's job, leaving Howard with no job at all.  Only after he protested through several layers of management did Howard finally obtain the On Board Services Chief position.

405.   Howard's tenure as On Board Services Chief in Oakland was short-lived.  In March 1997, white managers abolished Howard's job, and created instead two Crew Base Supervisor positions.  The company then posted the jobs as an ARSA regional bulletin, allowing anyone from the Western Region to bid on it.  Howard was outbid by the same

white manager whom management had previously attempted to persuade to outbid Howard for the On Board Services Chief position.

406.    In order to continue to work for Amtrak, it became necessary for Howard to exercise his seniority to get an On Board Chief's position at the Los Angeles crew base. During the time he held this position, he had to commute between his home in Oakland and his crew base in Los Angeles, and he had to work on a train running the Los Angeles - Chicago route, an extraordinarily grueling schedule.

407.    In January 1998, when a Crew Base Supervisor position became vacant again in Oakland, the company posted the job as a ARSA local bulletin, which would preclude Howard from bidding on it, and, thus, would prevent him from returning to work in his home area, Oakland.  Management again recruited a white employee, who had less seniority than Howard,  to bid on the position.  Howard bid on the position anyway, and ARSA protested the local bulletin posting, but management still gave the position to the junior white employee.

408.    Howard eventually, in October 1998, received the Crew Base Supervisor position in Oakland, but only after the junior white employee left the company and ARSA again demanded, this time successfully, that the position be bulletined regionally.

409.    In December 1999, Howard applied for a position on the Network Instructor pool, a safety training special assignment.  Despite his extraordinarily strong qualifications for the job, he was rejected.  A white conductor and one of Howard's own subordinates, also white and much less qualified than Howard, received two of the three available positions on the pool.

410.    As a result of Amtrak's discriminatory actions, as set forth above, Howard has suffered extreme harm.

411.   **Plaintiff Twilva "Cookie" Simpson** has been employed by Amtrak in its West SBU from 1988 through the present, working at the commissary in Sacramento, San Francisco, and at the Oakland crew base.   She has been a Ticket Clerk, Material Control Clerk, and, at present, is a Commissary Clerk in Oakland.

412.   During her employment with Amtrak, Cookie Simpson was adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented and delayed her from advancing into higher and better paying positions and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Simpson has been subjected to a racially hostile work environment.

413.   In 1998, Simpson was effectively running the Oakland commissary, but when the actual job came up for bid, and Simpson and several other qualified African-Americans bid on it, the job was nevertheless awarded to a non-black employee who had no experience or knowledge working in the commissary, but rather was a personal friend of the white manager of the commissary.

414.   After widespread dissatisfaction with the selection was evident among commissary workers, Amtrak management, including a Human Resources official, held a "town meeting" for employees to express their opinions.   One black worker said the selection was racist, which prompted a white manager to end the meeting immediately. Simpson filed a discrimination complaint with the company's EEO office regarding the decision, but little has been done to address it.

415.   In 1997 or 1998, after the non-black employee selected for the job left the job, management decided to rotate into the position the three black commissary employees who

had bid on the job to test them to see who did the best.  However, instead of awarding the job to any of them, management then abolished the position.

416.    Simpson and other blacks working in the commissary have been harassed because of their race.  The white commissary supervisor and her assistant were mean and disrespectful to black employees, targeted them for harassment, besmirched their reputations within the workplace, and assigned them the worst jobs, while treating white employees in a friendly manner and with respect.

417.    As a result of Amtrak's discriminatory actions, as set forth above, Simpson has suffered extreme harm.

418.    **Plaintiff Timeka Collier** was employed by Amtrak in its West SBU as a Lead Service Attendant and as a Commissary Clerk from June 1993 until her termination on October 22, 1997.  She worked at the commissary at the Oakland crew base.

419.    During her employment with Amtrak, Timeka Collier was adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and discipline policies which have prevented and delayed her from advancing into higher and better paying positions and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Collier has been subjected to a racially hostile work environment.

420.    Collier and other black employees working in the commissary have been harassed because of their race.  The white commissary supervisor and her assistant were mean and disrespectful to black employees, targeted them for harassment, and assigned them the worst jobs, while treating white employees in a friendly manner and with respect. In particular, Collier was assigned to clean the freezers with dangerous toxic chemicals, without the benefit of any safety gear, while the white manager and her assistant stood

114

outside the freezer area and made jokes and laughed about it.  The Occupational Safety and Health Administration found out about the occurrence and levied a stiff fine against Amtrak for the safety violation.

421.    Collier requested time off from work to take care of her ailing grandmother, who had raised her as a child.  Although initially she was led to believe she could take time off, and she travelled to Tennessee to care for her grandmother, her white manager called and told her she had to return to work.  Collier was unable to do so and was summarily terminated.  Whites have been afforded opportunities to take time off to care for sick loved ones who were not immediate family members without any penalty, let alone being terminated.

422.    As a result of Amtrak's discriminatory actions, as set forth above, Collier has suffered extreme harm.

423.    **Plaintiff Raymond Burditt** has been employed by Amtrak in its West SBU as a Coach Cleaner in the King Street Coach Yard in Seattle from 1989 through the present.

424.    During his employment with Amtrak, Raymond Burditt has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented and delayed Burditt from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Burditt has been subjected to a racially hostile work environment.

425.    In October 1998, Burditt applied for an Instructor position in the Safety Department for which he was qualified, was interviewed.  He was rejected, and the

company told him that the position was closed.  In fact, however, the position was held open, and then was given to a white employee.

426.    Burditt has tried to advance his career by seeking training, but has been discouraged by a white course instructor from Amtrak's Los Angeles crew base who stated that he did not know why Burditt was taking his class.

427.    Burditt and other black employees of Amtrak are subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis.

428.    As a result of Amtrak's discriminatory actions, as set forth above, Burditt has suffered extreme harm.

429.    **Plaintiff Kimberli Hornes** applied for work and was hired by Amtrak; she worked in Amtrak's West SBU as an On Board Service Train Attendant from March 25, 1998 as a probationary employee until she was terminated on July 6, 1998.  She worked out of Union Station in Los Angeles.

430.    During her employment with Amtrak, Kimberli Hornes was adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and termination policies which prevented Hornes from maintaining and advancing into higher and better paying positions and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Hornes was subjected to a racially hostile work environment.

431.    During her brief employment by Amtrak, Hornes was repeatedly harassed by her white supervisor.  Other employees knew, and told Hornes, that this supervisor hates black women generally and Hornes in particular.  Hornes complained to the manager in charge of the Los Angeles train crews.  One week later, despite her good job performance and fine performance evaluations, Hornes was summarily terminated.

432.   On July 13, 1998, Hornes filed a charge of race discrimination with the United States Equal Employment Opportunity Commission in Los Angeles.  She is currently in the process of completing administrative requirements for issuance of a Notice of Right To Sue.

433.   As a result of Amtrak's discriminatory actions, as set forth above, Hornes has suffered extreme harm.

434.   **Plaintiff Wanda Johnson** was hired by Amtrak in its West SBU to work as a Coach Cleaner in Los Angeles on March 1, 1999, but was refused an opportunity to start work on her reporting day, March 11, 1999.

435.   Wanda Johnson was adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and termination policies which prevented Johnson from maintaining and advancing into higher and better paying positions and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

436.   On the day she was supposed to report for work at Amtrak, March 11, 1999, she was greeted with her dismissal.  Purportedly, the company would not let her work there because of its anti-nepotism policy.  Although Johnson was to work in the Coach Cleaning Department, her brother is a general foreman in the Mechanical Department.  The anti-nepotism policy is not enforced in this manner against white employees.

