## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

KENNETH CAMPBELL, *et al.*,                      )
                                                 )
        Plaintiffs,                         )
                                                 )
        v.                                  )    CIVIL ACTION NO. 1:99CV02979 (EGS)
                                                 )    Judge Sullivan
NATIONAL RAILROAD PASSENGER                      )
CORPORATION,                                     )
                                                 )
        Defendant.                          )
                                                 )
_____         )

### PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANT AMTRAK FOR DESTRUCTION OF DOCUMENTS AND FAILURE TO PRODUCE DISCOVERY

Plaintiffs, by and through their undersigned counsel, hereby move this Court for sanctions against Defendant National Railroad Passenger Corporation ("Amtrak" or "Defendant") for the destruction of relevant and discoverable documents and data and for Defendant's failure to produce required discovery and to abide by the discovery provisions of the Federal Rules of Civil Procedure and the orders of this Court.

Specifically, the Plaintiffs request that the Court sanction Amtrak as follows:

(1) a ruling that Plaintiffs meet their burden of establishing commonality and typicality for purposes of Rule 23(a), Fed. R. Civ. P., with regard to all claims of race discrimination in hiring, job assignment, promotion or selection (to non-senority-based bid jobs, *i.e.*, excluding jobs to which the senior bidder is automatically entitled under the applicable collective bargaining agreement), and transfer involving the practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs;

(2) a ruling that Plaintiffs meet their burden of establishing that Amtrak has acted or refused to act on grounds generally applicable to the class, for purposes of Rule 23(b)(2), Fed. R. Civ. P., with regard to all claims of race discrimination in hiring, job assignment, promotion or selection (to non-senority-based bid jobs), and transfer involving the practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs;

(3) a ruling that Plaintiffs meet their burden of establishing that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for purposes of Rule 23(b)(3), Fed. R. Civ. P., with regard to:

(a) all claims of race discrimination in hiring, job assignment, promotion or selection (to non-senority-based bid jobs), and transfer involving the practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs; and/or

(b) underutilization of African-Americans in higher-paying, less menial, higher-prestige unionized jobs throughout its workforce and within subparts thereof;

(4) adverse findings that certain matters and facts shall be taken to be established for the purposes of this action in accordance with the claims of the Plaintiffs and/or the class(es) or any subclass(es), in particular the following:

(a) that Amtrak did, from 1990 through 1997, in connection with hiring, job assignments, promotions and selections, and transfers, channel African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs, throughout its workforce and within subparts thereof; and

(b) that Amtrak did, from 1990 through 2004, engage in a pattern and practice of underutilizing African-Americans in higher-level, higher-paying, less menial, higher-prestige unionized jobs throughout its workforce and within subparts thereof;

(c) that Amtrak willfully destroyed documents and data in connection with its affirmative action plans from 1990 through 2004 that tended to demonstrate such channeling and underutilization for the purpose of covering up such facts and/or minimizing the extent of such channeling and/or underutilization;

(5) adverse inferences against Amtrak are to be drawn, and the jury so instructed that adverse inferences must be drawn against Amtrak and in favor of the Plaintiffs, the class(es), and/or subclass(es), concerning certain claims, elements of claims, or factual matters bearing on the claims, of the Plaintiffs, class(es), and/or subclass(es), specifically including, but not necessarily limited to, the following:

(a) that Amtrak did, from 1990 through 2004, engage in a pattern and practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs in connection with hiring, job assignments, promotion or selection (to non-senority-based bid jobs), and transfers;

(b) that Amtrak did, from 1990 through 2004, underutilize African-Americans in higher-level, higher-paying, less menial, higher-prestige unionized jobs throughout its workforce and within subparts thereof;

(c) the calculation(s) of backpay, and/or any element or factor pertaining thereto, due to the Plaintiffs and the class(es) and/or subclass(es) by Plaintiffs' experts are presumptively correct because such calculations have been hindered by Amtrak's willful destruction of

material evidence pertaining thereto;

(6) evidentiary rulings that Amtrak shall not, during either pretrial proceedings (including, but not limited to, class certification) or at trial, be allowed to oppose, or introduce any evidence regarding certain claims, elements of claims, or factual matters bearing on the claims, of the Plaintiffs, class(es), and/or subclass(es), in connection with, but not necessarily limited to, the following:

      (a) Amtrak's pattern and practice, from 1990 through 2004, of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs in connection with hiring, job assignments, promotion or selection (to non-senority-based bid jobs), and transfers;

      (b) Amtrak's underutilization, from 1990 through 2004, of African-Americans in higher-level, higher-paying, less menial, higher-prestige unionized jobs throughout its workforce and within subparts thereof, or the extent thereof;

      (c) the calculation(s) of backpay, and/or any element or factor pertaining thereto, due to the Plaintiffs and the class(es) and/or subclass(es);

(7) an award of attorneys' fees and costs and expenses in the amount of $300,000 for bringing this motion and other prior discovery motions for which Plaintiffs did not seek fees and expenses, and to punish and deter Amtrak for/from engaging in past and future discovery abuses;

(8) an award of attorneys fees and costs and expenses, including experts' fees and expenses associated with statistical and labor market analyses which must yet be performed, in amounts to be determined, as a result of:

      (a) Amtrak's destruction of W-2 data for the years 1990-1997; and

(b) Amtrak's destruction of affirmative action plan documents from 1990-2004; and

(c) Amtrak's other discovery abuses, as detailed in the supporting Memorandum of the Plaintiffs;

(9) such other sanctions as the Court determines to be warranted.

The bases for Plaintiffs' motion are set forth in the accompanying Memorandum.

Respectfully submitted this 2nd day of June, 2006,

_____/s/_____
Timothy B. Fleming (DC Bar No. 351114)
Lori B. Kisch (MD Fed Bar No. 25781)
**WIGGINS, CHILDS, QUINN & PANTAZIS, PLLC**
7 Dupont Circle, N.W.
Suite 200
Washington, D.C. 20036
(202) 467-4123

Robert F. Childs, Jr. (AL Bar No. CHI003)
Jon C. Goldfarb (AL Bar No. GOL015)
**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**
The Kress Building
301 19th Street North
Birmingham, AL 35203
(205) 328-0640

Warren K. Kaplan (DC Bar No. 034470)
Susan E. Huhta (DC Bar No. 4534478)
**THE WASHINGTON LAWYERS COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS**
11 Dupont Circle, N.W.
Suite 400
Washington, DC  20036
(202) 319-1000

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

KENNETH CAMPBELL, *et al.*,         )
                                     )
         Plaintiffs,        )
                                     )
         v.              )     CIVIL ACTION NO. 1:99CV02979 (EGS)
                                     )     Judge Sullivan
NATIONAL RAILROAD PASSENGER   )
CORPORATION, *et. al.*,        )
                                     )
         Defendants.     )
                                     )
_____ )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR SANCTIONS AGAINST AMTRAK FOR THE DESTRUCTION
<u>OF DOCUMENTS AND FOR THE FAILURE TO PRODUCE DISCOVERY</u>**

Plaintiffs, through their undersigned Counsel, respectfully submit this Memorandum in Support of Their Motion for Sanctions Against Amtrak for the Destruction of Documents and for the Failure to Produce Discovery.

**I.    SUMMARY**

Amtrak has destroyed electronic W-2 data (employee wage-hour data) for the years 1990 through 1997, affirmative action plan documents, and has withheld documents related to its affirmative action plans and employment diversity audits by the United States Office of Federal Contract Compliance Programs ("OFCCP"), all of which are manifestly material to this employment civil rights class action litigation. Other discoverable materials have been continually withheld from discovery despite this Court's orders to Amtrak to produce them and despite numerous additional efforts by Plaintiffs to obtain them.

Amtrak has discarded W-2 data annually throughout this litigation, as recently as 2004.

Amtrak continued this annual erasure of W-2 data through 2004 despite the parties' briefings to this Court at that very time regarding document destruction and contrary to an injunction that was in place during the latter half of 2004.[1]   Amtrak has also violated this Court's Minute Order of September 9, 2005, granting Plaintiffs' Motion to Compel the Production of W-2 data.  Moreover, at the time that Plaintiffs moved to compel the production of the W-2 data, Amtrak knew that such data had already been destroyed, yet Amtrak nevertheless failed to inform Plaintiffs or the Court of that critical fact.  Amtrak's complete disregard for its obligations – and this Court's order – to maintain documents reasonably calculated to lead to the discovery of evidence in this case, together with its misrepresentations to the Plaintiffs and to the Court regarding this matter, warrant the issuance of severe sanctions in this case.