437.   As a result of Amtrak's discriminatory actions, as set forth above, Johnson has suffered extreme harm.

438.   **Plaintiff Daisy Moore** applied for employment with Amtrak in its West SBU in Oakland and San Jose in 1996, 1997, and/or 1998.

439.   Daisy Moore has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective

selection policies which have prevented Moore from being hired into positions such as Ticket Agent and various office clerical jobs.

440.   On two occasions, Moore applied for ticket agent and office clerical positions in Oakland and San Jose.  She was qualified for both by virtue of her prior experience as a ticket agent in the airline field.  Moore telephoned the Human Resources office several times and was told the positions had been filled but was given no reason why she was rejected.  Upon information and belief, white persons were hired for the jobs.

441.   As a result of Amtrak's discriminatory actions, as set forth above, Moore has suffered extreme harm.

442.   **Plaintiff Ted Bailey** has been employed by Amtrak in its NEC SBU as an Electrician in Ivy City, Maryland, near Washington D.C., from 1984 through the present.

443.   During his employment with Amtrak, Ted Bailey has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, training, transfer, and discipline policies which deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Bailey has been subjected to a racially hostile work environment.

444.   In about 1994, Bailey applied for a promotion to an engineer's position.  He was interviewed, but did not find out he had been rejected until some six months later.

445.   During his employment with Amtrak, Ted Bailey has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented Bailey from advancing into higher and better paying positions for which he was qualified, such as "Supertechnician," Locomotive Engineer and Supervisor and have deprived him of the opportunity to work in an integrated environment

in which African-American employees hold higher level positions.  In addition, Bailey has been subjected to a hostile working environment.

446.   In about 1994, Bailey applied for a promotion to an engineer's position.  He was interviewed, but did not find out he had been rejected until some six months later.

447.   Bailey has been bypassed for promotions in the shop where the electricians work, where white electricians with less experience than Bailey are approached by white managers and informed that they will be promoted to supervisor positions.   Black electricians are not offered such promotion opportunities and are deterred from seeking them by the actions of the white managers.

448.   Bailey has been passed over for training opportunities, such as a training program for "supertechnician" designed to prepare employees to become electrical technicians for locomotives, in favor of white electricians.  When Amtrak tested electricians to determine who was qualified to receive special training for the high speed locomotive, Bailey and other African-American electricians believed they had done well on the test.  Without explanation, however, management discarded the test results and required a second test.  Bailey was not informed of those test results, but he was not selected for the special training.

449.   Bailey and other African-American electricians are frequently given more menial, less desirable, and physically harder job assignments than are white electricians.

450.   Bailey and other African-American electricians receive disciplinary write-ups for minor infractions, whereas white employees who commit similar infractions are treated more leniently.

451.   As a result of Amtrak's discriminatory actions, as set forth above, Bailey has suffered extreme harm.

452.   **Plaintiff Clyde Briscoe** was employed by Amtrak in its NEC SBU as an Electrician at the Amtrak Maintenance Facility in Washington D.C., from May 1992 until his constructive discharge in late 1999.

453.   During his employment with Amtrak, Clyde Briscoe has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented Briscoe from advancing into higher and better paying positions for which he was qualified and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Briscoe has been subjected to a hostile working environment.

454.   Briscoe was bypassed for promotions in the shop where the electricians work, where white electricians with less experience than Briscoe and other blacks were approached by white managers and informed that they will be promoted to supervisor positions.  Black electricians are not offered such promotion opportunities and are deterred from seeking them by the actions of the white managers.

455.   Briscoe requested, but was denied, the opportunity to receive advanced training provided to white electricians with less experience and less seniority than he.  The training would have resulted in greater promotional opportunities and a higher salary.

456.   Briscoe was subjected to Amtrak's racially discriminatory testing procedures. Briscoe, along with several other black electricians, sucessfully passed a test administered for promotion to a special electrician's job working on the new high-speed train.  Without explanation, management invalidated the results of this test, and Briscoe did not get the position.

457.   Briscoe and most other black electricians were relegated to working on the second shift, which had approximately half the number of electricians as compared to the

predominately white first shift.  Nonetheless, the second-shift complement of electricians were responsible for a workload equal to or greater than that of the first shift complement.

458.   Briscoe and other black employees at Amtrak were continually subjected to a racially hostile work environment.  He was repeatedly harassed by white supervisors and co-workers and falsely accused of Amtrak policy violations.

459.   In 1997, Briscoe's tool locker and personal belongings were stolen by two white electricians and a white supervisor under circumstances indicating that the theft was an act of racially motivated harassment.  Briscoe, over the course of approximately two years, attempted to secure the return of his property and to hold the white supervisor and white electricians accountable and for them to be disciplined for their actions.  Briscoe also attempted to have the matter addressed by filing reports with the Amtrak Police and Amtrak's EEO office, by writing letters to Amtrak executives, and by attempting to meet with various Amtrak corporate officials.  None of the white employees responsible for the theft of Briscoe's locker was ever punished in any meaningful way.  Instead, Briscoe was made to feel as if he were the one who had done something wrong, just for having attempted to secure a remedy for racial harassment.

460.   Due to the events and circumstances surrounding the racially-motivated theft, and the unwillingness of Amtrak management to provide any significant remedy to address a racially-charged incident, Briscoe underwent a great deal of stress, necessitating two leaves of absence.  When he returned to work, management left the white supervisor in charge of Briscoe and made no other work assignment changes to insulate Briscoe from the white electricians and supervisors who had harassed him.  Finally, in late 1999, because of the continuing anxiety caused by these events, Briscoe resigned. The facts and circumstances leading to his resignation amount to constructive discharge.

461.    As a result of Amtrak's discriminatory actions, as set forth above, Briscoe has suffered extreme harm.

462.    **Plaintiff Michael Steward** was hired by Amtrak on June 13, 1994 as an On-Board Service Attendant working out of Washington, D.C.  In 1995, he was promoted to Assistant Conductor and has remained in that position to the present.

463.    During his employment with Amtrak, Steward has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented Steward from advancing into higher and better paying positions for which he was qualified, such as locomotive engineer and yardmaster, and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Steward has been subjected to a hostile working environment.

464.    In the spring of 1997, Steward applied for the position of locomotive engineer at Penn Station in New York City, but received no interview.  Upon information and belief, most of the approximately twelve successful applicants were white.

465.    In August, 1997, Steward applied for the job of yardmaster. He was not given an interview. The job went to a white employee with less education, experience, and seniority.

466.    On a train returning from Montreal to Washington, on which Steward was working as an On-Board Service Attendant, a Canadian reporter asked to interview him for a story he was doing on Amtrak.  Steward, who had completed his duties in the dining car, was sitting with the Canadian reporter when he was approached by Roger Paolini, a white conductor, who ordered him to "Get your black ass to your room!"  Steward, who previously been the object of racist remarks and jokes from his fellow crew members, was then

confined to "room arrest," without access to food or water, for the balance of the 18 hour trip back to Washington.  Following his return, he was charged with insubordination for having ventured forth from his room to obtain the identity of the reporter to be a witness to the occurrence.