The breadth of the destruction of relevant documents related to Amtrak's affirmative action program, including adverse impact analysis report documents and affirmative action plan ("AAP") drafts and other documents, is not yet fully known.  But it is clear that Amtrak, to date, has withheld years of adverse impact analyses, as well as the data underlying those reports.  Amtrak has also continually delayed the production of discovery and depositions related to the AAP's to the detriment of Plaintiffs.  Despite an outstanding order by this Court, issued more than a year ago, to Amtrak to produce a witness or witnesses pursuant to a Rule 30(b)(6) notice of deposition regarding AAP's, Amtrak to this day has failed to produce such a witness,[2] refused to disclose the name(s) of

---

[1] The exact time(s) of the erasure(s) of the W-2 is unknown, even to Amtrak (although, given that it was done annually, it is unclear how that could be unknown).  See Ex. 18, 20.  Regardless, the issue of document destruction became an issue at least by March 12, 2004, see Amtrak's Memorandum In Opposition To Plaintiffs' Motion For Preliminary Injunction at p. 3, Dkt. 169, and the injunction was either being briefed or was in place (it was entered from the bench on July 7, 2004) throughout most of 2004.

[2] Amtrak did produce a witness with limited knowledge about its AAP's for the years 2004 and 2005, but the witness had little or no knowledge regarding the AAP's prior to that time.  Additionally, the witness did not possess

such witness(es) and does not respond to written inquiries by the Plaintiffs regarding such inquiries. Plaintiffs also recently learned that Amtrak has withheld numerous OFCCP audits, which were requested years ago and on which subject Amtrak was ordered, in April 2005, to produce a Rule 30(b)(6) witness.

Throughout the litigation, Amtrak has repeatedly refused to produce discoverable and relevant (and inculpatory) evidence unless ordered to do so by this Court. Further, Amtrak has attempted to evade several court orders regarding outstanding discovery by misleading Plaintiffs and this Court regarding the existence of the evidence. Indeed, despite *eight separate orders* by this Court requiring Amtrak to produce witnesses or documents that it sought to withhold, Amtrak still refuses to comply with its discovery obligations.

Amtrak's blatant disregard for its discovery obligations and the prejudice that such disregard has already caused and will continue to cause Plaintiffs, form the bases for this motion. Accordingly, Plaintiffs request that sanctions be imposed upon Amtrak in the form of adverse rulings, findings, and inferences related to class certification, liability, evidence, and damages, as follows:

(1) a ruling that Plaintiffs meet their burden of establishing commonality and typicality for purposes of Rule 23(a), Fed. R. Civ. P., with regard to all claims of race discrimination in hiring, job assignment, promotion or selection (to non-seniority-based bid jobs), and transfer involving the practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs;

(2) a ruling that Plaintiffs meet their burden of establishing that Amtrak has acted or refused to act on grounds generally applicable to the class, for purposes of Rule 23(b)(2), Fed. R. Civ. P.,

---

knowledge regarding several AAP issues relating to the 2004 and 2005 time frames.

with regard to all claims of race discrimination in hiring, job assignment, promotion or selection (to non-seniority-based bid jobs), and transfer involving the practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs;

(3) a ruling that Plaintiffs meet their burden of establishing that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for purposes of Rule 23(b)(3), Fed. R. Civ. P., with regard to:

(a) all claims of race discrimination in hiring, job assignment, promotion or selection (to non-seniority-based bid jobs), and transfer involving the practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs; and/or

(b) underutilization of African-Americans in higher-paying, less menial, higher-prestige unionized jobs throughout its workforce and within subparts thereof;

(4) adverse findings that certain matters and facts shall be taken to be established for the purposes of this action in accordance with the claims of the Plaintiffs and/or the class(es) or any subclass(es), in particular the following:

(a) that Amtrak did, from 1990 through 1997, in connection with hiring, job assignments, promotion or selection, and transfers; channel African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs; throughout its workforce and within subparts thereof; and

(b) that Amtrak did, from 1990 through 2004, engage in a pattern and practice of underutilizing African-Americans in higher-level, higher-paying, less menial, higher-prestige

–4–

unionized jobs throughout its workforce and within subparts thereof;

(c) that Amtrak willfully destroyed documents and data in connection with its affirmative action plans from 1990 through 2004 that tended to demonstrate such channeling and underutilization for the purpose of covering up such facts and/or minimizing the extent of such channeling and/or underutilization;

(5) a ruling that adverse inferences against Amtrak are to be drawn, and the jury so instructed that adverse inferences must be drawn, against Amtrak and in favor of the Plaintiffs, the class(es), and/or subclass(es), concerning certain claims, elements of claims, or factual matters bearing on the claims, of the Plaintiffs, class(es), and/or subclass(es), specifically including, but not necessarily limited to, the following:

(a) that Amtrak did, from 1990 through 2004, engage in a pattern and practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs in connection with hiring, job assignments, promotion or selection (to non-senority-based bid jobs), and transfers;

(b) that Amtrak did, from 1990 through 2004, underutilize African-Americans in higher-level, higher-paying, less menial, higher-prestige unionized jobs throughout its workforce and within subparts thereof;

(c) the calculation(s) of backpay, and/or any element or factor pertaining thereto, due to the Plaintiffs and the class(es) and/or subclass(es) by Plaintiffs' experts are presumptively correct because such calculations have been hindered by Amtrak's willful destruction of material evidence pertaining thereto;

(6) evidentiary rulings that Amtrak shall not, during either pretrial proceedings (including,

but not limited to, class certification) or at trial, be allowed to oppose or introduce any evidence regarding certain claims, elements of claims, or factual matters bearing on the claims, of the Plaintiffs, class(es), and/or subclass(es), in connection with, but not necessarily limited to, the following:

(a) Amtrak's pattern and practice, from 1990 through 2004, of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige unionized jobs in connection with hiring, job assignments, promotion or selection (to non-seniority-based bid jobs), and transfers;

(b) Amtrak's underutilization, from 1990 through 2004, of African-Americans in higher-level, higher-paying, less menial, higher-prestige unionized jobs throughout its workforce and within subparts thereof, or the extent thereof;

(c) the calculation(s) of backpay, and/or any element or factor pertaining thereto, due to the Plaintiffs and the class(es) and/or subclass(es);

Plaintiffs also request monetary sanctions for the attorneys' fees and expenses (including experts' fees and expenses), already incurred by Plaintiffs as a result of the discovery abuses as well as the future fees and expenses that will be incurred as a result of the destruction of evidence.  Plaintiffs seek a monetary sanction of $300,000 to compensate Plaintiffs for the attorneys' fees and expenses associated with Amtrak's illegal document destruction and underhanded tactics and to punish Amtrak for its conduct and to deter it from such conduct in the future. Amtrak's repeated discovery abuses, its misrepresentations to this Court and the Plaintiffs, and its complete disregard for the seriousness of its actions, warrant these sanctions. Due to the attorney time and expenses that will necessarily be incurred as a result of Amtrak's

conduct, together with the manifest and potential prejudice to their case, Plaintiffs request additional monetary sanctions against Amtrak in an amount to be determined at a later date. Plaintiffs request that, upon submission to the Court by Plaintiffs of the attorneys' fees and expenses, including but not limited to, the expert costs and expenses associated with creating annualized pay data for the years 1990-1997, Amtrak shall, within 14 days, pay such sums to the Plaintiffs.

## II.    BACKGROUND

Plaintiffs filed this case against Amtrak on November 9, 1999, alleging class-wide violations of Title VII, including allegations related to, *inter alia,* discriminatory promotions, discriminatory transfers, and discrimination in hiring, all of which operate to segregate African-Americans into the least desirable and lowest paying positions at Amtrak.  Plaintiffs brought this suit on behalf of themselves and all other African-American current and former unionized employees of Amtrak and applicants for employment in unionized positions, except for the track workers in Amtrak's Northeast Corridor (who were covered by the previous *Thornton v. Amtrak* litigation, which resulted in entry of a consent decree).  Prior to filing this suit, classwide EEOC charges had been filed as early as January 25, 1997.  *Campbell v. National Railroad Passenger Corp.*, 163 F. Supp. 2d, 19, 26 (D.D.C. 2001).

### A.    During the Preliminary Injunction Briefing and Hearing Amtrak Repeatedly Assured This Court That Its Managers and Employees Were Fully Aware of Their Obligations to Preserve Documents Related to the Litigation, and That Plaintiffs' Concerns Regarding Document Destruction Were "Much Ado About Nothing"

On March 10, 2004, during pretrial discovery, Plaintiffs learned for the first time that Amtrak had destroyed company documents which were not only reasonably calculated to lead to the

discovery of admissible evidence, but were plainly relevant to the allegations in the lawsuit as well as to the administrative charges of discrimination filed with the EEOC.  On March 12, 2004, Plaintiffs notified Amtrak of their concern regarding document retention and inquired regarding the instructions given to Amtrak employees regarding their obligations to maintain documents.  Amtrak did not respond to this letter.  Ex. 1.  On April 1, 2004, Plaintiffs again wrote to Amtrak about their concern for the lack of instructions given to Amtrak employees regarding the need to maintain documents related to the lawsuit, and again requested to be informed of the instructions given with regard to maintaining documents and how such instructions had been disseminated.  Ex. 2.  *Id.*  On April 6, 2004, Defendant responded that it had so instructed employees on various occasions and that it would not share the communications with Plaintiffs' counsel.  Ex. 3.