467.    In October, 1997, Steward was found  guilty of having submitted a time-card indicating he had worked on a train from New York to Washington, when in fact he had "dead-headed."  He was suspended for 30 days without pay.  In contrast, several white employees who admitted or were found to have committed much more serious incidents of dishonesty were given lesser punishment or no punishment at all.

468.    Steward, like other black employees at Amtrak, has had to work in a racist environment.  On many occasions, Steward has seen racist graffiti in the crew locker rooms.  On one such occasion within the last year, he brought the offensive graffiti to the attention of a white manager, who said he would take care of it,  but it was several months before the graffiti was removed.

469.    As a result of Amtrak's discriminatory actions, Steward has suffered extreme harm.

470.    **Plaintiff Barry L. Price** was hired by Amtrak on November 13, 1986, as a Laborer.  He was subsequently promoted to Class 4 Engineer in May 1989, and has worked in that capacity through the present.

471.    During his employment with Amtrak, Price has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Price from advancing into higher and better paying positions such as Class 1 Engineer, and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Price has

been subjected to a hostile working environment, disparate discipline and disparate treatment.

472.   Although Price has all of the necessary qualifications to be a Class 1 Engineer, including a knowledge of the NORAD rules, and has qualified as a Safety Instructor, he has been unable to get promoted.

473.   Price applied for promotion to Class 1 Engineer on three occasions: 1989, 1992, and 1997.  In October 1997, twelve vacancies were to be filled, six from D.C. and six from New York.  The three white selectees from D.C. were not as well qualified as Price.

474.   On August 25, 1993, Price applied for promotion to a Foreman II position, but was rejected for the alleged reason that his father was also employed by Amtrak as a Coach Cleaner.  This anti-nepotism policy is applied in a discriminatory manner, however, since white employees are allowed to work in supervisory positions even though they have a close family member in the same facility.  For example, a white employee, Jeffrey Pesce, is allowed to work as a Foreman II, even though he has a brother who is a manager in the same department.

475.   Class I engineers are primarily recruited from two sources: (a) conductors and assistant conductors, and (b) Class 4 engineers. Local 1050 of the NCF&O, based in Washington, D.C., is a predominantly African-American union, and has experienced blatant discrimination. During the past 11 years, only one union member has been selected for promotion to a Class I engineer position, although many have applied.  During the past 13 years, not a single member of this union has been promoted to a Foreman I position, although several have applied.

476.   As a result of Amtrak's discriminatory actions, as set forth above, Price has suffered extreme harm.

477.   **Plaintiff Wilson Hutchinson** has been employed by Amtrak in its West and NEC SBU's as a Train Attendant, Sleeping Car Attendant, Service Attendant, and Lead Service Attendant in the On Board Services Department continuously from 1991 through the present.   He has worked out of Union Station in Los Angeles and Union Station in Washington, D.C.

478.   During his employment with Amtrak, Wilson Hutchinson has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented and delayed Hutchinson from advancing into higher and better paying positions such as Lead Service Attendant and which deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions. In addition, Hutchinson has been subjected to a racially hostile work environment.

479.   For several years Hutchinson requested training trips so that he could advance from Sleeping Car Attendant to Service Attendant, but his requests were consistently denied by white managers.   Many newly hired white employees have had no trouble getting assigned to training trips right away.   After three years of such requests, Hutchinson finally was given a training trip, but afterward, he still was not listed on the seniority rosters as a Service Attendant.   Hutchinson also was denied training for Lead Service Attendant positions, and was denied the position until late 1999.   White employees have had no trouble obtaining such training and becoming LSA's in a much shorter time.

480.   Hutchinson and other black employees of Amtrak are subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis.

481.   On January 2, 1997, Hutchinson was threatened on the job by a white contract employee who castigated him for telling white women not to smoke and warned

Hutchinson that "you better not ever come back through here, nigger." Hutchinson, shaken by the threat, had to seek medical attention for stress.  He reported the incident to his managers, to the union, to Amtrak's Labor Relations, and to company executives, but none of them did anything about it.  Rather, they made Hutchinson to feel as if he was wrong or bothersome to request some action to address the matter, and lectured him regarding the offender's rights.  The company also denied Hutchinson's request to be removed from that train route in order to avoid possible contact with the white contract employee who had threatened him.

482.    In the late 1990's, Hutchinson reported to his white manager an incident in which a white passenger addressed him as "boy" and ordered him to get him a drink.  The white manager told Hutchinson that it was part of his job to listen to such slurs.

483.    As a result of Amtrak's discriminatory actions, as set forth above, Hutchinson has suffered extreme harm.

484.    **Plaintiff Gavin Clarke** has been employed by Amtrak in its NEC SBU as a Commissary Clerk, Lead Commissary Clerk, and as an Assistant Train Director at Union Station in Washington D.C., from 1988 through the present.

485.    During his employment with Amtrak, Gavin Clarke has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Clarke from advancing into higher and better paying positions such as Supervisor and Engineer, and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Clarke has been subjected to a racially hostile work environment.

486.    From 1995 to 1997, Clarke applied for a promotion from his Lead Commissary Clerk job to a supervisor's position, for which he was well qualified by virtue

of his lengthy experience in a lead role in the commissary.  He was interviewed but never contacted regarding the decision.  Three consecutive times, white men were transferred from other departments to do the job.

487.   In 1995 and 1996, Clarke twice applied for an Engineer's position, but was rejected after interviews.  He was never given any reason.  White employees have succeeded in obtaining Engineer's positions.

488.   In 1996, Clarke applied for a Supervisor of Customer Services position, for which he was qualified.  He was interviewed but never contacted regarding the results.  He also applied for a Special Duty Assignment as Train Controller, and was accepted for training.  However, after three days, Clarke was removed from training and returned to his job in the commissary by the white commissary manager for the sole reason that the manager did not want to pay someone else overtime to handle Clarke's duties while Clarke trained for a better job.  Clarke complained to the manager's boss, who is also white, who failed to do anything about it.  Clarke tried again when the Train Controller position was posted, and was told that he would get it, pending the white commissary manager's approval.  However, Clarke was then turned down again, purportedly due to a lack of financing for the training.

489.   Under a black commissary manager, who held the job until late 1995, Clarke was able to take training classes for supervisory positions, and Clarke was assigned to represent the commissary in bi-annual schedule change meetings.  After the black manager was replaced by a white manager, Clarke was unable to get authorization to attend such classes and his responsibility for representing the commissary at the bi-annual meetings was removed.

490.   In 1997, Clarke applied for the job of Supervisor of MARC Commuter Services, for which he was qualified, but he was rejected in favor of a white lead clerk in Passenger Services.

491.   Clarke and other black employees at Amtrak were continually subjected to a racially hostile work environment.  The terms "nigger" and "boy" were used routinely by whites in the workplace.  Racially offensive graffiti was prevalent in the men's room, and was not removed by the company for months.  Blacks were frequently harassed, spoken down to, and disrespected by white supervisors and co-workers.  White employees were not spoken to in a similar manner.  Black employees received physically more demanding and less desirable work assignments than whites received, and blacks could not get requested time off, whereas whites' schedules were generally accommodated.  Blacks were disciplined in writing for petty infractions, such as minor tardiness, while whites were unpunished at all for similar, and worse, offenses.

492.   As a result of Amtrak's discriminatory actions, as set forth above, Clarke has suffered extreme harm.

493.   **Plaintiff Quinton Saunders** was employed in Amtrak's NEC SBU from 1979 until he was wrongfully terminated in 1995. During his time at Amtrak, Q. Saunders worked as a Commissary Clerk in the Passenger Services Department,  as a Lead Ticket Agent, Clerk in the Material Control Department, Lead Store Attendant and Acting Supervisor in the warehouse and Acting Supervisor in Material Control.