Amtrak has stated over and over again that it is aware of its document retention responsibilities and that its management has been advised of such responsibilities.  Ex. 4, Declaration of Melissa Rogers.  In its Notice Re: Document Preservation filed with this Court on May 2, 2005, Amtrak stated that in December 2000 its senior level management was instructed regarding their obligation to maintain documents.  Dkt. No. 210, Ex. 4, at 2.  Further, Amtrak stated that its Record Retention Department was instructed in June 2001 to preserve relevant documents relating to the lawsuit.  Ex. 4, Rogers Declaration at 2.  Amtrak also stated that its Senior Director of Payroll Operations, its Manager of Document Administration, as well as its Human Resources Directors were all instructed regarding document preservation.  Ex. 4.  Amtrak stated that it distributed a letter dated July 12, 2004, "to all Amtrak management employees…that reminded all managers of the obligation to preserve and maintain any documents conceivably relevant to Plaintiffs' claims."  *Id.*  In or around July, 2004, Amtrak mailed to the homes of every Amtrak

management employee a memorandum regarding Amtrak's obligation to preserve and maintain documents relevant to the litigation. *Id.* Amtrak also stated, "Amtrak fully understands and appreciates, as it has from the onset of this litigation, that it is obligated to take all reasonable efforts to ensure that documents relevant to Plaintiffs' claims be preserved and maintained." *Id.* Amtrak stated during the injunction hearing, "[T]he instruction [regarding document preservation] did go out and has gone out since the advent of the case, and has gone out to senior managers." July 7, 2004 transcript at 11. Amtrak is "well aware of its obligations." *Id.* at 13.

On June 10, 2004, Plaintiffs filed a Motion for Preliminary Injunction and Order for Preservation of Documents. Dkt. No. 167. The matter was fully briefed and, on July 7, 2004, this Court held a hearing and heard oral argument on Plaintiffs' motion, and at the conclusion of the hearing, the Court granted the injunction from the bench and by Minute Order. Ex. 5, 6. The parties were directed to submit proposed orders, which they submitted on September 9, 2004. Dkt. No. 184. At the Court's request, the parties then submitted statements supporting their respective proposals. Dkt. Nos. 188, 190. During several status conferences from December, 2004, through March, 2005, the issue of the injunction was raised repeatedly and the parties spoke about various issues regarding the injunction.

On April 8, 2005, the Court ordered Amtrak to:

(1) notify the Court of the steps it had taken and will continue to take to ensure that all documents relevant to Plaintiffs' claims are preserved and maintained; and to provide to the court, for in camera review, a copy of all written instructions that were or will be given to Amtrak employees regarding document preservation; and (3) provide to the court a list of all employee positions that have or will receive written instructions regarding document preservation.

Dkt. No. 208.

On May 1, 2005, Amtrak filed a Notice Re: Document Preservation explaining the steps it took prior to, and after, the injunction was granted relating to its efforts to preserve the documents at issue. Dkt. No. 210.  On May 12, 2005, Plaintiffs filed a response specifically raising concerns that managers, supervisors, and employees within the Diversity Department had not been notified regarding document preservation.  Dkt. No. 212.

During the July 7, 2004 hearing regarding the motion seeking an injunction against document destruction, Amtrak cavalierly summed up the Plaintiffs' document destruction concerns as "much ado about nothing." Ex. 5 at 14.  The destroyed documents, it said, were a bunch of "junk" (*id.* at 19), and the "upshot" is, "the types of documents plaintiff complained about are not the types of documents that would impact specifically here plaintiffs' ability to demonstrate or attempt to demonstrate a class ought to be certified." *Id.* at 5.  Amtrak argued that if destroyed documents were later determined to be relevant, Plaintiffs could "seek an adverse ruling from the Court regarding" the destroyed documents.  *Id.* at 14.  Plaintiffs do so now.

### B. Amtrak Has Demonstrated a Pattern of Evasion of Its Preservation and Discovery Obligations

Through almost every step of the discovery process, Amtrak has attempted to avoid preservation and discovery of some of the most clearly damaging material evidence in the case.  This Court has ordered Amtrak on eight separate occasions to produce relevant discovery which Amtrak had attempted to withhold from Plaintiffs:

(1)  On March 22, 2002, this Court ordered, over Amtrak's objections, that Plaintiffs were entitled to take the deposition of former Vice President for Diversity, Wanda Hightower. Dkt. No. 111.

(2)  On June 19, 2002, this Court ordered, over Amtrak's objections, that Plaintiffs were entitled to take the deposition of Amtrak consultant Charles White.  Dkt. No. 117.

−10−

(3)  On January 26, 2004, this Court ordered, over Amtrak's objections, that Plaintiffs were entitled to take the depositions of Amtrak supervisors.  Dkt. No. 163.

(4)  On July 7, 2004, this Court, by Minute Order, granted Plaintiffs' Motion to Compel and ordered that Amtrak produce EEO complaint and investigation files and the "job files" relating to non-seniority bid promotion or selection and external hiring.

(5)  On September 10, 2004, this Court ordered, over Amtrak's objections, that Plaintiffs were entitled to take another deposition resisted by Amtrak.  Dkt. No. 185.

(6)  On April 8, 2005, this Court ordered Amtrak to notify the Court of the steps it had taken to preserve documents.  Dkt. No. 208.  On April 8, 2005, this Court also ordered, over Amtrak's objections, that Amtrak produce a Rule 30(b)(6) witness regarding its Affirmative Action Plans.  Dkt. No. 208.

(7)  On June 3, 2005, this Court, by Minute Order, directed Amtrak to produce W-2 electronic data.

(8)  On July 26, 2005, this Court, by Minute Order, directed Amtrak to return to Washington, D.C., documents and files which Amtrak had shipped out to Los Angeles, California.  This Court ordered the return of the documents so that Plaintiffs could continue to review the documents, which this Court had previously ordered Amtrak to make available to Plaintiffs.

## C.    Amtrak Was Ordered By This Court To Produce W-2 Wage Documents That Amtrak Knew It Had Already Destroyed

In June 2001, Plaintiffs served document production requests including the following wage information:

> "Document Request No. 4:   Computer tapes containing any data base or computerized information relating to the work force within the defendant company during the time period of January 1, 1985 to present, which contain all or some of the following information . . . . name; . . . social security number; . . . all jobs held with the defendant; . . . wages and/or salary received . . . ."

Ex. 7.

Subsequent to the service of these document requests, the parties agreed that discovery would be produced in the case dating back to January 1, 1990. Ex. 9, Letter of August 28, 2001.

−11−

Additionally, Plaintiffs' August 28, 2001 letter advised Amtrak that computerized data was "of paramount priority."  *Id.*

Defendants produced electronic data for the first time a year later, in September 2002.  On December 17, 2004, Plaintiffs sent a letter to Amtrak requesting the long overdue W-2 electronic data.  Ex. 11.  Amtrak refused to produce the data, and on April 29, 2005, Plaintiffs filed a Motion to Compel Defendant to Produce W-2 Electronic Data.  Dkt. No. 209.  In opposition to the Motion to Compel, Amtrak argued that, although the W-2 electronic data *did relate to damages*, it was not relevant to class certification.  Dkt. No. 215, Ex. 10, 12.  Amtrak also refused to produce the data because it argued the information was duplicative of payroll data already produced.  The Court rejected Amtrak's arguments and ruled that the W-2 electronic data is "highly relevant" to class certification, in part, because it could provide evidence regarding Plaintiffs' channeling claim.  Ex. 12, Sept. 9, 2005 transcript at 20.  In rejecting Amtrak's arguments, the Court, during oral argument, inquired of Amtrak whether production of the W-2 data would be burdensome.  Ex. 12, at 10, 20-21.  Amtrak responded that it would not.  *Id.*  Accordingly, the Court found that it would not be burdensome to produce such data and ordered Amtrak to notify the Court if the production of such data would be burdensome.  *Id.* at 20-21.  Amtrak never disclosed that it had *already destroyed eight years of the data*.  Ex. 12.

On November 9, 2005, Amtrak produced W-2 electronic data for the years 1998 though 2005.  Ex. 13, 14.  Again, Amtrak did not disclose to Plaintiffs that W-2 data for the years 1990-1997 had been destroyed.  Ex. 13.  Rather, Amtrak merely stated in a cover letter to Plaintiffs, "Enclosed please find a CD containing all available Amtrak W-2 electronic data."  *Id.*  Plaintiffs sent a letter to Amtrak on November 16, 2005, inquiring about the missing W-2 electronic data.  Ex. 14.