494.   During his employment with Amtrak, Quinton Saunders has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Saunders from advancing into and maintaining higher and better paying positions such as Supervisor and have deprived him of the opportunity

to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Q. Saunders has been subjected to a racially hostile work environment.

495.   Q. Saunders was passed over for promotion to Supervisor in favor of a white employee with no Material Control experience, despite Saunders having four years experience in the department and having performed the supervisor's job on a temporary basis for over a year.  Saunders was then directed to train the white person, who had become his new boss. When Saunders complained about this, he was subjected to a long period of abuse and hostility, including a log being kept on when he arrived at work, when he went to the bathroom, when he talked to a co-worker, when he used the telephone, when he came back from lunch, etc.

496.   In 1988, after a lengthy period of such harassment from his supervisors, Saunders filed a claim of race discrimination within Amtrak's internal EEO system. Following this claim, Saunders was subjected to several instances of retaliation from Amtrak's management.  These included being removed from the position of Safety Coordinator, while a white employee was permitted to stay in the position, and being wrongfully terminated.

497.   Q. Saunders was terminated for allegedly stealing in December, 1995.  He had been working as a ticket agent, and the sum of $400 was found to be missing from his drawer. Although Saunders maintained his innocence at all times, and although there were many discrepancies in the following investigation and proceedings which seriously tainted the result, Saunders was nevertheless found guilty by Amtrak's Hearing Officer, and then terminated.  Prior to termination, Saunders was told that if he signed a "waiver" and admitted his guilt, he would be kept on. He refused to do so, since he was not guilty.

498.   White employees similarly situated are not similarly treated.  Thus, there are several white on-board service personnel and conductors who have admitted or have been found guilty of stealing much larger sums, and have been allowed to keep their jobs.

499.   As a result of Amtrak's discriminatory actions, as set forth above, Q. Saunders has suffered extreme harm.

500.   **Plaintiff Takeela Saunders** has been continuously employed with Amtrak in its Northeast Corridor SBU since September 1, 1984.  She has served in the positions of Head Mechanical Clerk, Baggage Clerk, Ticket Agent, Ticket Office Auditor, Payroll Clerk, Statistical Clerk, Accounting Clerk, Ticket Receiver, and Clerk-Stenographer.  At present, she is working as a Clerk-Stenographer at the High Speed Rail Construction Office, Engineering Department.

501.   During her employment at Amtrak, Takeela Saunders has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies, practices and procedures which have prevented her from advancing into higher and better paying positions and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, T. Saunders has been subjected to a racially hostile work environment.

502.   In 1996, T. Saunders was denied an opportunity to bid for a Clerk-Stenographer job in the Engineering Department, for which she was qualified and would have bid on, because it was not properly posted.  The position was given to a white employee who had less than half as much seniority as Saunders.

503.   T. Saunders has been a victim of Amtrak's pattern of retaliation against anyone who challenges its practice of race discrimination.  Following the 1989 filing of a claim of race discrimination by her husband, Plaintiff Quinton Saunders, who was then also

employed by Amtrak, T. Saunders was subjected to a program of unrelenting retaliation which continues to this day.

504.    Shortly after the complaint filed by her husband, T. Saunders began getting bad reviews and experiencing problems with her supervisor, who accused her of going through confidential files.  T. Saunders was subsequently accused of "stirring up trouble" by discussing race and discrimination at Amtrak.

505.    In 1992, T. Saunders was told by a friend in Human Resources that she should stop applying for promotions, since she was regarded as "not a team player," and all her applications were being summarily denied, if not discarded.  When she asked why, she was told that it was because her husband had filed a discrimination complaint, and because she herself had "stirred up a mess" after she had filed an unjust treatment complaint against her white supervisor.

506.    As further acts of retaliation, T. Saunders was denied at least five positions for which she applied, and for which she was qualified, during the period 1995-99.

507.    As a result of Amtrak's discriminatory actions, as set forth above, T. Saunders has suffered extreme harm.

508.    **Plaintiff Brian Watkins** was employed by Amtrak in its West and NEC SBU's as a Lead Service Attendant in the On Board Services Department from 1986 until 1999. He worked out of the Oakland, California crew base and, more recently, out of Union Station in Washington, D.C.

509.    During his employment with Amtrak, Brian Watkins was adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Watkins from advancing into higher and better paying positions such as Ticket Clerk and have deprived him of the opportunity to work in an integrated

environment in which African-American employees hold higher level positions.  In addition, Watkins was subjected to a racially hostile work environment.

510.   In December, 1998, Watkins applied for a lateral position as a Ticket Clerk. All five bidders for the job were African-American.  Nevertheless, the job was awarded to a white applicant who had not previously worked for Amtrak.  After being rejected under these circumstances, Watkins resigned in disgust in January 1999.

511.   Watkins and other black employees of Amtrak were subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis.  For example, in 1997, a white conductor said to Watkins, "Look at that shit!  Black Entertainment Television.  If we had WET – White Entertainment Television – you people would have a heart attack."  In the New York City crew room, he observed that black and whites were segregated when eating.

512.   Watkins observed white conductors commonly treat black customers rudely while treating white passengers courteously.  In 1998, Watkins observed a white conductor roll his eyes when an elderly black woman requested assistance, then hurl her baggage off the train onto the ground.  On another occasion that same year, Watkins saw a white conductor kick a black businessman's briefcase up the aisle to the back door.  Watkins observed white conductors routinely speak disrespectfully to black passengers, making derogatory, stereotypical comments about how blacks dress, eat, and behave.  White passengers were not treated in this manner.

513.   Watkins and other blacks are treated dissimilarly to whites in disciplinary matters.  While working in California, Watkins was disciplined, and forced to pay for, food that he was instructed by his white supervisor to give away free because the train had been understocked.  Nothing was done to the white supervisor.

514.   **Plaintiff John McCargo** was initially hired by Amtrak in 1983 as a Train Attendant on the Auto-Train.  In 1984, he was promoted to On-Board Services Chief, and in 1997 to Administrative Chief.   In 1998, following disciplinary proceedings, he was demoted back to Train Attendant, and has remained in that position to the present, working out of Washington, D.C.

515.   During his employment with Amtrak, John McCargo has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented McCargo from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, McCargo has been subjected to a racially hostile work environment.

516.   As an On-Board Services Chief, McCargo was accustomed to being able to sign for a sandwich from the on-board service waiter on trains operating out of Washington. After becoming an Administrative Chief in 1997, McCargo thought he could still do this, and on several occasions when riding the train, signed for a sandwich for his lunch.  On three of these occasions, he did not bother to sign, but told the service attendant to write down his name as having taken a sandwich.  Over a period of four to five months, he took a total of six sandwiches in this manner.

517.   In 1998, he was brought up on charges for "stealing" the sandwiches, was suspended, and was told by his supervisor that Amtrak intended to have him fired.  After a hearing in September, 1998, and despite a fifteen year record of flawless performance, McCargo was demoted to the rank of Train Attendant.

518.   The penalty imposed on McCargo for allegedly "stealing" six sandwiches is wholly disproportionate to, and far greater than, the punishment given to whites who

commit much more serious offenses. Upon information and belief, no white On-Board Services Chief has ever received such a serious penalty for such a petty offense.