On November 30, 2005, Amtrak responded that the W-2 data produced to the Plaintiffs was the only data in its possession, citing Internal Revenue Service regulations on data retention and its "understanding" that Plaintiffs sought "electronic payroll data …." Ex. 15.  Again, Amtrak did not disclose that the W-2 data in question had been destroyed, although Plaintiffs inferred (correctly) that it had.  *Id.*  On December 5, 2005, Plaintiffs inquired about the dates upon which the missing data was destroyed.  Ex. 16.  On December 16, 2005, Plaintiffs also requested that Amtrak provide an explanation of the method of destruction and inquired whether it was possible yet to retrieve the data from whatever computer or database(s) within which the data had been maintained.  Ex. 17.  Amtrak responded on December 20, 2005, that "each year, one file [of W-2 data] would roll off," but that "[b]ecause of the manner in which these files were maintained, we cannot identify the exact date that each year's data from 1990-1997 was no longer maintained."  Ex. 18.[3]  Again, Amtrak did not give any information as to when the documents were destroyed.  *Id.*  That same day, Plaintiffs sent Amtrak a fourth letter regarding the destroyed W-2 data and requested that Amtrak disclose the month and/or year of destruction.   Ex. 19.  Plaintiffs also requested Amtrak to "identify the individual(s) and the job title(s) of such individual(s) who were responsible for determining when the data would be destroyed and the dates upon which such individual(s) were informed of the lawsuit and related EEOC charges."  Ex. 19.  Amtrak responded on January 10, 2006, and reported that the data was "erased" seven years after its creation.  Ex. 20.  Therefore, it reported that the 1997 W-2 data was erased in 2004, the 1996 W-2 data was erased in 2003, *etc.  Id.*  Amtrak also stated in this letter that no backup tapes for the W-2 data exist.  *Id.*  Amtrak refused to answer Plaintiffs' questions

---

[3] In a telephone conversation between the parties' counsel, Richard Black refused to admit that the data had been "destroyed" and was critical of Ms. Kisch for using the word "destroyed" when referencing the data.  Instead, Mr. Black euphemistically explained that the W-2 data had been "let go."  Ex. 31, Kisch Decl.

regarding the identity of the decision makers for the destruction and whether they had been informed of the lawsuit and the related EEOC charges.  *Id.*

### D.      Amtrak Destroyed Draft Affirmative Action Plan and Adverse Impact Analysis Documents

Amtrak has admitted that "[a]ffirmative action plans . . . are a big issue in employment class action litigation."  Ex. 21, April 8, 2005 hearing transcript at 6.  Yet, Kevin Marshall, who, in February 2004, was hired by Amtrak, as its Director of Employment Diversity, did not learn of the existence of this litigation until "May or June, 2005."  Ex. 22, Marshall Dep. at 169, 489.[4] This fact is quite remarkable given Amtrak's representations to this Court and to Plaintiffs' counsel in 2004 and 2005, assuring both that all appropriate individuals at Amtrak had been informed of the lawsuit and of their obligations to preserve documents.  Despite the injunction motion briefing occurring at the time,[5] Amtrak did not bother to notify its Director of Employment Diversity[6] of this class action employment discrimination lawsuit for more than a year after he was hired into the job.  As of November 2005, Mr. Marshall also was not aware that reports created by Amtrak indicating the number of individuals promoted, transferred, and hired, by position and race are the type of documents that must be maintained in relation to this lawsuit. *Id.* at 534-41.  Marshall testified that these documents are used and relied upon to create

---

[4] Indeed, Marshall testified that he was notified regarding the lawsuit as a result of the scheduling of his deposition in this case. Ex. 22, Marshall Dep. at 489.

[5] On June 24, 2004, Amtrak filed a brief opposing the Plaintiffs' motion for a preliminary injunction in which it cited its own letter of April 6, 2004, in which it wrote, "[W]e can assure you that Amtrak has instructed managers regarding document retention on numerous different occasions since Plaintiffs initiated this lawsuit in November, 1999." Dkt. 169, at p. 3; see also Ex. 3. Mr. Marshall was in place as the Director of Employment Diversity at the time both the letter and the brief were written.

[6] Marshall's job duties include overseeing the "creation, the implementation and the monitoring of [] [Amtrak's] affirmative action plans." Ex. 22, Marshall Dep. at 170. He is also "responsible for implementing diversity training

Amtrak's Affirmative Action Plans.  *Id.*  Plaintiffs' document requests of June 2001 specifically included a request for documents "which indicate the distribution of all, or any subset of, Amtrak employees by race, and all documents containing information used to compile" the analysis in Affirmative Action Plans.  Ex. 7, Document Request No. 8.

Plaintiffs have now discovered that Amtrak destroyed relevant documents relating to its Affirmative Action Program.  Documents relating to its 2005 Affirmative Action Plans were destroyed sometime after November 2004.  Ex. 22, Marshall Dep. at 481-82.  The destroyed documents included draft Affirmative Action Plans, notations regarding the changes to the draft plans, and draft adverse impact analysis reports.  *Id.* at 477-86.  These destroyed draft documents were provided to Amtrak by Blackwell & Associates ("Blackwell"), a company hired by Amtrak to assist in drafting the plans, and these documents contained unique handwritten notations by Amtrak officials.  *Id.*  Although Amtrak rejected some of the analysis and conclusions by Blackwell regarding Amtrak's underutilization of minorities, and Amtrak made changes to the draft plans, Amtrak's destruction of the draft plans permanently destroyed the evidence of such changes.  *Id.*

Changes made by Amtrak may have been significant, as demonstrated by the draft plans for the 2006 Affirmative Action Plans which were preserved.  *See, e.g.*, Ex. 33.  Quite significantly, notations on the 2006 draft plans evidence changes made to the underlying statistical assumptions to determine whether underutilization exists in various job groups.  In particular, numerous notations demonstrate changes to the weightings assigned to internal versus external availability figures for determining underutilization.  *Id.*  The handwritten notations

---

or any other initiatives that might be appropriate."  *Id.* at 170.

demonstrate changes, as many as four times, to the weighting assumptions.  *Id.*  Marshall also

testified that other changes to the plans included changes to the reasonable recruitment area and

the method of auditing Amtrak's progress in implementing the affirmative action program.  Ex.

22, Marshall Dep. at 493, 524-25.

     **E.**    **Amtrak Has Withheld from Production Numerous Adverse Impact Analysis Reports**

Amtrak has utterly failed to live up to its discovery obligations by withholding the

production of Adverse Impact Analyses Reports which are not only relevant to the claims in this

lawsuit, but also are and which were directly responsive to document production requests served

on Amtrak in 2001.   The Adverse Impact Analyses Reports were responsive to the following

specific document requests served on Amtrak:

     (8)    All workforce analyses, workforce utilization analyses, EEO-1 reports, Affirmative Action Plans, Affirmative Action Quarterly Reports, and/or similar documents which indicate the distribution of all, or any subset of, Amtrak employees by race, and all documents containing information used to compile such analysis, from January 1, 1980 to the present.

     (9)    Documents relating to Amtrak's actual or attempted compliance or noncompliance with any and all federal, state, or local laws relating to equal employment opportunity, non-discrimination, affirmative action, or equal pay, or relating to any charge, complaint, or audit with respect thereto filed against the defendant with any court, administrative agency, or other tribunal concerning same, all settlement, conciliation, and/or mediation agreements and consent decrees made or entered into in conjunction with any such proceedings, and all documents relating to any investigation concerning race discrimination in connection with any and all federal, state, or local laws relating to equal employment opportunity, non-discrimination, affirmative action, or equal pay.

     (10)   Documents comprising, used in, outlining, listing, describing, or discussing employee selection devices utilized by Amtrak, including but not limited to tests, assessment centers, interviews, and evaluations, for job selection decisions of any type, including hiring, promotions, transfers,

and training, and all documents comprising, containing, discussing, or describing whether and/or how such selection devices satisfy, or do not satisfy, the requirements of the United States Equal Employment Opportunity Commission's Uniform Guidelines On Employee Selection Procedures, 29 C.F.R. Part 1607, and/or the requirements of Executive Order 11246 and/or applicable regulations of the Office Of Federal Contract Compliance Programs.

Ex. 7.

Further, in a letter dated August 28, 2001, to Amtrak, Plaintiffs specifically advised Amtrak that production of documents regarding "workforce analysis and utilization, [and] EEO data were a top priority." Ex. 7, 8.

Plaintiffs learned of the existence of the Adverse Impact Analysis Reports during a deposition of Mr. Kevin Marshall, Amtrak's Rule 30(b)(6) witness regarding Affirmative Action Plans, on October 6, 2005. Ex. 22, Marshall Dep. at 1. Mr. Marshall testified that adverse impact analysis reports are conducted to "ensure that there's no discrimination." *Id.* at 231-32. The analysis is used to "measure and evaluate employment activity including hiring, promotions, transfers, [and] terminations . . . ." *Id.* at 232. Marshall also testified that these reports had "always been a part of conducting an affirmative action analysis, thus there should be years worth of such reports," and that the reports were conducted on an annual basis since at least 1995. *Id.* at 232-34. Upon learning that such documents existed, but had not been produced, Plaintiffs sent a letter to Amtrak on December 19, 2005, requesting the production of such documents. Ex. 23. Plaintiffs did not receive a response to their letter until March 7, 2006, when Amtrak produced Adverse Impact Analysis reports for only the years 2004 and 2005. Ex. 24. Amtrak did not, at that time, state whether other Adverse Impact Reports had ever existed and, if so, when they would be produced.