519.    As a result of Amtrak's discriminatory actions, as set forth above, McCargo has suffered extreme harm.

520.    **Plaintiff Carmen Wilson** has been employed by Amtrak in its NEC SBU as a Crew Dispatcher from 1998 through the present, working at the Consolidated National Operations Center in Wilmington, Delaware.

521.    During her employment with Amtrak, Carmen Wilson has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, training, and discipline policies which have prevented Wilson from advancing into higher and better paying positions and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Wilson has been subjected to a racially hostile work environment.

522.    White employees at the CNOC are placed on the fast track for promotion and have positions held or protected for them, particularly partially exempt positions from which they cannot be bumped by more senior employees.  African-Americans such as Wilson are not afforded such opportunities.  When Wilson exercised her seniority to bump a white employee in September 1999, she was singled out for harassment by her white supervisor.

523.    Her white supervisor called her, to her face, a deeply offensive derogatory name containing a racial epithet and an expletive, and then, to cover up, attempted to persuade a black co-worker to write a letter saying she did not use the term, which the black employee refused to do.  Rather than discipline the white supervisor properly, the company intentionally waited thirty-one (31) days to hold a disciplinary hearing, knowing

that the charge would be dismissed under the applicable collective bargaining agreement's requirement that such proceedings be held within thirty (30) days.

524.    Wilson has been harassed by her white managers because she was unable to work regular sixteen-hour shifts, whereas a white employee was excused from working such long shifts.  Wilson has also been harassed regarding her work performance, her usage of insulin for her diabetes in the workplace, and other personal matters.

525.    As a result of Amtrak's discriminatory actions, as set forth above, Wilson has suffered extreme harm.

526.    **Plaintiff Wayne Bailey** has been employed by Amtrak in its NEC SBU from 1986 through the present and is currently a Signalman's Helper.

527.    During his employment with Amtrak, Wayne Bailey has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Bailey from advancing into higher and better paying positions such as Electronics Technician and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Bailey has been subjected to a racially hostile work environment.

528.    In 1994, Bailey was laid off from a management position.  Afterward, he applied for numerous communications positions but was not interviewed for any of them.  Instead, despite his education in the field of electronics and his work experience as a field engineer and telecommunications technician, he had to take a more menial job as a Signalman's Helper.

529.    In 1997, Bailey applied several times for electronics technician and communications positions, for which he was not only qualified, but probably qualified to teach the subject by virtue of his education and experience.  However, Amtrak

management did not even allow Bailey to take the test to demonstrate his eligibility for these jobs, and he was rejected.  White employees with less experience and education in these fields were allowed to take the test and received the jobs.  Bailey asked white managers and supervisors why he was not selected to take the test, but they either ignored him or brushed him off, telling him to reapply.

530.    Bailey was not properly trained as a Signalman's Helper and was not given the opportunity to train on certain equipment, such as the backhoe.  White employees do receive training and opportunities to use such equipment.

531.    Bailey and other African-American electricians are frequently given more menial, less desirable, and physically harder job assignments than are white electricians. The white supervisors stand over them laughing, ordering them gruffly to dig.  They do not treat the white employees in this way.  The white supervisors also do not allow Bailey to use the restroom on the tracks, forcing him to walk a mile or more to use the facilities. White employees are not treated in such a manner.

532.    In November 1997, Bailey was disciplined and was to be demoted based on the accusation of a white supervisor that Bailey had not climbed a signal bridge as instructed.  Only after a dozen witnesses indicated that Bailey had in fact climbed the bridge did he avoid demotion, but the white supervisor continued to harass Bailey, causing Bailey to transfer out of the department.

533.    In late 1997, Bailey was injured in a fall on the job.  He had been ordered by white supervisors to do a job in the rain without proper equipment.  The white supervisors were never criticized or disciplined for their negligence which led up to Bailey's injuries.

534.    As a result of Amtrak's discriminatory actions, as set forth above, Bailey has suffered extreme harm.

535.   **Plaintiff Joseph Pearson** has been employed by Amtrak in its NEC SBU from 1988 through the present as a Station Cleaner, a Coach Cleaner, and presently as a Heavy Equipment Operator.  He works in Philadelphia in the Race Street Engine House at the Penn Coach Yard.

536.   During his employment with Amtrak, Joseph Pearson has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented Pearson from advancing into higher and better paying positions such as Locomotive Engineer, and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Pearson has been subjected to a racially hostile work environment.

537.   Since 1995, Pearson has applied for the job of Locomotive Engineer at least three times.  The first time, despite his qualifications, which includes experience driving locomotives in the Penn Coach Yard, he received an interview by two white managers from the Transportation Department, who told him during the interview that they already knew who they were going to select for the job.  The person who was pre-selected was white. The second and third times Pearson applied, he was rejected without even being interviewed.  Whites again received the jobs.  One of the white managers involved in the selection process told Pearson that the company was only hiring experienced engineers from outside the company.  This was not true, however, as at least one white assistant conductor within Amtrak was promoted into the position without experience, training, or a class 1 engineer's license.

538.   Amtrak has also hindered Pearson's advancement by discriminatorily disciplining him and placing a letter in his employee file indicating a pattern of carelessness. This obstacle is unfair because Pearson in fact has a good safety record.  White employees

with worse safety records and more serious safety infractions have not been similarly disciplined.

539.   As a result of Amtrak's discriminatory actions, as set forth above, Pearson has suffered extreme harm.

540.   **Plaintiff Mary Mitchell** has been employed by Amtrak in its NEC SBU as a secretary and clerical worker from 1990 through the present, working in various departments including Material Control, Transportation, Revenue Accounting, Purchasing, Accounts Payable, Payroll, and Engineering at the 30th Street Station in Philadelphia.

541.   During her employment with Amtrak, Mary Mitchell has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented Mitchell from advancing into higher positions such as lead clerk and partially exempt positions, and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Mitchell has been subjected to a racially hostile work environment.

542.   Mitchell applied for the job of Inventory Planner, a job for which she was qualified.  Despite her qualifications, she was rejected, and a white employee received the position.  In 1994, Mitchell applied for a lead clerk position in the Accounting and Finance Department, and despite her qualifications, including educational certificates for banking, secretarial, and clerical training, was rejected.  A white employee with less experience than Mitchell, whom Mitchell had herself trained, received the job.  Mitchell applied for the same position in 1997 or 1998.  Another white employee was awarded the position, and Mitchell was not even interviewed.  In 1999, Mitchell applied for the job of Bank Reconciliation Clerk.  Again, despite her qualifications, she was rejected.  A white person who had been a temporary employee, and had just started with Amtrak, received the position.

543.   As a result of Amtrak's discriminatory actions, as set forth above, Mitchell has suffered extreme harm.

544.   **Plaintiff Steven Johnson** was employed by Amtrak in its NEC SBU as a Service Attendant in the On Board Services Department from 1993 until his termination on March 3, 1999.  He worked out of the New York City crew base.

545.   During his employment with Amtrak, Steven Johnson was adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented Johnson from maintaining and advancing into higher and better paying positions such as Conductor and Lead Service Attendant and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Johnson was subjected to a racially hostile work environment.

546.   Johnson has been denied jobs for which he applied and was qualified, including Conductor, Cook, and Lead Service Attendant.  Whites have been hired, promoted, or transferred into those positions.