On March 8, 2006, Plaintiffs sent another letter to Amtrak inquiring whether additional Adverse Impact Analyses Reports were created for years prior to 2004. Ex. 25. On April 4, 2006, Amtrak responded that it "is investigating" whether such reports were created prior to 2004 and "[t]o the extent that such documents exist, Amtrak will produce them." Ex. 26. Plaintiffs followed up again on April 14, 2006, requesting that Amtrak advise as to when the production could be expected. Ex. 27. Plaintiffs also requested a listing of all such reports, even those that may no longer exist. *Id.* [7] Additionally, on April 18, 2006, Plaintiffs requested the backup data for the 2004 Adverse Impact Analysis Report and requested that such data be produced in the Excel format in which it was, apparently, provided to Blackwell. Ex. 28. During a telephone conversation with Amtrak's counsel, Ray Donahue, Plaintiffs also requested an estimate of when the adverse impact analyses reports would be produced. Mr. Donahue refused to give such an estimate. Ex. 31, Kisch Decl. Lori Kisch, counsel for Plaintiffs informed Mr. Donahue that Plaintiffs would need to seek assistance from the Court if Amtrak was not willing to provide such an estimate. *Id.* Mr. Donahue stated that Plaintiffs should go ahead and file another "crazy motion" but that such a motion would not speed up Amtrak's efforts in any way. Ex. 30, 31. After the status conference on April 21, 2006, Ms. Kisch inquired of Richard Black, also counsel to Amtrak, when the reports would be produced. Mr. Black also refused to give an estimate. Ex. 31. On April 26, 2006, Plaintiffs received a letter from Amtrak's counsel stating that "Amtrak is taking all steps necessary to locate and produce all responsive requested documents, including adverse impact analyses." Ex. 29. Plaintiffs responded immediately stating that, again, such a

---

[7] Plaintiffs also await a response to the March 8, 2006 letter regarding other issues such as whether certain data regarding promotions, hires, transfers, and terminations exist, as well as whether additional applicant flow data exists that has not been produced. Ex. 25.

response does not give Plaintiffs "any more of an understanding as to when [Plaintiffs] [] will receive the outstanding discovery that is years overdue." Ex. 30. After almost six months of specific requests for the production of the outstanding responsive and highly relevant documents, Plaintiffs, to date, have no idea whether the Adverse Impact Analyses Reports predating 2004 have been preserved or when they will be produced.

### F.      Amtrak Has Withheld the Production of Numerous OFCCP Audits

Amtrak has, to date, withheld the production of numerous OFCCP audits. Such audits were responsive to Plaintiffs' document requests in 2001. Ex. 7. Additionally, Amtrak was on notice, as early as April 2005, that such audits were the subject matter of a Rule 30(b)(6) deposition. Ex. 35. On April 10, 2006, the day before a re-scheduled deposition of Mr. Ted Campbell, Amtrak's designated witness regarding the OFCCP audits, Amtrak notified Plaintiffs that it had not produced any of the OFCCP audits conducted in 2003. Ex. 34. Upon inquiry from Plaintiffs' counsel on that same day as to whether all other audits had been produced, including audits prior to 2003 and from 2004 and 2005, counsel for Amtrak responded that he did not know whether all other audits had been produced. Ex. 31, Kisch Decl. To date, Amtrak has not produced any additional audits and has not informed Plaintiffs regarding the breadth of the production failure or whether any audits have been destroyed. *Id.*[8]

Amtrak had previously been on notice regarding the importance of such documents because Plaintiffs' counsel questioned Amtrak's designated Rule 30(b)(6) witness, Kevin Marshall, on October 6, 2005 regarding OFCCP audits. Ex. 22, Marshall Dep. at 70-78.

---

[8] Counsel for Amtrak did represent that he would promptly look into this issue and provide Plaintiffs with a list of all audits that had been produced, would be produced, and that had ever existed since 1990. Ex. 27, 32. However, to date, no such list has been provided.

Despite the Rule 30(b)(6) notice which specifically listed audits as a topic to be covered during the deposition, counsel for Amtrak objected, stated that Mr. Marshall was not prepared to testify regarding OFCCP audits, and designated another witness, Ted Campbell, to testify regarding the OFCCP audits.  *Id.* at 449-51; Ex. 35.  Yet, Mr. Marshall testified earlier in his deposition that he had spoken with Ted Campbell to prepare for the deposition and that Mr. Campbell's job duties exclusively related to OFCCP audits.  *Id.* at 81-83, 88-89.

Despite Plaintiffs' attempts beginning in November 2005 to schedule Mr. Campbell's deposition, his deposition has not yet occurred.  Ex. 34. A deposition date of January 5, 2006, was scheduled for Mr. Campbell's deposition related to the OFCCP audits, Ex. 33, but the day before the scheduled deposition Amtrak, called to postpone it due to Mr. Campbell's illness.  *Id.* Plaintiffs agreed to the postponement and the deposition was re-scheduled for April 11, 2006. On April 10, 2006, counsel for Amtrak again called Plaintiffs and, this time, notified counsel that Amtrak had not produced many of the audits that had been conducted and, therefore, the deposition was again postponed.  Ex. 27, 32.  Counsel for Amtrak agreed to contact counsel for Plaintiffs by April 13, 2006, regarding the rescheduling of the deposition and also agreed to produce the outstanding audits as soon as possible.  *Id.*  While no deadline was established for the production of the outstanding audits, the parties discussed that such production would occur in the next one to two weeks.  Ex. 27, 29, 32.  To date, no such production has occurred.

## III.   ARGUMENT

### A.   This Court Has the Power to Impose Severe Sanctions Against Amtrak for Its Destruction of Relevant Documents

"The Court's power to sanction misconduct  . . . emanates both from the Federal Rules of

Civil Procedure and from the Court's inherent powers." *Webb v. District of Columbia*, 189

F.R.D. 180, 185 (D.D.C. 1999). Rule 37(b)(2) provides, in part,

> If a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> (A)   An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
>
> (B)   An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
>
> (C)   An order . . . rendering a judgment by default against the disobedient party;
>
> (D)   . . . an order treating as a contempt of court the failure to obey any orders . . . .

"Under Rule 37, the district court has broad discretion to impose sanctions for discovery

violations." *Bonds v. District of Columbia*, 93 F.3d 801, 807 (D.C. Cir. 1996). "The possible

sanctions set out in Rule 37(b)(2) are not mutually exclusive; the court may impose several of the

specified sanctions." *Law Office of Azita Mojarad v. Aguirre*, No. 05-0038, 2006 WL 786415

(D.D.C. Mar. 27, 2006); *Young v. Office of the U.S. Senate*, 217 F.R.D. 61, 65 (D.D.C. 2003)

(same). "Rule 37 is designed to protect basic institutional values: 'Rule 37 sanctions are

imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the

discovery process.'" *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 129 (S.D. Fla.

1987) (quotation omitted).

Pursuant to Rule 37(b), Plaintiffs seek adverse findings, evidentiary rulings, and

−21−

monetary sanctions.

### B.    Adverse Findings and Evidentiary Rulings Are Warranted

Amtrak admitted that if Plaintiffs had "evidence that there has been a document that is relevant to Plaintiffs' claim that has been destroyed, . . . the Plaintiffs have an ability to seek an adverse inference from the court regarding that document as to its evidentiary nature." Ex. 5, July 7, 2004 transcript at 14, 19-20.  Having admitted that an adverse inference is an appropriate remedy where documents have been destroyed, *id.* at 19-20, Amtrak's multiple breaches of its document preservation responsibilities are compelling reasons for strong punitive sanctions, including adverse inferences, at this time.

The destruction of the W-2 data warrants adverse rulings regarding those factual issues compromised by the destruction of the W-2 data.  As explained by Plaintiffs during the Motion to Compel hearing, Plaintiffs sought the data, in part, to establish that African-Americans have been channeled into the least desirable, lowest paying jobs at Amtrak.  Ex. 12 at 15, 17.  Such channeling has occurred in hiring, promotion or selection, and transfers.  Plaintiffs allege that African-Americans, when hired, are assigned to the lower paying, more menial, and less desirable positions.  Plaintiffs also allege that Amtrak systemically promotes and transfers African-Americans into the lower paying, more menial, and less desirable openings.  Therefore, the following adverse findings are warranted:  that Amtrak did, from 1990 through 1997, in connection with hiring, job assignments, and transfers; channel African-Americans into lower-paying, more menial, and lower-prestige unionized jobs; and that Amtrak did, from 1990, through 2004, engage in a pattern and practice of underutilizing African-Americans in higher-level, higher-paying, less menial, higher-prestige unionized jobs.  In addition, Plaintiffs seek to

prevent Amtrak from opposing, or introducing evidence regarding, the practice of channeling African-Americans into lower-level, lower-paying, more menial, and lower-prestige jobs and the underutilization of African-Americans in higher-level, higher-paying, less menial, higher-prestige unionized jobs.  Plaintiffs also request that adverse inferences be drawn, and that the jury be instructed that adverse inferences must be drawn, regarding these same issues of channeling and underutilization.