547.   In 1996 or 1997, Johnson attempted to obtain a transfer from New York to the Oakland, California crew base.  Although there were jobs in Oakland for which Johnson was qualified, Johnson's white managers in New York vetoed his transfer.  White employees have been permitted to transfer without interference.

548.   Johnson was terminated on or about February 23, 1997 for alleged sexual harassment of a man, which charge was unfounded.  Although he was reinstated on August 17, 1998, he was terminated again, on or about March 3, 1999, this time for alleged sexual harassment of a woman, which was, again, false.  He awaits a hearing before a

Public Law Board.  White employees are not terminated on the basis of false, trumped up charges of sexual harassment.

549.    Johnson and other black employees of Amtrak are subjected to racial epithets, racial jokes, and racial hostility from white managers and co-workers on a continuing basis.

550.    As a result of Amtrak's discriminatory actions, as set forth above, Johnson has suffered extreme harm.

551.    **Plaintiff Minnie Baker** was employed by Amtrak in its NEC SBU as an Usher/Information Booth Clerk from 1987 until her termination on April 2, 1998.  She worked in Penn Station in New York City.

552.    During her employment with Amtrak, Minnie Baker was adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies, practices and procedures which have prevented Baker from maintaining and advancing into higher and better paying positions and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Baker was subjected to a racially hostile work environment.

553.    On or about March 4, 1998, Baker injured her toe while at work.  She went to the hospital after work, but, after waiting several hours without being seen by a doctor, she went home.  She reinjured her foot at home when she tripped on her son's barbells.

554.    Baker never filed any claim with Amtrak or the State of New York for either sick leave or workers' compensation, and she never intended to do so.

555.    A few days after the original injury, Baker told the lead clerk about the accident, and he encouraged her to file an accident report.  She did so and was brought up on disciplinary charges for falsification of an on-the-job injury.  She was then terminated

from her employment.  White employees who have committed rules infractions far worse than those of which Baker was charged have nevertheless retained their jobs at Amtrak.

556.   During her employment, Baker was repeatedly harassed by her white supervisor.  This supervisor, who did not treat white employees in a similar manner, also pressed for the unfair disciplinary charges against Baker.

557.   Desiring to move to Florida for family reasons, Baker had successfully bid on a baggage job in Jacksonville.  Because of the unjust disciplinary proceedings, her bid was cancelled and she did not get the job in Florida.

558.   As a result of Amtrak's discriminatory actions, as set forth above, Baker has suffered extreme harm.

559.   **Plaintiff Robert Guerra** has been employed by Amtrak in its NEC SBU as a Policeman in New York City from 1986 through the present.

560.   During his employment with Amtrak, Robert Guerra has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies, practices and procedures which have prevented Guerra from advancing into higher and better paying positions and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Guerra was subjected to a racially hostile work environment.

561.   Guerra's managers at Amtrak have promised him opportunities to participate in advanced training programs ever since he began working at Amtrak in 1986, but have not delivered on their promises.  White officers are afforded opportunities to be trained, while black officers are not.

562.   In 1999, Guerra requested to participate in drug interdiction training.  He was denied, while two white officers with less seniority than Guerra were selected to take the

training.  In the late 1990's, Guerra requested to take precision shooting training classes. He was sent to a one week class at a local college, while four white officers with less seniority than Guerra were sent to the Federal Law Enforcment Training Center in Georgia for a four week course in precision shooting.  Also in the late 1990's, Guerra requested to take CPR training, but was denied while white officers with less seniority were selected.

563.    Black officers such as Robert Guerra are required to work on assignments in more dangerous areas than where white officers are assigned, and black officers are routinely detailed to the less desirable assignments, such as duty patrolling the men's restroom at Penn Station, more frequently than are their white counterparts.

564.    As a result of Amtrak's discriminatory actions, as set forth above, Guerra has suffered extreme harm.

565.    **Plaintiff Bonita Stephney** has been employed by Amtrak in its NEC SBU as a Coach Cleaner and a Carman Helper from 1993 through the present, working at the Southampton Yard in Boston.

566.    During her employment with Amtrak, Bonita Stephney has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented Stephney from advancing into higher and better paying positions such as Sheet Metal Worker and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Stephney has been subjected to a racially hostile work environment, and has been retaliated against for testifying against a white employee in a race-related criminal prosecution.

567.    Stephney has applied for promotions to better jobs such as Sheet Metal Worker nine times, most recently in 1998.  She has also applied for an Electrician's position

in about 1997 and for a Coach Cleaner Foreman's job in 1999.  Despite her qualifications, Stephney has been rejected for all these jobs in favor of whites who have been awarded the jobs.  Stephney actually was awarded the foreman's position, but the offer was revoked a few hours later, purportedly because of the Amtrak nepotism rule.  The nepotism rule is not invoked against whites in the same manner.

568.  Stephney has requested sheet metal working training numerous times but has always been denied, and is told that she must obtain such training on the outside.  Her lack of such training has been given by white managers as the reason she is denied the job. White employees, however, have received the job and then are given on-the-job training.

569.  Stephney has been harassed by white employees who have dropped trash on her head, engaged in racially derogatory insults and epithets, and refused to work with her because she is black.

570.  In approximately 1997, Stephney witnessed the brutal beating of a black car cleaner by a white sheet metal worker in the Shop at the Southampton facility.  The white employee was criminally prosecuted, and Stephney testified against him.   He was convicted.  However, approximately a year later, the white employee was reinstated to his job at the Southampton facility, where the black victim of the beating still works.  Because of her testimony, as well as her race, Stephney has been denied training and promotion opportunities.  Stephney, as do the other blacks working at the Southampton shop, must endure the continuing, intimidating, presence of a white employee who was reinstated to his job after brutalizing a black employee.

571.  As a result of Amtrak's discriminatory actions, as set forth above, Stephney has suffered extreme harm.

572.   **Plaintiff Terence Whitesides** has been employed by Amtrak in its NEC SBU as a Car Cleaner and a Laborer from 1997 through the present, working at the Southampton Yard in Boston.

573.   During his employment with Amtrak, Terence Whitesides has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented Whitesides from advancing into higher and better paying positions such as Signalman and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

574.   In 1998, Whitesides applied at least four times for promotions to better jobs, including Signalman, Signalman Helper, and Track Worker.  He was interviewed by white managers from the departments involved and Personnel.  Despite his qualifications and a positive reference from his then foreperson in the Southampton Shop, Whitesides was rejected for these jobs in favor of whites with lesser skills than Whitesides.

575.   In 1998, Whitesides was called to interview for a Laborer position that he had applied for months previously.  Although he had hoped to get a better position as a Signalman or Track Worker, Whitesides went to the interview for the Laborer position anyway. His Car Cleaner foreperson told him, even before the interview, that he would get the Laborer job.  He was informed during the interview that he did get the job.

576.   As a laborer, Whitesides and other blacks are assigned the most menial, dirty, and dangerous work, such as picking up trash, and cleaning the oil pits in the locomotive engines, which is particularly filthy and dangerous because of the presence of toxic materials and excrement.  Whites are not assigned such work unless they are being punished.

577.    As a result of Amtrak's discriminatory actions, as set forth above, Whitesides has suffered extreme harm.

578.    **Plaintiff Sonia Hodge** has been employed by Amtrak in its NEC SBU as a Coach Cleaner at the Southampton Shop in Boston from 1997 through the present.

579.    During her employment with Amtrak, Sonia Hodge has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection and transfer policies which have prevented Hodge from advancing into higher and better paying positions such as and partially exempt positions, and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Hodge has been subjected to a racially hostile work environment.