Additionally, Plaintiffs would present to the Court, in their Motion for Class Certification, the issue of channeling to demonstrate commonality and typicality for purposes of Rule 23 certification.  Therefore, Plaintiffs seek adverse rulings against Amtrak that the Plaintiffs have established commonality and typicality for purposes of Rule 23(a), Fed. R. Civ. P., with regard to all claims of race discrimination in hiring, job assignment, promotion or selection (to non-seniority-based bid jobs), and transfer involving the practice of channeling.  For purposes of Rule 23(b)(2), Plaintiffs, to meet their burden to establish that Amtrak has acted or refused to act on grounds generally applicable to the class, would present evidence of channeling and underutilization.  Accordingly, Plaintiffs seek a ruling that Plaintiffs have met their burden of establishing that Defendant has acted or refused to act on grounds generally applicable to the class.  Plaintiffs also would present, in their Motion for Class Certification, facts regarding channeling and underutilization to demonstrate that common questions of law or fact predominate over issues affecting individual class members, and that a class action is a method superior to other methods for the fair and efficient adjudication of the case.  Because Amtrak's destruction of documents and data will hinder Plaintiffs in making such a showing, Plaintiffs seek a ruling that they meet their burden of establishing common questions of law or fact and that

a class action is a superior method of adjudicating the controversy.

Further, as admitted by Amtrak, the W-2 data was relevant to the issue of damages. Dkt. No. 215, Ex. 10, 12. Therefore, Plaintiffs request this Court to rule that Amtrak is prohibited from raising any defense, or introducing any evidence, pertaining to Plaintiffs' damages calculations for the years 1990 through 1997. In addition, Plaintiffs seek a ruling that this Court will draw, and that the jury at trial will be instructed to draw, adverse inferences against Amtrak regarding the calculation of damages because such calculations have been hindered by Amtrak's willful destruction of material evidence.

Additionally, as explained by Plaintiffs in their Motion to Compel the production of the W-2 data, Plaintiffs' experts would have used the discarded W-2 data as a basis for much of its statistical analysis. Dkt. Nos. 209, 218, Ex. 12. The W-2 data was the most reliable data available regarding the composition of the workforce and the workers' pay, and the loss of such data leaves Plaintiffs' experts with flawed data upon which to base their statistical analysis. *Id.* No other annualized pay data exists regarding Amtrak's workforce. *Id.* Additionally, no other data exists that is completely reliable regarding the composition of the total workforce and workers' pay. *Id.* Therefore, Plaintiffs' experts will have to rely upon certain assumptions when crafting their statistical analysis. Plaintiffs request that this Court prohibit Amtrak from opposing any and all assumptions that must be made by Plaintiffs' experts in their statistical analyses as a result of Amtrak's destruction of W-2 data.

Further, the loss of the W-2 data will require Plaintiffs' experts to rely upon other data that will be much more costly to use. For example, because the W-2 data contained the only annualized pay data maintained by Amtrak for its unionized employees, Plaintiffs or their experts will have to create annualized data from daily time sheets for each of the thousands of employees over a fifteen-

year period.  *Id.*  Such a task will be time consuming and costly.  Therefore, Plaintiffs request that, upon submission to Amtrak of such costs, Amtrak shall, within 14 days, and without objection, pay such costs incurred by Plaintiffs.  Further, Plaintiffs seek an order from this Court prohibiting Amtrak from presenting any evidence or raising any objections to the calculations made by Plaintiffs' experts regarding the annualized pay for the unionized employees.

Further, with regard to the destroyed draft Adverse Impact Analysis reports and the draft Affirmative Action Plans, Plaintiffs request that this Court issue an adverse ruling against Amtrak that it did, in fact, willfully make significant changes to the draft plans and that such changes were made in order to affect the conclusions of the plans, namely to eliminate or dilute the initial findings of underutilization for African-Americans in unionized positions.  Plaintiffs thus request that Amtrak be prohibited from introducing any evidence to oppose the finding that Amtrak willfully made changes to the draft plans to affect in its favor the ultimate conclusions of the plans.

Finally, Amtrak's long delay in producing a knowledgeable Rule 30(b)(6) witness warrants sanction.  In *Webb*, the defendant failed to produce a proper Rule 30(b)(6) witness "to testify to many of the items included on plaintiff's notice of deposition."  *Webb*, 189 F.R.D. at 183.  Where a defendant employer fails to proffer a Rule 30(b)(6) witness capable of testifying to "matters known or reasonably available to the organization," such conduct is "sanctionable under Rule 37(d) even absent a court order."  *Webb*, 189 F.R.D. at 18.  However, as in *Webb*, this Court had entered an order, in April 2005, directing Amtrak to produce a Rule 30(b)(6) witness regarding the issues outlined in Plaintiffs' deposition notice.

### C.    Amtrak's Discovery Abuses Have Been Willful

"A sanction under Federal Rule of Civil Procedure 37, does not require a finding of bad

faith." *Millsap v. McDonnell Douglas Corp.*, 162 F. Supp. 2d 1262, 1308 (N.D. Okla. 2001).  In

*Jordan F. Miller Corp. American Eagle Ins. Co. v. Mid-Continent Aircraft Serv.*, 1998 WL

68879 (10th Cir. Feb. 20, 1998), the Tenth Circuit affirmed the sanction of dismissal of the claim

for the failure to preserve evidence even though the loss of evidence was neither intentional nor

in bad faith.

Although Plaintiffs do not need to demonstrate willfulness or bad faith in order to obtain the

sanctions requested, the evidence reflects that the destruction <u>was</u> willful.  Amtrak itself, through its

counsel, Melissa Rogers, and through its outside counsel, made it abundantly clear through sworn

affidavits and pleadings filed with this Court, that Amtrak has been fully aware of its document

retention responsibilities since the inception of this lawsuit in 1999.  Plaintiffs have, for several

years, been concerned about document destruction at Amtrak and whether Amtrak had informed all

the individuals necessary to ensure that evidence is not destroyed, and this Court has addressed this

issue on several occasions, including the preliminary injunction proceedings, and has even required

Amtrak to make *in camera* submissions to ensure that evidence has not been, and will not be,

destroyed.  In response, Amtrak, in open court and through pleadings and sworn affidavits filed with

this Court, represented that all individuals necessary to ensure the preservation of evidence relevant

to this case had been notified regarding their obligations.  These admissions clearly support a finding

that the erasure of the electronic W-2 data, and the destruction of the draft Affirmative Action Plans

and the adverse impact analyses were willful and in "callous disregard" for the rules of discovery.

*National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976) (default judgment

is appropriate where there is flagrant bad faith and callous disregard for the rules of discovery).  In

light of all these proceedings and representations, Amtrak's willful destruction of data and

documents warrants severe sanctions.

### D. Further Sanctions Are Warranted To Penalize Amtrak for Its Destruction of Evidence in This Case

In *Gibson v. National Railroad Passenger Corporation*, 176 F.R.D. 190 (E.D. Pa. 1997), the

court held as follows:

> The history of the discovery process in this case evidences the defendant's '*flagrant disregard*' of the scheduling orders of this Court and of the discovery process as outlined in the Federal Rules of Civil Procedure. Defendant's disregard for the Court's orders has caused the expenditure of great judicial resources. In fact, this is the sixth motion filed by plaintiffs in an effort to obtain discovery they are entitled to under Rule 26. . . . The facts demonstrate that *defendant has a practice of not complying with discovery obligations until plaintiffs seek court intervention*.

*Gibson*, 176 F.R.D. at 193 (emphasis added). *Gibson* is significant because it involved the same

defendant exhibiting the very same conduct as in this case. *Campbell* is, on the issue of discovery

abuse, *Gibson* redux.

Amtrak's repeated failure to comply with discovery obligations in this case is clearly

sanctionable conduct. The willful destruction of evidence alone warrants a sanction severe enough

to deter future misconduct. This is particularly so in light of Amtrak counsel's taunt that Plaintiffs'

filing of another "crazy motion" would have no effect on Amtrak's production of discoverable

materials. Ex. 31, Kisch Decl. However, Amtrak also has a longstanding track record of evidence

destruction and abusive discovery tactics.

Apart from Amtrak's serial discovery abuses found in *Gibson*, still other courts have held that

Amtrak has destroyed evidence and, therefore, have imposed adverse rulings against Amtrak. *See,

e.g.*, *Pace v. Nat'l R.R. Passenger Corp.*, 291 F. Supp. 2d 93 (D. Conn. 2003); *Stanton v. Nat'l R.R.

Passenger Corp.*, 849 F. Supp. 1524, 1528 (M.D. Ala. 1994). In *Pace*, the court gave a spoliation

instruction to the jury after Amtrak failed to produce "several maintenance and inspection reports" in

a case where an employee sustained injuries through the course of his employment.  *Id.* at 97.   In

*Pace*, Amtrak argued that the documents were destroyed "in accordance with the railroad's ordinary

record destruction policy."  *Id.* But the court found that Amtrak had knowledge of the claim at the

time it destroyed the documents; therefore the spoliation instruction was necessary.  *Id.*  In *Stanton*,

the court drew an adverse inference against Amtrak regarding the motivation behind Amtrak's

destruction of a computer tape that would have revealed the speed of a train at the time of a collision

which was an issue in the case.