580.    When Hodge applied for work at Amtak, it was for a Conductor's position. She was given a test, told she did not pass, and was offered a job as a Coach Cleaner instead.

581.    In 1997 and 1998, Hodge applied for the job of Assistant Conductor three times but was rejected every time.  Although she took a test, management told her she did not pass it, but never gave her any scores.  Whites have been deemed to pass the test and have received the positions.

582.    In 1998, Hodge applied for the job of Electrician.  She had taken courses at Quincy College and received a certificate in the field.  She interviewed for fourteen electrician jobs with three white officials, two from the department and one from Personnel. Hodge was told by the department manager that she had interviewed very well for the position.  Despite her qualifications, Hodge was rejected.  All of those chosen for the jobs were white, and some of them were car cleaners with no electrical training or experience.

583.   Hodge attempted to challenge the racially discriminatory decision to deny her the Electrician's job.  She contacted the Amtrak Diversity Office and was told she would be sent papers to fill out in order to make a complaint.  The Diversity Office never sent the papers, however, and never contacted Hodge concerning her complaint.

584.   As a result of Amtrak's discriminatory actions, as set forth above, Hodge has suffered extreme harm.

585.   **Plaintiff Cassandra Cato-Louis** has been employed by Amtrak in its NEC SBU as an Electrician from 1989 through the present, working at the Boston Engine Terminal in Somerville, Massachusetts.

586.   During her employment with Amtrak, Cassandra Cato-Louis has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection, transfer, and discipline policies which have prevented Cato-Louis from advancing into higher and better paying positions such as Foreman and have deprived her of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.  In addition, Cato-Louis has been subjected to a racially hostile work environment.

587.   In the spring of 1997, Cato-Louis applied for a Foreman's position, but was told she could not interview for it because she had not worked in the shop for one year. Whites who have not worked in the shop for a year have been allowed to become foremen.

588.   In the summer of 1998, Cato-Louis applied for a Foreman II position, for which she was qualified.  She was interviewed but rejected.  Of the six available positions, five went to non-blacks.    In 1998, she applied for the position of Assistant Director of Engineering, for which she was qualified.  She was rejected without an interview.

589.   In 1998 or 1999, Cato-Louis applied for the position of Electrical Technician on the new high speed train.  The availability of these jobs was not generally posted, and

white managers withheld information about a test to be given to qualify for such a job, causing Cato-Louis to miss an opportunity to take the test.  When she signed up for the test later in 1998, it was cancelled.  Finally, she took and passed the test in March 1999, and in August 1999, received a letter of eligibility.  Cato-Louis did not get the job, and a white employee with less seniority and experience was selected instead.

590.   As a result of Amtrak's discriminatory actions, as set forth above, Cato-Louis has suffered extreme harm.

591.   **Plaintiff Karl Thomson** has applied for employment with Amtrak in its NEC SBU for work in Boston since 1994.

592.   Karl Thomson has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies which have prevented Thomson from being hired and advancing into well paid positions such as Conductor and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

593.   From 1994 through 1999, on numerous occasions, Thomson applied for employment as an Assistant Conductor with Amtrak.  In 1996 alone, he submitted his resume five times.  He telephoned repeatedly and sent letters to the Human Resources office.  He was told that Amtrak was in fact hiring for multiple positions, but he was never invited to interview or to test for the position.  The next month Thomson again saw the positions advertised in the newspaper.  On another occasion, Thomson was told that Amtrak would only consider persons who were from Massachusetts.  When Thomson explained that he was born and raised in Boston and wanted to return to Boston to work, he was merely told to wait until he was contacted.  He never was contacted by Amtrak.

594.   This pattern was repeated over and over.  In January 1997, Thomson was referred by Bill Regan to Amtrak's minority liason, Leroy Fergus.  Fergus promised that the

company would call him about jobs.  No one did.  In February, Thomson tried again, and Fergus claimed they had tried to reach him.  No messages had been recorded on Thomson's answering machine.  Again, in March, Fergus told Thomson that Amtrak was hiring only bus drivers.  Thomson replied that he had driven transit buses for five years and a charter bus for a year.  Again, Fergus said Amtrak would call back, but it never did.

595.    The applications of white persons are not handled in this manner, and white persons have been hired by Amtrak for all the positions for which Thomson applied.

596.    As a result of Amtrak's discriminatory actions, as set forth above, Thomson has suffered extreme harm.

597.    **Plaintiff Clinton Daniels** has applied for employment with Amtrak in its NEC SBU in New York many times since the 1980's, most recently in 1999.

598.    Clinton Daniels has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies which have prevented Daniels from being hired and advancing into well paid paying positions such as Conductor and have deprived him of the opportunity to work in an integrated environment in which African-American employees hold higher level positions.

599.    Since the 1980's, on at least ten (10) occasions, Daniels applied at the Amtrak Personnel Office at Penn Station in New York City for assistant conductor postions. He has passed the test that is given for assistant conductor candidates and is well qualified for the job.  However, he has been rejected every time.

600.    On one occasion, Daniels was called in for an interview for a train attendant position, for which he did not apply.  One week later, he received a letter stating that he was rejected because he was not qualified for the position.

601.    In 1999, Daniels went to the Human Resources at Penn Station to check on his job prospects for an assistant conductor position.  He had delivered his resume yet again about a month earlier.  He was told that the position was closed and no one was being hired for it.  However, while he was there, he saw a classroom full of newly hired assistant conductors.  Virtually all of them were white.

602.    Over the years, Daniels has taken his resume in to the Human Resources Office in person, and he has spoken to officials in that department many times about his life-long ambition to become an Amtrak conductor.  He has spent a great deal of time at Pennsylvania Station in New York City learning about the history and operation of the railroad and Amtrak in particular.   He has also gotten to know numerous Amtrak employees.  To further his chances of getting a job, Daniels circulated a petition and got twenty-one (21) Amtrak employees to sign, stating that they did not see any reason why Daniels should not be hired for a job by Amtrak.  The petition was to no avail, however, as all his applications have been rejected.  The applications of white persons are not handled in this manner, and white persons have been hired by Amtrak for the positions for which Daniels applied.

603.    As a result of Amtrak's discriminatory actions, as set forth above, Daniels has suffered extreme harm.

604.    **Plaintiff Victor Kipping** is an African-American citizen of the United States and a resident of the State of Massachusetts.  He has applied for employment with Amtrak in its NEC SBU in Boston since 1998.

605.    Victor Kipping has been adversely affected by the systemic pattern and practice of racial discrimination detailed in this Complaint, including Amtrak's subjective selection policies which have prevented Kipping from being hired and advancing into well paid positions such as Conductor and Locomotive Engineer, and have deprived him of the

opportunity to work in an integrated environment in which African-American employees hold higher level positions.

606.   In 1998, on four or five occasions, Kipping applied in person at the Amtrak Personnel Office in Boston, Massachusetts.  He saw an employment advertisement in the Bay State Banner, a local newspaper, for positions including conductor, engineer, laborer, and kitchen worker.  Kipping took his resume to the Amtrak Personnel Office and spoke to a white official there who told him that the company would advise him of its decision on his application within two weeks.  The company did not call him back, however, and four weeks after his application, Kipping telephoned the Personnel Office.  He was told to wait another three weeks for a decision.  Three weeks later, not having heard from Amtrak, he called again and was told to bring in another resume, which he did.