In *Bonds v. District of Columbia*, 93 F.3d 801 (D.C. Cir. 1996), the D.C. Circuit set forth

guidelines for determining whether a severe sanction is justified:

> [T]he district court may consider the resulting prejudice to the judicial
> system, and the need to deter similar misconduct in the future. . . . The
> district court's interest in deterrence is a legitimate one, 'not merely to
> penalize those whose conduct may be deemed to warrant such a sanction,
> but to deter those who might be tempted to such conduct in the absence of
> such a deterrent.'

*Id.* at 808.   Accordingly, this Court has held that

> . . . the most severe in the spectrum of sanctions provided by statute or rule must
> be available to the district court in appropriate cases, not merely to penalize those
> whose conduct may be deemed to warrant such a sanction, but to deter those who
> might be tempted to such conduct in the absence of such a deterrent.

*Webb v. District of Columbia*, 189 F.R.D. 180, 185 (D.D.C. 1999).

Even when a sanction is not expressly authorized in the Federal Rules of Civil Procedure,

federal courts also have inherent power to sanction conduct that threatens the integrity of the judicial

system.

When the Federal Rules of Civil Procedure do not provide courts with

> sufficient authority to protect the integrity of the judicial system and prevent abuses of the judicial process, courts have the inherent power to impose sanctions for abusive litigation practices undertaken in bad faith. . . . These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

*Atkins v. Fischer*, 232 F.R.D. 116, 127-28 (D.D.C. 2005); *Millsap v. McDonnell Douglas Corp.*, 162 F. Supp. 2d 1262, 1308 (N.D. Okla. 2001). "[T]he sanctions for misconduct need not be solely remedial. The Court of Appeals has recognized and approved the punitive aspect of sanctions for party and attorney misconduct." *Webb*, 189 F.R.D. at 188. Finally, a district court need not impose the least onerous sanction. *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999).

Amtrak's destruction of evidence and its continued efforts to obstruct the discovery process in this case warrant a sanction that will serve to compensate Plaintiffs for the attorneys' fees, costs, and expenses associated with combating Amtrak's abusive discovery practices. This sanction will also serve to punish Amtrak for its conduct, to deter Amtrak in the future from committing similar discovery violations, and to protect the integrity of this Court and the judicial process. Accordingly Plaintiffs seek a monetary sanction of $300,000, or such other sum as this Court deems appropriate.[9] Such a sanction is also reasonable because merits discovery has not yet even begun. Therefore, a strong enough sanction must be imposed to deter Amtrak from further destruction of evidence and to ensure that, when merits discovery begins, and for trial, the documents and data will have been preserved.

### E.   Plaintiffs Have Requested Less Severe Sanctions Than Are Warranted

Plaintiffs have not sought the most severe sanctions against Amtrak, such as default

---

[9] Plaintiffs have previously filed a motion for fees and costs related to Amtrak's attempt to obstruct the production of

judgment. Instead, Plaintiffs have tailored and limited their requests for adverse rulings that are tied to the specific actions of destruction. However, as evidenced by several other cases, default judgment has been granted where conduct similar to Amtrak's has been found. *See, e.g., Nat'l Hockey League*, 427 U.S. at 643.

In *Webb*, two-and-one-half months after the plaintiff's first document request, defense counsel first alerted plaintiff's counsel that relevant documents relating to the case may have been destroyed. *Webb*, 189 F.R.D. at 182. The defense counsel's delay in informing plaintiffs of the document destruction in *Webb* pales in comparison to the delay of several years by Amtrak to notify Plaintiffs of the document destruction in this case. In *Webb*, the court chastised defendant for its silence regarding the document destruction and specifically stated that "although defendant was . . . aware of the destruction of numerous documents relating to plaintiff and his claims, no mention of such destruction was made in the . . . responses to plaintiff's discovery requests." *Id.* at 183.

As the *Webb* court explained,

> plaintiff's discrimination claims could have been practically won with the . . . [destroyed documents]. Of course, neither plaintiff nor the Court will ever know if such a "smoking gun" document existed, but that is not the fault of the plaintiff and he should not be forced to bear the burden of the District's illegal destruction of documents and inexcusable delay in bringing the destruction to light in this litigation until too late. . . . . [P]laintiff should not be forced to reconstruct through circumstantial evidence what he was entitled to receive from the defendant in discovery.

*Id.* at 188.

Neither should Plaintiffs in the instant action be forced to reconstruct through other means, evidence which it was entitled to receive and which Amtrak was on notice that it must preserve.

---

EEO complaint and investigation files. Such fees and costs amounted to over $48,000. Plaintiffs respectfully request a ruling from the Court on that matter as well as the instant motion.

Moreover, even worse than *Webb*, Amtrak here knew of the destruction of critical data and documents at the very time it was representing, not only to the Plaintiffs but also to this Court, that it was taking all necessary steps to assure that such destruction was not occurring.

Further, the Court in *Webb* cautioned against "issue-related sanctions" as the only remedy for the following reason:

> Issue-related sanctions can sometimes be ineffective insofar as they present the perpetrator of misconduct with a skewed risk-benefit choice, as follows. Assume for the sake of argument that a defendant has in fact examined a plaintiff's personnel file and found a document containing racially or gender-based discriminatory remarks. In this scenario, the heavy presumption in favor of issue-related sanctions would provide the unscrupulous defendant with a substantial incentive to discard the inculpatory document, because one of two results would be likely to flow from such action. In the best case scenario (from the defendant's perspective), the destruction of the document might never come to light in litigation or perhaps would be considered insufficiently important to warrant sanction. In this best case scenario, the defendant gets away with something. Even in the worst case scenario (again from the defendant's perspective), however, the destruction of the document will result only in an evidentiary inference that the remark existed. Because the remark did in fact exist, the defendant has lost nothing. The clear incentive is to destroy the evidence.

*Id.* at 191.

Other courts have also entered default judgments where a defendant company knowingly destroyed documents even where the court found that "it is now impossible to determine whether the discarded documents might have fallen within the ambit of [the] . . . Request For Production" of documents. *Telectron, Inc. v. Overhead Door Corporation*, 116 F.R.D. 107, 124 (S.D. Fla. 1987). A default judgment is proper where the defendant company's "willful attempt to remove from circulation forever corporate records . . . *might* have substantiated . . . [plaintiff's] claims against the . . . [defendant]." *Id.* at 126. In such cases, the defendant's conduct effectively robs the plaintiffs of their day in court. Thus, in cases where "willful destruction of discoverable materials" has occurred,

"default judgment has been deemed the only appropriate sanction under Rule 37." *Id.* at 130.

> The policy of resolving lawsuits on their merits must yield when a party has intentionally prevented the fair adjudication of the case. By deliberately destroying documents, the defendant has eliminated the plaintiffs' right to have their cases decided on the merits. Accordingly, the entry of a default is the only means of effectively sanctioning the defendant and remedying the wrong.

*Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 486 (S.D. Fla. 1983).

### F. Amtrak's Destruction of Documents and Inordinate Delay in Producing Relevant Documents Has Prejudiced the Plaintiffs and Warrants Severe Sanctions

The document destruction of the W-2 data and the draft Affirmative Action Plans has

prejudiced, and will continue to prejudice, the Plaintiffs in this case.

> In . . . carrying out the destruction of documents, the Defendant has attempted to place forever beyond the Plaintiff's reach a substantial portion of otherwise discoverable, relevant evidence. The irretrievable loss of these materials has decidedly prejudiced . . . [plaintiffs'] ability to adjudicate its claims fully and fairly. This prejudice derives both from the irretrievable loss of materials relevant to . . . [plaintiffs'] claims and from the delay, inconvenience and expense suffered by . . . [plaintiffs] in investigating the sources and impact of the . . . document destruction scheme.

*Telectron*, 116 F.R.D. at 132.

"[T]he bad-faith destruction of a relevant document, by itself, 'gives rise to a strong inference

that production of the document would have been unfavorable to the party responsible for its

destruction.'" *Telectron*, 116 F.R.D. at 133 (citing *Coates v. Johnson & Johnson*, 756 F.2d 524, 551

(7th Cir. 1985)).

Amtrak has stated, in a sworn written statement to this Court, that its managers understood

since the inception of this lawsuit their obligations regarding document preservation. Ex. 4. Taking

Amtrak at its word, no other finding can be made than that the destruction of the relevant documents

was intentional.  Indeed, the timing and pattern of the abuses, particularly in light of Amtrak's prior track record (*i.e.*, *Gibson, Pace,* and *Stanton*, *supra*), permit no other logical inference.  The prejudice to the Plaintiffs is manifest.  By any measure, this is a large employment discrimination action.  Yet, despite the injunction proceedings and all of the briefings and *in camera* submissions detailing the manner in which Amtrak managers were informed of their evidence preservation obligations because of the lawsuit, still, somehow, Amtrak's Director of Employment Diversity *did not even know about this case*.

Further, Amtrak has admitted the W-2 electronic data was relevant to the issue of damages. Dkt. 215, Ex. 10, 12.  That being the case, Amtrak's excuse that it did not <u>think</u> Plaintiffs had requested the W-2 data is simply unavailing because Amtrak should have understood — clearly did understand — that the damages evidence was not yet in play because merits discovery and trial were yet to come.  Further, this Court has already found that the W-2 data was relevant to the issue of channeling. Ex. 12 at 20.  No other annualized pay data exists, and the W-2 data is not replicated anywhere else. Dkt. Nos. 209, 218, Ex. 12.  Therefore, with regard to damages and to the issue of channeling, Plaintiffs are already severely prejudiced by the destruction of this evidence.