607.   This pattern was repeated in the weeks and months to come, as each time he was told to wait, or bring in another resume, or that his application had been lost. Kipping's most recent application to Amtrak was in mid-April, 1999, which again, he delivered in person.  Kipping has never received any response from Amtrak for any of his applications.

608.   The applications of white persons are not handled in this manner, and white persons have been hired by Amtrak for all the positions for which Victor Kipping applied.

609.   As a result of Amtrak's discriminatory actions, as set forth above, Kipping has suffered extreme harm.

## VIII.   PLAINTIFFS' CLAIMS

### A.   The Civil Rights Act of 1866, 42 U.S.C. § 1981

610.   The plaintiffs restate and reallege paragraphs 1 through 609 as though set forth here in full.

611.   Amtrak has discriminated against the named Plaintiffs and all members of the proposed classes by denying them the same rights as are enjoyed by white non-exempt employees and applicants for non-exempt employment in the making, performance, modification and termination of their employment relationship with Amtrak and to the enjoyment of all benefits, privileges, terms and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended.

612.   Amtrak's conduct has been intentional, deliberate, willful, and conducted in callous disregard of the rights of the named Plaintiffs and members of the proposed classes.

613.   By reason of the continuous nature of Amtrak's discriminatory conduct, persistent throughout the employment of the named Plaintiffs and class members, the named Plaintiffs and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

614.   By reason of Amtrak's discrimination, the named Plaintiffs and the members of the proposed classes are entitled to all legal and equitable remedies available under §1981, including, but not limited to, damages for mental anguish and punitive damages.

**B.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e**

615.   Plaintiffs restate and reallege paragraphs 1 through 614 as though set forth here in full.

616.   Amtrak has discriminated against the named Plaintiffs and all members of the proposed classes with respect to terms and conditions of their employment because of their race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991.

617.    Amtrak's conduct has been disparate, intentional, deliberate, willful, and conducted in callous disregard of the rights of the named Plaintiffs and the members of the proposed classes.

618.    Amtrak's policies and/or practices have produced a disparate impact against the named Plaintiffs and the class members with respect to the terms and conditions of employment.

619.    By reason of Amtrak's discrimination, the named Plaintiffs and the members of the proposed classes are entitled to all legal and equitable remedies available under §2000e.

## IX.    PRAYER FOR RELIEF

620.    Wherefore, the named Plaintiffs, on behalf of themselves and the members of the classes whom they seek to represent, request the following relief:

a.    Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a),  (b)(2) and/or (b)(3) , on behalf of the proposed Plaintiff classes, and designation of the Plaintiffs as representatives of these classes and their counsel of record as class counsel;

b.    A declaratory judgment that Amtrak's employment policies, practices and procedures challenged herein are illegal and in violation of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. Section 2000(e), et seq. and 42 U.S.C. §1981;

c.    A permanent injunction against Amtrak and its partners, officers, owners, agents, successors, employees, and representatives and any and all persons acting in concert with them, from engaging in any further unlawful

practices, policies, customs, usages, racial discrimination and retaliation by Amtrak as set forth herein;

d.      An Order requiring Amtrak to initiate and implement programs that (i) will provide equal employment opportunities for African-American employees and applicants; (ii) will remedy the effects of Amtrak's past and present unlawful employment policies, practices and procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described above;

e.      An Order requiring Amtrak to initiate and implement systems of hiring, assigning, training, transferring, compensating, and promoting African-American applicants and employees in a non-discriminatory manner;

f.      An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (b) through (e) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (b) through (e), above;

g.      An Order placing or restoring the named Plaintiffs and the classes they seek to represent into those jobs they would now be occupying, but for Amtrak's discriminatory policies, practices and procedures;

h.      An Order directing Amtrak to adjust the wage rates and benefits for the named Plaintiffs and the classes they seek to represent to the level that they would be enjoying but for Amtrak's discriminatory policies, practices and procedures;

i.      An award of back pay, front pay, compensatory damages, punitive

damages, lost benefits, preferential rights to jobs, and other damages for lost

compensation and job benefits suffered by the named Plaintiffs and the

classes they seek to represent;

j.      Any other appropriate equitable relief to the named Plaintiffs and

proposed class members;

k.      An award of litigation costs and expenses, including reasonable

attorneys' fees, to the Plaintiffs and class members;

l.      Pre-judgment interest;

m.     Such other and further relief as the Court may deem just and proper;

and

n.      Retention of jurisdiction by the Court until such time as the Court is

satisfied that Amtrak has remedied the practices complained of herein

and is determined to be in full compliance with the law.

**X.    JURY DEMAND**

The Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted this 13th day of March, 2000.

Timothy B. Fleming (DC Bar No. 351114)
Derek B. Brett (FL Bar No. 0090750)
**Gordon, Silberman, Wiggins & Childs, P.C.**
1621 Connecticut Avenue N.W.
Suite 400
Washington, D.C. 20009
(202) 238-0690

Robert F. Childs, Jr. (AL Bar No. CHI003)
Jon C. Goldfarb (AL Bar No. GOL015)
Joel S. Isenberg (DC Bar No. 453812)
**Gordon, Silberman, Wiggins & Childs, P.C.**
1400 SouthTrust Tower
Birmingham, Alabama 35203
(205) 328-0640

Avis E. Buchanan (DC Bar No. 365208)
Warren K. Kaplan (DC Bar No. 034470)
Susan E. Huhta (DC Bar No. 4534478)
**Washington Lawyers' Committee for Civil
Rights and Urban Affairs**
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000

*ATTORNEYS FOR THE PLAINTIFFS*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing FIRST AMENDED COMPLAINT has been served by First Class U.S. Mail upon:

*Counsel for the National Railroad Passenger Corporation (AMTRAK)*
Thomas E. Reinert
Grace E. Speights
MORGAN, LEWIS & BOCKIUS, LLP
1800 M Street, N.W.
Washington, D.C. 20036

*Counsel for the National Conference of Firemen & Oilers, SEIU:*
Erick J. Genser
Manar S. Morales
Molly Elkin
MULHOLLAND & HICKEY
1125 15th Street, N.W., Suite 400
Washington, D.C. 20005

*Counsel for the International Brotherhood of Electrical Workers,*
*Brotherhood of Locomotive Engineers, Sheet Metal Workers'*
*International Association, Brotherhood of Railway Signalmen:*
Michael S. Wolly
ZWERDLING, PAUL, LEIBIG, KAHN, THOMPSON & WOLLY, P.C.
1025 Connecticut Avenue, N.W., Suite 712
Washington, D.C. 20036

*Counsel for the Transportation Communications International Union;*
*United Transportation Union; American Railway Supervisors*
*Association, TCU; Transport Workers' Union of America;*
*Brotherhood of Railway Carmen Division, TCU;*
*International Association of Machinists and Aerospace Workers;*
*Amtrak Service Workers' Council:*
Joseph Guerrieri, Jr.
Jeffrey A. Bartos
GUERRIERI, EDMOND & CLAYMAN, P.C.
1625 Massachusetts Avenue, N.W., Suite 700
Washington, D.C. 20036

this 13th day of March 2000.

4

Timothy B. Fleming
D.C. Bar No.: 9351114
**ATTORNEY FOR THE PLAINTIFFS**
GORDON, SILBERMAN, WIGGINS & CHILDS,
P.C.
1621 Connecticut Avenue, N.W.
Suite 400
Washington, D.C. 20009
(202) 238-0690