The loss of the W-2 electronic data and the destruction of the AAP documents prejudice the Plaintiffs because they preclude a presentation of such evidence in support of Plaintiffs' channeling claim for the years 1990-1997.  Additionally, they prejudice the Plaintiffs because Plaintiffs' experts cannot rely on such evidence in other statistical analyses.  The loss of adverse impact analysis data and AAP documents prejudices the Plaintiffs because this evidence regarding Amtrak's efforts to minimize or eliminate the admissions of underutilization of African-Americans in certain positions is forever lost.  The evidence that Amtrak knew that it had underutilized African-Americans in certain

positions, and did nothing to address the issue, is forever lost. Thus, the destruction of evidence in this case poses the very disturbing problem of calculated risk-benefit that so greatly concerned this Court in *Webb*.

Plaintiffs have been further prejudiced by the continued refusal and delay in producing other relevant documents. Amtrak's discovery tactics, requiring Plaintiffs to file motion after "crazy motion" to obtain the discovery to which they are clearly entitled, cost the Plaintiffs and their counsel substantial time and money.[10] This same time and money spent to obtain through extraordinary proceedings the discovery to which they were routinely entitled, could have been directed to litigating the underlying case.

Default judgment has also been found appropriate where a defendant has caused the inordinate delay in producing documents. *Telectron, Inc.*, 116 F.R.D. at 134. "It is not the court's function to drag a party kicking and screaming through discovery. That is what the defendant required in this case and such conduct must be deterred if the courts are to perform their intended function." *Id.* at 134. Yet, that is exactly what Amtrak's conduct has required in this case — and it must be deterred if this Court is to perform effectively its intended function. Plaintiffs have had to seek the assistance from this Court on no fewer than eight separate occasions to obtain discovery. On each occasion, Amtrak refused to produce the requested witness or requested documents or data. On each occasion, the Court rejected Amtrak's unfounded objections and ordered that it comply with its discovery obligations. Where a party causes the opposing party to divert its attention from the litigation to obtain what ought to be routine discovery, such conduct is sanctionable, and the party

---

[10] Fees and costs for litigating just one of these disputes totaled $48,688.10, as explained in Plaintiffs' outstanding Motion For Reasonable Expenses Associated with Their Motion To Compel, filed on September 20, 2004.

who was forced to expend valuable time and effort to obtain the discovery should be compensated for such time.  *Id.* at 134; *see also Lucent Technologies Inc.*, 2005 WL 2860976 at *4 (a corporation and its attorneys "behavior in hiding documents, misrepresenting the existence of documents, and allowing the destruction of documents is sanctionable conduct — both as to" the corporation and its attorneys).

Finally, with regard to the OFCCP audits, five years after their request and more than a year after a Rule 30(b)(6) notice was issued regarding the audits, the documents still have not all been produced.  It was not until the day before a re-scheduled deposition in which Amtrak knew that the witness would be asked about the audits, that it finally admitted it had failed to produce numerous OFCCP audits.  There is no justification for Amtrak's failure to have produced these audits years earlier.

Further, the delay in producing the still outstanding OFCCP reports, adverse impact analyses reports, and the electronic Excel documents regarding hiring, promotion or selection, and transfers, and the delay in producing the recent production of two years of adverse impact analyses reports, has substantially prejudiced the Plaintiffs.  Had such documents been produced in a timely manner, Plaintiffs could have incorporated the evidence and information from those documents into their discovery plan and undoubtedly would have asked questions of certain witnesses regarding issues raised in those documents.  Additionally, Plaintiffs could have targeted their review of the 385 boxes of "job files" based on certain information contained in the outstanding documents.  But Plaintiffs never had this opportunity.  To go back now and redo the document review and depositions would be extremely costly financially, would delay the filing of the class certification motion significantly, and would unduly prejudice the Plaintiffs.

Equally troubling is the possibility that hundreds of additional relevant and responsive documents which Plaintiffs have not uncovered may have been destroyed and/or may not have been produced.   The extent of the potential prejudice from failure to produce such documents cannot be overestimated.

### G.    Amtrak's Material Misstatements to The Plaintiffs and This Court Warrant Stiff Sanctions

"A litigant can also be sanctioned under Rule 37 for making false statements to the Court regarding the state of discovery."  *Millsap*, 162 F. Supp. 2d at 1309.  Where "[d]efendant has made material misstatements of fact in discovery, refused to produce documents, falsely and repeatedly claimed that it had produced all responsive documents, and it sought to avoid the testimony" from important witnesses, sanctions are warranted.  *Id*.  In *Millsap*, the court found that the defendant had refused to produce documents, and "falsely and repeatedly claimed that it had produced all responsive documents."  *Id*.   The court in *Millsap* also ruled that because the defendant had "intentionally and in bad faith withheld and possibly destroyed documents, and then attempted to mislead the Plaintiffs and the Court about its conduct," sanctions in the form of a ruling for plaintiffs on the issue of liability was warranted.  *Id.* at 1308.   The Court in *Webb* also held that default judgment was appropriate where documents had been destroyed and a corporation's counsel's recalcitrance and silence were both ongoing and knowing.  *Webb*, 189 F.R.D. at 185.

Moreover, as in *Webb*, Amtrak here has been "unwilling . . . to provide complete and timely discovery to the plaintiff[s]," thus warranting sanctions.  *Id.* at 189; *see also Whitehall Specialties, Inc. v. Delaportas*, No. 04-C-0436-C, 2005 WL 752234, *1 (W.D. Wis. March 25, 2005) (default judgment entered against defendant and court admonished defendant for failing to disclose and

explain earlier the reason for the loss of documents).

Amtrak's repeated representations to this Court and Plaintiffs that it understood its discovery obligations, and (presumably, regarding the *in camera* submissions) met those obligations further demonstrate why sanctions are necessary and appropriate. At no time did Amtrak, on its own, alert Plaintiffs or the Court that W-2 data, or, for that matter, any of the other documents referenced herein, had been destroyed. Rather, Amtrak continually attempted to hide these facts. Amtrak did not alert Plaintiffs to the fact that it had failed to produce years' worth of Adverse Impact Analyses Reports. Rather, Plaintiffs have repeatedly requested such documents and, to date, five years after the initial request and almost six months after numerous specific inquiries and letters regarding the documents, Amtrak still has not produced the documents and still has not responded meaningfully to Plaintiffs' inquiries regarding the existence and production of such documents. Such contemptible litigation behavior must be put to a stop, and it should be stopped now, lest the civil rights of thousands of Plaintiffs and putative class members be lost along with all of the destroyed, erased, and buried evidence detailed herein, and before the judicial process of this Court itself is further undermined.

## III.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that this Court grant their Motion For Sanctions Against Defendant Amtrak For Destruction of Documents and Failure To Produce Discovery and enter an appropriate Order or Orders.

Respectfully submitted this 2nd day of June, 2006,


_____/s/_____
Timothy B. Fleming (DC Bar No. 351114)
Lori B. Kisch (MD Fed Bar No. 25781)
**WIGGINS, CHILDS, QUINN & PANTAZIS, PLLC**
7 Dupont Circle, N.W., Suite 200
Washington, D.C. 20036
(202) 467-4123


Robert F. Childs, Jr. (AL Bar No. CHI003)
Jon C. Goldfarb (AL Bar No. GOL015)
**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**
The Kress Building
301 19th Street North
Birmingham, AL 35203
(205) 328-0640


Warren K. Kaplan (DC Bar No. 034470)
Susan E. Huhta (DC Bar No. 4534478)
**THE WASHINGTON LAWYERS COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS**
11 Dupont Circle, N.W., Suite 400
Washington, DC  20036
(202) 319-1000


**ATTORNEYS FOR THE PLAINTIFFS**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
KENNETH CAMPBELL, *et al.*,                   )
                                              )
                 Plaintiffs,                  )
                                              )
         v.                                   )    CA NO. 1:99CV02979 (EGS)
                                              )    Judge Sullivan
NATIONAL RAILROAD PASSENGER                   )
CORPORATION,                                  )
                                              )
                 Defendant.                   )
                                              )
_____      )


## **ORDER**

WHEREAS, Plaintiffs have moved the Court for Sanctions Against Defendant Amtrak for Destruction of Documents and Failure to Produce Discovery, and Defendant has opposed such motion, and, based on the memoranda of the parties and the oral argument held on _____, 2006, and all the papers and files and records herein,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Sanctions Against Defendant Amtrak for Destruction of Documents and Failure to Produce Discovery is GRANTED, and the Court imposes sanctions upon Defendant Amtrak as follows:


SO ORDERED this _____ day of _____, 2006.


                                        _____

                                        United States District Court Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of June, 2006, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.


By:    <u>s/ Lori B. Kisch</u>    .
               Attorneys for Plaintiffs